In The
# United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff – Appellee,*

v.

**ERIC NJI,**
**WILSON NUYILA TITA,**
**WILSON CHE FONGUH,**

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

————————

**BRIEF OF APPELLANTS**

————————

**Robert J. Wagner**
**ROBERT J. WAGNER PLC**
**101 Shockoe Slip**
**Suite J**
**Richmond, VA 23219**
**(804) 814-8172**

**Mirriam Z. Seddiq**
**SEDDIQ LAW FIRM**
**Suite 300-33**
**P. O. Box 1127**
**Rockville, MD 20850**
**(301) 513-7832**

**Erin M. Trodden**
**OFFICE OF THE**
 **FEDERAL PUBLIC**
**DEFENDER**
**Western District of Virginia**
**401 East Market Street**
**Suite 106**
**Charlottesville, VA 22902**
**(434) 220-3380**

*Counsel for Appellant*
 *Eric Nji*

*Counsel for Appellant*
*Wilson Che Fonguh*

*Counsel for Appellant*
 *Wilson Tita*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... v

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE .................................................................... 3

    A.    Pretrial Matters ...................................................................... 3

    B.    Government Motion *in Limine* .............................................. 3

    C.    Trial Testimony ....................................................................... 5

    D.    Instructions ............................................................................ 10

    E.    Sentencing Proceedings ....................................................... 13

SUMMARY OF ARGUMENT ................................................................. 17

ARGUMENT ............................................................................................ 22

I.    THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT
    TO SUPPORT APPELLANTS' CONVICTIONS UNDER
    ALL COUNTS; THEREFORE, ALL CONVICTIONS
    SHOULD BE REVERSED ............................................................. 22

    A.    Standard of Review .............................................................. 22

    B.    Argument ............................................................................... 22

1. The government's evidence was insufficient to support Mr. Nji, Fonguh, and Tita's convictions under Count 4, violation of 18 U.S.C. § 922(k)............22

    a. The government's evidence was insufficient to show the Defendants knew that serial numbers had been obliterated.................................23

    b. The evidence was insufficient to show the Defendants were willfully blind to the obliteration of the serial numbers...........................29

    c. The evidence was insufficient to support the Defendants' vicarious liability under *Pinkerton v. United States*........................................33

    d. The evidence was insufficient for the jury to find that the guns at issue met the federal definition of a firearm..............................36

2. The evidence was insufficient to support the Mr. Nji, Fonguh, and Tita's convictions under Count 5, violation of 18 U.S.C. § 554......................................38

3. The government's evidence was insufficient to support Mr. Nji, Fonguh, and Tita's convictions under Count 1, violation of 18 U.S.C. § 371 ................40

II. THE DISTRICT COURT ABUSED ITS DISCRETION IN ITS GATEKEEPING FUNCTION BY EXCLUDING EXPERT TESTIMONY FROM THE APPELLANTS' EXPERT WHEN THE TESTIMONY WENT TO ELEMENTS THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT .........................................43

    A. Standard of Review ................................................43

    B. Argument.................................................................43

1.  The trial court erred in excluding Mr. Tembon's testimony when it held him to the standards of a scientific expert ............................................................. 45

2.  The trial court erred in excluding Mr. Tembon's testimony because it would somehow go to the Appellants' state of mind ............................................. 51

3.  The trial court erred in finding that the expert testimony should be excluded under the Rule 403 balancing test ............................................................. 54

4.  Excluding the expert deprived the Appellants of their constitutional rights by preventing them from fully presenting their defense ............................. 56

5.  The trial court's error in excluding the expert testimony was not harmless ........................................ 57

III.  BARRING THE APPELLANTS FROM EXAMINING MR. BANGARIE ON A QUESTION-BY-QUESTION BASIS VIOLATED THEIR RIGHT TO COMPEL TESTIMONY AND HAVE A FAIR TRIAL UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION ................................... 59

A.  Standard of Review ............................................................. 59

B.  Argument ............................................................................ 59

IV.  THE DISTRICT COURT ERRED BY INSTRUCTING THE JURY UNDER THE PINKERTON STANDARD, BY GRANTING A WILLFUL BLINDNESS INSTRUCTION, AND WITH ITS ERRONEOUS CONSPIRACY INSTRUCTION DEFINING KNOWINGLY ................................ 66

A.  Standard of Review ............................................................. 66

B.  Argument ............................................................................ 67

1. The District Court Erroneously Instructed the Jury Under the *Pinkerton* Standard...........................68

2. The District Court Improperly Instructed the Jury Regarding Willful Blindness........................................75

3. The District Court Improperly Instructed the Jury Regarding the Conspiracy............................................80

4. This Court must look upon all instructions cumulatively................................................................82

V. THE DEFENDANTS' SENTENCES WERE PROCEDURALLY UNREASONABLE BECAUSE THE DISTRICT COURT IMPROPERLY CALCULATED THEIR SENTENCING GUIDELINES .......................................84

A. Standard of Review ..............................................84

B. Argument...............................................................86

VI. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR AS TO EACH OF THE DEFENDANTS BY IMPOSING WRITTEN CONDITIONS OF SUPERVISED RELEASE THAT DIFFERED FROM THOSE PRONOUNCED ORALLY AT SENTENCING ............................95

A. Standard of Review ..............................................95

B. Argument...............................................................95

CONCLUSION ...................................................................100

REQUEST FOR ORAL ARGUMENT...................................101

CERTIFICATE OF COMPLIANCE.....................................102

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez Lagos v. Barr,*
927 F.3d 236 (4th Cir. 2019) ........................................................ 49

*Boyd v. United States,*
271 U.S. 104, 46 S. Ct. 442, 70 L. Ed. 857 (1926) .......................... 74

*Boyde v. California,*
494 U.S. 370 (1990) ................................................................... 82

*Chapman v. California,*
386 U.S. 18 (1967) ........................................................ 58, 66, 83

*Crane v. Kentucky,*
476 U.S. 683 (1986) ................................................................... 56

*Diaz v. United States,*
144 S. Ct. 1727, 219 L.Ed.2d 240 (2024) ............................ 51, 52, 53

*Estelle v. McGuire,*
502 U.S. 62 (1991) ................................................................... 82

*Gaskins v. McKellar,*
916 F.2d 941 (4th Cir. 1990) ................................................. 63, 65

*Global-Tech Appliances, Inc. v. SEB S.A.,*
563 U.S. 754 (2011) .......................................................... 29, 32, 78

*Griffin v. United States,*
502 U.S. 46 (2016) ................................................................... 40

*Hardin v. Ski Venture, Inc.,*
50 F.3d 1291 (4th Cir. 1995) ..................................................... 74

*Hoffman v. United States,*
341 U.S. 479 (1951) ................................................................... 64

*Holmes v. South Carolina,*
 547 U.S. 319 (2006) ....................................................... 56

*Iannelli v. United States,*
 420 U.S. 770 (1975) ....................................................... 41

*Kumho Tire Co. v. Carmichael,*
 526 U.S. 137 (1999) ....................................................... 43

*Molina-Martinez v. United States,*
 578 U.S. 189 (2016) ....................................................... 94

*Neder v. United States,*
 527 U.S. 1 (1999) .......................................................... 57

*Old Chief v. United States,*
 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997) ................. 55

*Pinkerton v. United States,*
 328 U.S. 640 (1946) ............................................... *Passim*

*Rodriguez-Arias v. Whitaker,*
 915 F.3d 968 (4th Cir. 2019) ..................................... 49, 50

*Rosales-Mireles v. United States,*
 585 U.S. 129 (2018) ............................................... 93, 94

*United States v. Abbas,*
 74 F.3d 506 (4th Cir. 1996) .......................................... 79

*United States v. Anglada,*
 524 F.2d 296 (2d Cir. 1976) .......................................... 64

*United States v. Aramony,*
 88 F.3d 1369 (4th Cir. 1996) ........................... 55, 69, 71

*United States v. Ashley,*
 606 F.3d 135 (4th Cir. 2010) ..................................... 69, 70

*United States v. Bright,*
No. 23-4624,—F.4th—, 2025 WL 21384
(4th Cir. Jan. 3, 2025) ................................................. 85, 88, 92, 93

*United States v. Burgos,*
94 F.3d 849 (4th Cir. 1996) .......................................................... 28

*United States v. Castro,*
129 F.3d 226 (1st Cir. 1997) ......................................................... 64

*United States v. Cortez,*
930 F.3d 350 (4th Cir. 2019) ........................................................ 59

*United States v. Crawford,*
734 F.3d 339 (4th Cir. 2013) ........................................................ 84

*United States v. Dinkins,*
691 F.3d 358 (4th Cir. 2012) ............................................ 68, 69, 70

*United States v. Ebersole,*
411 F.3d 517 (4th Cir. 2005) ........................................................ 67

*United States v. Evans,*
90 F.4th 257 (4th Cir. 2024) ....................... 84, 85, 87, 88, 89, 92, 93

*United States v. Feola,*
420 U.S. 671 (1975) ...................................................................... 40

*United States v. Flores-Alvarado,*
779 F.3d 250 (4th Cir. 2015), *as amended*
(Mar. 11, 2015) ...................................................................... 85, 93

*United States v. Gilbert,*
No. 21-4696, 2025 WL 66684 (4th Cir. Jan. 10, 2025) ................. 99

*United States v. Gillespie,*
27 F.4th 934 (4th Cir. 2022) ......................................................... 84

*United States v. Green,*
599 F.3d 360 (4th Cir. 2010) ........................................................ 81

*United States v. Grooms,*
2 F.3d 85 (4th Cir.1993), *cert. denied,*
114 S. Ct. 1550 (1994) ................................................................ 58

*United States v. Haile,*
685 F.3d 1211 (11th Cir. 2012) ............................................. 23, 24

*United States v. Hale,*
857 F.3d 158 (4th Cir. 2017) ............................... 29, 30, 32, 77, 80

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) ........................................ 44, 46, 47

*United States v. Hastings,*
134 F.3d 235 (4th Cir. 1998) ................................................ 66, 67

*United States v. Higgs,*
353 F.3d 281 (4th Cir. 2003) ...................................................... 67

*United States v. Jewell,*
532 F.2d 697 (9th Cir.1976) ....................................................... 32

*United States v. Jinwright,*
683 F.3d 471 (4th Cir. 2012) ............................... 30, 76, 77, 80

*United States v. Johnson,*
617 F.3d 286 (4th Cir. 2010) ...................................................... 43

*United States v. Layton,*
564 F.3d 330 (4th Cir. 2009) ...................................................... 85

*United States v. Lentz,*
524 F.3d 501 (4th Cir. 2008) ...................................................... 55

*United States v. Lighty,*
616 F.3d 321 (4th Cir. 2010) .................................. 43, 75, 77, 78

*United States v. Lynn,*
592 F.3d 572 (4th Cir. 2010) ...................................................... 85

*United States v. MacCloskey,*
 682 F.2d 468 (4th Cir. 1982) ........................................................ 28

*United States v. Manzella,*
 791 F.2d 1263 (7th Cir.1986) ............................................. 69, 70, 71

*United States v. Martinez-Molina,*
 No. 23-4652, 2024 WL 3565310 (4th Cir. July 29, 2024) ........... 100

*United States v. Massenburg,*
 564 F.3d 337 (4th Cir. 2009) ........................................................ 85

*United States v. Mathis,*
 103 F.4th 193 (4th Cir. 2024).............................. 95, 96, 98, 99, 100

*United States v. McCauley,*
 983 F.3d 690 (4th Cir. 2020) ................................................... 73, 74

*United States v. McLellan,*
 959 F.3d 442 (1st Cir. 2020) ........................................................ 83

*United States v. McNeal,*
 818 F.3d 141 (4th Cir. 2016) ................................................... 36, 37

*United States v. Melchor Moreno,*
 536 F.2d 1042 (5th Cir. 1976) ...................................................... 64

*United States v. Mendoza-Medina,*
 346 F.3d 121 (5th Cir. 2003) ........................................................ 78

*United States v. Millender,*
 970 F.3d 523 (4th Cir. 2020) ........................................................ 22

*United States v. Miller,*
 No. 10-4297 (4th Cir. Jun 14, 2011).............................................. 64

*United States v. Miltier,*
 882 F.3d 81 (4th Cir. 2018) ..................................................... 73, 74

*United States v. Moody,*
   2 F.4th 180 (4th Cir. 2021) ........................................................... 81

*United States v. Morehouse,*
   34 F.4th 381 (4th Cir. 2022) ................................................... 84, 85

*United States v. Nguyen,*
   493 F.3d 613 (5th Cir. 2007) ........................................................ 77

*United States v. Oti,*
   872 F.3d 678 (5th Cir. 2017) ........................................................ 78

*United States v. Perry,*
   335 F.3d 316 (4th Cir. 2003) ........................................................ 22

*United States v. Ravenell,*
   66 F.4th 472 (4th Cir. 2023), *cert. denied,*
   144 S. Ct. 1344, 218 L. Ed. 2d 422 (2024) .............................. 78, 79

*United States v. Reyes,*
   No. 23-4598, 2024 WL 4381162 (4th Cir. Oct. 3, 2024) ............... 99

*United States v. Rogers,*
   961 F.3d 291 (4th Cir. 2020) ............................. 21, 95, 96, 99, 100

*United States v. Sanchez,*
   917 F.2d 607 (1st Cir. 1990) ........................................................ 70

*United States v. Sayles,*
   296 F.3d 219 (4th Cir. 2002) ........................................................ 63

*United States v. Serrano-Delgado,*
   29 F.4th 16 (1st Cir. 2022) ..................................................... 68, 70

*United States v. Singh,*
   518 F.3d 236 (4th Cir. 2008) ........................................................ 71

*United States v. Singletary,*
   984 F.3d 341 (4th Cir. 2021) ............................. 21, 95, 96, 99, 100

*United States v. Sperling,*
    506 F.2d 1323 (2d Cir. 1974) ........................................................ 70

*United States v. Stokes,*
    261 F.3d 496 (4th Cir. 2001) ........................................................ 66

*United States v. Sullivan,*
    455 F.3d 248 (4th Cir. 2006) .................................................. 23, 24

*United States v. Thomas,*
    No. 10-4725, No. 10-4729 (4th Cir. Jul 20, 2012) .................... 46, 47

*United States v. Torrez,*
    869 F.3d 291 (4th Cir. 2017) ........................................................ 36

*United States v. Udeozor,*
    515 F.3d 260 (4th Cir. 2008) ........................................................ 55

*United States v. Ulysse,*
    No. 23-4062, 2024 WL 3874677 (4th Cir. Aug 20, 2024) .............. 99

*United States v. Vinson,*
    852 F.3d 333 (4th Cir. 2017) .................................................. 79, 80

*United States v. Watkins,*
    111 F.4th 300 (4th Cir. 2024) ...................................................... 81

*United States v. Whittington,*
    26 F.3d 456 (4th Cir. 1994) .................................................. 79, 80

*United States v. Wilson,*
    484 F.3d 267 (4th Cir. 2007) ........................................................ 43

*United States v. Young,*
    609 F.3d 348 (4th Cir. 2010) ........................................................ 28

*Washington v. Texas,*
    388 U.S. 14 (1967) ...................................................................... 64

**Statutes**

18 U.S.C. § 2 ........................................................................... 23

18 U.S.C. § 371 ............................................................. 3, 23, 40

18 U.S.C. § 554 ................................................................ 38, 39

18 U.S.C. § 554(a) ............................................................ 3, 23

18 U.S.C. § 921(a)(3) ................................................. 36, 37, 38

18 U.S.C. § 922(k) ............................................ 3, 22, 23, 24, 91

18 U.S.C. § 924(c) ..................................................................... 70

18 U.S.C. § 3231 .......................................................................... 1

22 U.S.C. § 2778 ......................................................................... 3

28 U.S.C. § 1291 ......................................................................... 2

50 U.S.C. § 4819 ......................................................................... 3

Arms Export Control Act ....................................................... 73

Export Control Reform Act ............................................... 3, 73

Mann Act ................................................................................. 71

**Constitutional Provisions**

U.S. Const. amend. V ......................................... 20, 59, 60, 63

U.S. Cont. amend. VI ................................................... 56, 63

U.S. Cont. amend. XIV ....................................................... 56

## United States Sentencing Guidelines

U.S.S.G. § 1B1.3 ................................................21, 86, 87, 88, 90, 92, 93

U.S.S.G. § 1B1.3(a)(1).................................................................. 90

U.S.S.G. § 1B1.3(a)(1)(B)......................................................... 88, 92

U.S.S.G. § 1B1.3 cmt. (3)(B)..................................................... 91, 92

U.S.S.G. § 1B1.3, note (3)(B) (2021)................................................ 86

U.S.S.G. § 2K2.1...................................................................... 95

U.S.S.G. § 2K2.1(b)(1)(C) .............................13, 14, 16, 21, 86, 89, 93

U.S.S.G. § 2K2.1(b)(5) ...............................13, 14, 16, 21, 86, 90, 91

U.S.S.G. § 2K2.1 cmt. 13 (2021)................................................... 91

U.S.S.G. § 2K2.1 cmt. (13)(B)...................................................... 92

## Rules & Regulations

Fed. R. Crim. P.43(a)(3) ............................................................ 95

Fed. R. Crim. P. 52(b)............................................................... 94

Fed. R. Evid. 401 .................................................................... 44

Fed. R. Evid. 402 .................................................................... 43

Fed. R. Evid. 403 ......................................................... 19, 54, 55, 56

Fed. R. Evid. 702 ................................................................ 19, 43

Fed. R. Evid. 703 .................................................................... 19

Fed. R. Evid. 704 ................................................................ 52, 53

Fed. R. Evid. 704(b)................................................................. 53

Fed. R. Evid. 804 (a)(1)..............................................................60

Fed. R. Evid. 804(a)(1)...............................................................65

Fed. R. Evid. 804 (b)(3)(B)..........................................................60

Fed. R. Evid. 807 ........................................................... 60, 63, 65

Fed. R. Evid. 807(a) ..................................................................66

**Other Authorities**

Council on Foreign Relations,
*U.S. Adults' Knowledge About the World,* December 2019,
available at:
https://www.cfr.org/sites/default/files/report_pdf/NatGeo_CF
R_US%20Knoweldge.pdf
    (last visited January 23, 2025) ......................................................50

# INTRODUCTION

In response to the brutalities of the Cameroonian civil war, the Appellants participated in a group that sent weapons and ammunition to aid their home communities in Cameroon. The government charged them in a five-count indictment related to the group's shipment of these weapons. At trial, they argued that they did not know their compatriots had ground off the serial numbers on the weapons at issue or that their export was unauthorized. They were convicted of three of the five counts after the judge refused their proffered expert testimony, rejected their attempts to question another group member, and instructed the jury on vicarious liability and willful blindness. The Appellants now challenge their convictions and sentences.

# STATEMENT OF JURISDICTION

This appeal arises from the criminal convictions of Appellants Wilson Tita, Eric Nji, and Wilson Fonguh on charges returned in a 5 count Superseding Indictment. Joint Appendix ("JA") 53-79. The cases were tried by a jury in the District of Maryland, Baltimore Division, the Honorable Catherine Blake presiding. The Honorable Richard D. Bennett presided over the sentencing portion of the Appellants' cases. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.

The Orders of Conviction became final on March 22, 2023 (Nji, JA2479), April 5, 2023 (Tita, JA2556), and May 25, 2023 (Fonguh, JA2682). Eric Nji filed his Notice of Appeal on March 31, 2023. JA2554. Wilson Tita filed his on April 18, 2023. JA2562. Wilson Fonguh filed June 2, 2023. JA2692.

This Honorable Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I. Was the government's evidence sufficient to support the defendants' convictions?

II. Did the district court abuse its discretion by excluding the appellants' proffered expert testimony?

III. Did the district court violate the defendants' rights to compel testimony and to a fair trial by barring them from examining Mr. Bangarie on a question-by-question basis?

IV. Did the district court err in instructing the jury under the *Pinkerton* standard, by granting a willful blindness instruction, and by incorrectly defining "knowingly" in the conspiracy instruction?

V. Did the district court impose procedurally unreasonable sentences by improperly calculating the defendants' sentencing guidelines?

VI. Did the district court commit reversible error by failing to orally pronounce all conditions of supervised release?

## STATEMENT OF THE CASE

A.    Pretrial Matters

The first indictment charged the three Appellants with Conspiracy to Unlawfully Export Firearms, in violation of 18 U.S.C. § 371 (Count 1), Unlawful Export of Firearms, in violation of 22 U.S.C. § 2778 (Count 2), a count under the Export Control Reform Act, in violation of 50 U.S.C. § 4819 (Count 3), and Transportation of Firearms with Obliterated Serial Numbers, in violation of 18 U.S.C. § 922(k) (Count 4). JA27. The indictment was returned on August 26, 2021 by a grand jury in the District of Maryland, Baltimore Division. That indictment was superseded in March of 2022 adding a Smuggling of Firearms count, under 18 U.S.C. § 554(a) (Count 5). JA53.

B.    Government Motion *in Limine*

A motion in limine was filed by the government to exclude expert testimony regarding the civil war in Cameroon, a matter that was central to the Appellants' shipment of goods from the United States to Africa by the defendants. JA80. The defendants opposed this motion, JA229, JA233, JA242, and JA244. Before trial, Appellants also filed notice of their intention to admit expert testimony from Efi Tembon to

testify about the civil conflict in Cameroon leading up to and during the events in the case. JA134. The Appellants were clear in their reasoning: to educate the jury on the ongoing conflict that involved violence against certain citizens of Cameroon by their own government to explain that people may conceal actions and activities to avoid detection from the Cameroonian authorities, not American ones. JA134, JA135.

Appellants argued that this testimony was relevant because the superseding indictment contained allegations of statements and acts that were done for secrecy to evade detection from the United States government; hence demonstrating that the Appellants knew their activities were illegal:

- "conceal and facilitate concealment of firearms..." JA56.
- "conceal from the United States that those items were being shipped..." JA57
- Defendants used code words via WhatsApp. JA57.
- "plans to secretly ship..." JA57.
- "defendants and other co-conspirators concealed and caused to be concealed..." JA58.

Over two dozen overt acts were listed in the indictment, and about half dealt explicitly with allegations of secretive and clandestine behavior.

On June 27, 2018, Mr. Tembon testified at a Congressional hearing on "the Crisis in the Republic of Cameroon." That testimony was attached as an exhibit to the notice. JA140. His presentation also included a detailed, thorough historical report of Cameroon, including the root causes of the issues that pit citizens against their government. JA140. The notice lists extensive personal knowledge, lived experience, and expertise gathered through advocacy for Cameroonians. JA140.

After extensive argument at motion, the Court excluded the proposed expert from testifying. JA296-299.

C.    <u>Trial Testimony</u>

At trial, the government introduced evidence that the Appellants came to the attention of the authorities in 2019 after Homeland Security agents became suspicious of a shipping container sent from Baltimore to Nigeria. JA3466. The container was returned to Baltimore, where agents opened it and found, among many other items, rifles and ammunition, extensively wrapped in plastic, aluminum foil, and duct tape. JA387-398, JA3467. They also found several metal compressor tanks, which also contained guns. JA387-

398, JA418-419. Of the 39 guns found, 28 had had their serial numbers removed. JA428, JA3467.

Law enforcement executed a search warrant at a house belonging to Tamufor St. Michael. In the basement they found tools and supplies to manufacture firearms and reload ammunition. JA399. The basement "wasn't very large" but did include multiple rooms. JA405.

The government's evidence regarding the obliteration of serial numbers came primarily from the testimony of one of the group's members, Alambi Walter Muma. Mr. Muma testified that his role in the group was to put firearms together, package them, and file off serial numbers. JA931. Mr. Muma testified that he ground off the serial numbers of approximately 10 of the 28 weapons. JA1003-1004. He testified that he used a mechanical grinder, which made a noticeable noise, and that he did the work in the "lab" near where Mr. Nji and Mr. Fonguh typically worked reconstituting ammunition. JA934-937.

Mr. Muma testified that Mr. St. Michael "ran the lab." JA971. He supervised the work that went on there and assigned tasks to the volunteers who came to work there. JA972. Mr. St. Michael had extensive knowledge of firearms, JA1146, and he built or purchased the

guns that were found in the shipping container and listed himself as the purchaser on any required forms. JA1147-1149. Mr. St. Michael later testified that he also had a milling machine in the lab that he used to make firearms, which made noise when it was operated. JA1203-1207.

Mr. Muma testified that St. Michael assigned him the task of grinding off serial numbers. JA933. According to Mr. Muma, in a prior shipment, one of the weapons the group had sent fell into the hands of the opposition, and they traced the serial number. "So that's when Mike said he assigned me to the filing." JA934. He testified that although Mr. Nji and Mr. Fonguh were in the lab at that time of this conversation, they were engaged in other activities and "not like listening" to Mr. St. Michael's assignment to him. JA933-934.

Mr. Muma testified that he and Mr. Nji and Mr. Fonguh were at the lab together "8 times out of 10" because Mr. Muma would often ride with them to the lab. JA937. Mr. Fonguh and Mr. Nji generally worked reloading and repackaging ammunition. JA937, JA939. Mr. Tita did not carpool with the others, and when he came to the lab, he didn't usually do any "hard work," but gave instructions to others. JA939.

Mr. Muma testified that the project lasted over a year, and that during that time, he spent no more than 5 minutes per firearm obliterating the serial numbers. JA936, JA967, JA1003-1004. He did not testify as to specific dates or times when he obliterated serial numbers.

The government also introduced evidence that Mr. Nji and Mr. Fonguh helped load the tanks and wrapped guns into the shipping container. JA949. There is no testimony that they ever handled the unwrapped firearms. Mr. Tita did not do any actual loading, but made suggestions about how the container should be loaded. JA949. He also bought pizza for the people who were loading the shipping container. JA1292.

The government introduced evidence that members of the group sought to conceal its activities. *See, e.g.*, JA941, JA2094-2097. However, as Mr. St. Michael testified, a large concern of the group's members was avoiding detection by Cameroonian authorities, who would likely retaliate against family members still in the country and who might seek to infiltrate the group in the United States if they were aware of it. JA1157-1158.

Mr. Nji and Mr. Fonguh both testified in their defense. Mr. Fonguh testified that he knew so little about firearms that he was not aware that guns had serial numbers until he was charged in this case. JA1262. He also testified that he never helped package any of the guns. JA1262. Mr. Nji testified that when he worked in the "lab" he did not work where the grinder was located, never operated it, and never saw or heard it being used. JA1365-1366. He did not know where a serial number was located on a firearm. JA1366.

After trial, the Defendants moved for acquittal under Rule 29, arguing, *inter alia*, that the evidence was insufficient to sustain their convictions, and in particular, for the jury to find that the items at issue in Count 4 met the statutory definition of a "firearm," or that the Defendants knew that the serial numbers on any firearms had been obliterated. JA1705-1817. They likewise challenged their convictions under Counts 1 and 5. *Id.*

In the Rule 29 hearing, the district judge focused on the fact that all three Defendants had been in the lab, that it was undisputed that a machine there was "being utilized in connection with firearms," and "[n]o one has been able to proffer any such suggestion as to what else the machines are there for." JA2269.

In its written order, the district court found that the evidence was sufficient to sustain the convictions. JA2343-2344.

D.    Instructions

The government presented the district court with its proposed jury instructions on March 17, 2022. JA90-133. In response, the defendants submitted objections to the proposed jury instructions of the government on April 14, 2022. JA272-276.

At trial, when the district court indicated its intentions to discuss jury instructions, an objection to the willful blindness instruction was proffered immediately. JA1448. The court suggested a telephone conference in court that afternoon of May 3, 2022 to address objections to the proposed instructions. Unfortunately, no record was made of that instruction conference.

The next day, May 4, 2022, began with the district court presenting the charge to the jury. JA1455. Included in the instructions were a conspiracy instruction that particularly focused on how the "knowing" element of the offense "is a matter of inference." A *Pinkerton* instruction was provided to the jury as well as a willful blindness instruction. To all of these instructions the Appellants noted their objections.

The district court, when instructing the jury on Count One, the conspiracy count, told the jury that, "[t]he defendant's knowledge, again, it's a matter of inference. It's a matter you may infer from the facts that have been proved." JA1481. Appellants raised their objections to the "knowledge language" presented to the jury under the conspiracy charge, arguing that it was an incorrect statement of law. JA1508.

The district court instructed the jury as to willful blindness, stating the following:

> In determining whether the defendant acted knowingly you may consider whether a defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with or that a defendant's ignorance was solely and entirely the result of a conscious purpose to avoid learning the truth, that is, that the serial numbers were removed, obliterated, or altered, then this element may be satisfied, but guilty knowledge may not be established by demonstrating that a defendant was negligent, foolish, or mistaken. If you find a defendant was aware of a high probability that the serial numbers were removed, obliterated, or altered and that the defendant acted with deliberate disregard of the facts, you may find that the defendant acted knowingly. However, if you find a defendant actually did not know that the serial numbers were removed, obliterated, or altered he may not be convicted. It's entirely up to you whether you are to find any defendant deliberately closed his eyes and what inferences, if any, should be drawn from the evidence on this issue.

JA1495-1496. Appellants all objected to the willful blindness instruction as it applied to Count 4. JA1507-1508.

An aiding and abetting instruction was also provided to the jury. JA1501. The jury was instructed by the district court about aiding and abetting by pointing out that participating in the crime, associating with the criminal venture, or seeking to make the criminal venture succeed may all result in a guilty verdict based on aiding and abetting the criminal activity. JA1501-1502. Aiding and abetting was described as one of the methods "by which you [the jury] may evaluate the possible guilt of a defendant for the substantive charges in the superseding indictment. JA1502.

The district court also provided the *Pinkerton* instruction to the jury over the objection of Appellants. JA1502-1503. Under this instruction, the court presented the reasonable foreseeability standard and five elements of *Pinkerton* to the jury, which instructed the jury to find guilt if: (1) the substantive crime was committed; (2) a member of the conspiracy committed the crime; (3) that the crime was committed pursuant to the common plan of the conspiracy; (4) that the defendant was a member of the conspiracy at the time the substantive crime was committed, and (5) "that the defendant could have reasonably foreseen that the substantive crime might have been committed by his

co-conspirators." JA1502-1503. This instruction was formally objected to as "too confusing and is likely to mislead the jury." JA1507.

Objections were also raised to the failure of the district court to instruct the jury that they must unanimously find that an overt act was committed, and must agree on that overt act. JA1507.

The district court overruled the *Pinkerton* instruction objection, saying that *Pinkerton* "is fairly Blackletter law and is no more confusing than the rest of the instructions." JA1508-1509. The district court also denied the willful blindness instruction objection because she found that "the layout of the basement, the noise, the people who traveled together, et cetera." JA1509-1510.

### E.    Sentencing Proceedings

Each of the defendants received, *inter alia,* a 6-level enhancement under § 2K2.1(b)(1)(C) of the United States Sentencing Guidelines for an offense involving 28 firearms and a 4-level enhancement under § 2K2.1(b)(5) for trafficking in firearms. JA3470 (Nji); JA3497 (Tita); JA3600 (Fonguh).

*Mr. Nji*

Mr. Nji objected to the 6-level enhancement for an offense involving 28 firearms and the 4-level enhancement for trafficking in firearms, arguing that there was no factual support for the proposition that he was aware that serial numbers on 28 firearms had been obliterated or that his conduct constituted trafficking. JA3478, JA2354-2355. The district court rejected these arguments, noting, "Your client was convicted on not only the smuggling, but he was convicted of being a member of a conspiracy." JA2418. The district court went on, "he's a member of a conspiracy, and was found guilty of being a member of a conspiracy to transport and smuggle weapons. And so—and the evidence was that there were 28 weapons involved. So I don't really see what the basis is for challenging the plus six offense level." JA2420. Similarly, as to the 4-level enhancement under § 2K2.1(b)(5), the district court denied the objection based on Mr. Nji's conspiracy conviction in Count 1. JA2422-2423.

*Mr. Tita*

Mr. Tita disputed the application of subsections (b)(5) (related to firearms trafficking) but did not object to the application of § 2K2.1(b)(1)(C). Counsel for Mr. Tita argued that Mr. Tita's

participation in the conspiracy was limited and that the evidence did not support that he knew that firearms with obliterated serial numbers were being transferred abroad. JA3527-3529. He also argued that the reach of the enhancement was not coextensive with the reach of the statue of conviction. JA3529.

The district court rejected these arguments, noting that Mr. Tita had been convicted of conspiracy and that under "basic Hornbook federal conspiracy law, the acts and admissions of other members of the conspiracy relate to the analysis" of relevant conduct. JA3532. The judge continued, "[Y]ou're very heavy into factual arguments here and I don't really see how you get around the reality of a conviction of conspiracy and a reality of a reality of a direct jury verdict on knowingly violating a statute." JA3534. The district judge ultimately ruled:

> On this, this is really not close. . . . the simple fact of the matter is is that there was a jury verdict as to . . . Count 4 under 922(k), and the gravamen of that offense obviously is the matter of obliterated serial numbers, but the jury clearly rejected any argument that there was no knowledge on his part. And Count 1, in terms of the basic -- under the basic conspiracy law, the jury obviously found what the purpose of the conspiracy was and found who the participants were. And so the jury verdict, it's not for me to change the view of the jury in this matter.

JA3536.

*Mr. Fonguh*

Mr. Fonguh also challenged the 6-level enhancement for an offense involving 28 firearms under § 2K2.1(b)(1)(C) and the 4-level enhancement for trafficking under § 2K2.1(b)(5). He argued that there was no proof that he was aware that all 28 firearms had had their serial numbers removed, JA2629, and that applying the enhancement was inconsistent with Mr. Fonguh's not guilty verdict in Counts 2 and 3. The district court disagreed, noting that he had been found guilty of Count 5, and "that count specifically referred to 28 firearms" which had the serial number obliterated. JA2631.

Similarly, Mr. Fonguh objected to the 4-level enhancement for trafficking under § 2K2.1(b)(5), arguing that while the willful blindness instruction may have permitted a finding of guilt, the defendants nonetheless should not have been given the enhancement where the jury acquitted them of Counts 2 and 3 and thus must have found that they were under the legitimately mistaken notion that they had an export license. JA2633. The district court rejected this argument, noting, "I think the same reasons I indicated in the Nji case, the offense is with respect to Count 4 and 5, as well as the conspiracy charge

clearly involved in the transport of more than two firearms to one another as referenced in terms of the trial testimony here, and portions of it that have been noted by the government in its submission." JA2633.

After their convictions, the Defendants timely appealed. JA2254 (Nji); JA2562 (Tita); JA2692 (Fonguh).

## SUMMARY OF ARGUMENT

ISSUE I:

The evidence was insufficient to support the defendants' convictions. The government's evidence that the defendants knew the serial numbers on the weapons in question had been obliterated, as required for guilt under Count 4, amounted to speculation, as the government introduced no evidence that the defendants were present when the serial numbers were obliterated; that they heard the conversation where another group member was told to remove the serial numbers; or that they ever saw the weapons with the obliterated serial numbers. Even under a willful blindness or vicarious liability theory, the government's evidence was insufficient to carry its burden as to the defendants' *mens rea*. In addition, the government failed to

offer sufficient evidence that the weapons in question met the federal definition of firearms, because it offered neither expert testimony regarding their design and function nor eyewitness testimony regarding their use.

Because the evidence was insufficient to support the defendants' convictions under Count 4, their Convictions under Counts 5 and 1 also fail. Because the evidence was insufficient to show that the defendants knew that serial numbers had been obliterated on any weapons, it was also insufficient to show that they knew the export of those weapons was "contrary to law," as required for guilt under Count 5. Similarly, because evidence of the defendants' *mens rea* was insufficient to support their convictions in Counts 4 ad 5, it was similarly insufficient to support the conviction for conspiracy to commit those offenses in Count 1.

ISSUE II:

The Appellants submitted their expert, Efi Walters Tembon, who would have provided critical testimony that the Cameroonian government has been involved in an armed conflict with Anglophone Cameroonians since at least 2016 and during the times alleged in the indictment. This was critical evidence necessary to negate the

Government's theory that Appellants were hiding their actions to evade the U.S. Government. Throughout the indictment, the Government alleged concealment as support for the charges. Denying the expert testimony allowed the Government to fully present its theory on concealment while materially gutting the Appellants' attempt to prove their innocence. Denying Appellants the right to call this expert who would have "assisted the trier of fact" was an abuse of discretion. The trial court legally erred in applying FRE 702 and 703, in holding the Appellants to a legally erroneous standard for relevance, and by erroneously applying the unfair prejudice test under FRE 403.

The decision to exclude the expert testimony was also a Constitutional error. It deprived the Appellants of their rights by preventing them from fully presenting their defense.

ISSUE III:

Appellants subpoenaed Tse Ernst Bangarie, a member of the Cameroonian community who owned a shipping business that frequently sends containers to Nigeria and Cameroon. Mr. Bangarie had pled guilty before the Appellants' trial and was pending sentencing. Appellants requested that they be allowed to examine Bangarie

question-by-question. The trial court held that because Bangarie was pending sentencing, it would give a blanket Fifth Amendment protection and excuse Bangarie from facing even one question. The testimony was relevant to the issues at trial and the trial court's refusal to allow examination question-by-question violated the Appellants' right to compel testimony and to have a fair trial.

ISSUE IV:

The district court erred by providing a *Pinkerton* instruction and a willful blindness instruction when the facts failed to support these significant statements of law during the jury charge. The court further erred by placing improper emphasis on finding a conspiracy by inference. Added to these cumulative errors was an aiding and abetting instruction which, with the other erroneous instructions, improperly reduced the government's standard of proof with regard to the conviction found by the jury, and deprived the Appellants of a fair trial. As a consequence, the convictions must be reversed.

Appellants appeal on the individual instructions, but also on the collective instructions as a whole. So much of the charge and the instructions provided to the jury minimized the standard of proof that

the government must satisfy. Considering that the jury was provided a *Pinkerton* instruction, a willful blindness instruction, a relaxed "knowing" instruction under the conspiracy charge that emphasized drawing inferences, and an aiding and abetting charge, the confluence of these instructions deprived the Appellants of a fair trial.

ISSUE V:

The defendants' sentences were also procedurally unreasonable. The district court failed to make particularized findings supporting the sentence enhancements under § 2K2.1(b)(1)(C) and (b)(5), and by simply relying on the fact of the defendants' convictions to support the enhancements, it confused the standard for guilt under *Pinkerton v. United States*, 328 U.S. 640 (1946), with the narrower standard for relevant conduct under § 1B1.3.

ISSUE VI:

In addition, the district court erred under this Court's *Rogers-Singletary* jurisprudence by failing to pronounce all the conditions of supervision at sentencing. For these reasons, the defendants' sentences must be vacated and their cases remanded for resentencing.

## **ARGUMENT**

I. THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANTS' CONVICTIONS UNDER ALL COUNTS; THEREFORE, ALL CONVICTIONS SHOULD BE REVERSED

A. Standard of Review

In resolving a sufficiency challenge, this Court considers the evidence in the light "most favorable to the prosecution" and assumes the jury resolved all credibility disputes or judgment calls in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). The evidence is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020).

B. Argument

1. The government's evidence was insufficient to support Mr. Nji, Fonguh, and Tita's convictions under Count 4, violation of 18 U.S.C. § 922(k).

While there is no dispute that Mr. Nji, Mr. Fonguh, and Mr. Tita participated in a group whose goal was to send arms and other supplies to Southern Cameroon, the government failed to offer sufficient evidence that they possessed the requisite *mens rea* for criminal liability during their involvement. In particular, the government failed

to adduce sufficient evidence that they 1) knew that the serial numbers on those firearms had been obliterated, as required for a violation of 18 U.S.C. § 922(k); 2) knew those firearms were being exported in violation of United States law, as required for a violation of 18 U.S.C. § 554(a); or 3) understood the unlawful character of any conspiracy to send arms to Cameroon and willingly participated in it, as required for a violation of 18 U.S.C. § 371. Because the government failed to introduce sufficient evidence of the Defendants' *mens rea*s, their convictions must be vacated. In addition, the government failed to establish another essential element of Count 4: that the items at issue were firearms within the statutory definition. For that reason as well, the government's evidence was insufficient as to Count 4.

> a. *The government's evidence was insufficient to show the Defendants knew that serial numbers had been obliterated.*

To convict a defendant under 18 U.S.C. § 922(k), the government must prove, inter alia, that the defendant knew the serial number had been obliterated. *United States v. Sullivan*, 455 F.3d 248, 261 (4th Cir. 2006); *United States v. Haile*, 685 F.3d 1211, 1220 (11th Cir. 2012) (collecting cases). This knowledge "may be inferred where the defendant

has possessed the gun under conditions under which an ordinary man would have inspected the [gun] and discovered the absence of a serial number." *Sullivan*, 455 F.3d at 261. But courts have found the government's evidence insufficient where there was no evidence that the defendant actually possessed the gun for long enough to become aware that its serial number had been obliterated. *Haile*, 685 F.3d at 1220-21. Proving constructive possession of the firearm, in other words, is not enough as that would "eviscerate the knowledge element of § 922(k) altogether." *Id.*

There is no evidence that any of the Defendants ever saw the firearms with the serial numbers removed. While the Defendants helped load (or in Mr. Tita's case, made suggestions about loading) the weapons and other items into shipping container, at that point all the weapons were either wrapped in multiple layers of plastic wrap and tape or sealed inside the tanks loaded into the shipping container. JA949. There is no testimony that they ever handled the unwrapped firearms.

The government relied on the testimony of Alambi Walter Muma for evidence that the Defendants knew the serial numbers had been

obliterated, but his testimony does not show any knowledge by the Defendants. He testified that he obliterated the serial numbers in the "lab," that Mr. Nji and Mr. Fonguh were often there when he was present, but were working on other activities, and that Mr. Tita was frequently there as well, but did not engage in any manual work. He testified that the grinder made a distinctive noise, and that he wore gloves and goggles when using it. JA934-936. He also testified that Mr. Nji and Mr. Fonguh were present in the lab when Mr. St. Michael assigned him to file off serial numbers, but were "not, not like listening." JA933-934. Based on this evidence, the district court ruled the evidence was sufficient for the jury to find that the Defendants knew of the obliteration of serial numbers. JA2344.

Evidence of the Defendants' proximity to Mr. Muma in the lab is far from sufficient to establish they knew he was, at times, obliterating serial numbers. To begin with, Mr. Muma never testified that the Defendants were present when he did the obliterating. *See* JA935 (Q: "And when you would do this grinding of the serial numbers, I think you indicated that *others* were present often in the lab with you; is that right?" A: "Yeah."). Mr. Muma never clarified who those "others" were,

and the "lab" in Mr. St. Michael's basement was used by many of the group members, not only by the Defendants. *See, e.g.,* JA946 (message from Mr. Nji thanking the group members who have been working and exhorting them to redouble their efforts). Thus, the presence of "others" does not necessarily mean the presence of Mr. Nji, Tita, or Fonguh. The government never established that the Defendants were present during the crucial times when Mr. Muma was removing serial numbers.

Nor can their presence be assumed, because the time Mr. Muma spent grinding off serial numbers represents only a small fraction of the time he spent working in the basement. Over the course of more than a year of work, in which he spent 16 to 32 hours every week working, JA965, he spent less than an hour *total* in the work of removing serial numbers, given that he ground off the serial numbers from approximately ten firearms, each of which took no more than five minutes to complete. JA936, JA967, JA1003-1004. He and Mr. Nji and Mr. Fonguh did not always coincide in their work in the basement. For example, Mr. St. Michael testified that Mr. Nji typically came to the lab at least once a week, JA1223, which suggests fewer visits than Mr. Muma's 16 to 32 hours per week. Further, as Mr. Muma testified,

Mr. Nji and Mr. Fonguh were busy with their own work refurbishing and packaging ammunition. JA937-939. When Mr. Tita was present, he did not engage in any hands-on activity at all, but simply gave instructions. JA939. In addition, there was at least one other noisy machine in the basement: Mr. St. Michael machined some of the guns found in the shipping container using a milling machine, which he testified also made a noise when used. JA1203-1207. Thus, Mr. Muma's testimony does not establish, or even permit a reasonable inference, that Mr. Nji, Mr. Tita, or Mr. Fonguh knew he was obliterating serial numbers.

There is also no evidence that the removal of serial numbers was ever discussed, either on the group chat or in person. Although he often carpooled to the lab with Mr. Nji and Mr. Fonguh, Mr. Muma did not testify that they discussed their respective tasks or that he ever told them that he was removing serial numbers from guns. Mr. Tita did not carpool with the other men, and Mr. Muma did not describe how often he came to the lab. Nor did the government ever introduce any group chats or other written communications mentioning the obliteration of serial numbers, although there were plainly group chats regarding other security measures. *See, e.g.,* JA690 (removing Edith Ngang from

the group), JA705 (discussing the need to load the shipping container quickly); JA739 (discussing placing cell phones in a bin by the door of the lab).

The Fourth Circuit has defined "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). Evidence is not substantial where it offers only mere speculation of guilt. *See, e.g.*, *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). The government's evidence here offers only speculation, permitting the jury to find the Defendants guilty only *if* the Defendants were present during the hour of total time when Mr. Muma was grinding off serial numbers, and *if* they noticed the noise of the grinder or Mr. Muma's protective goggles, given the brevity of their use, and *if* they understood that that noise and protective gear meant that he was removing serial numbers. There is no evidence of any of those conditions being met, and each requires the jury to make a sizeable speculative leap. Together, the distance they place between the

government's evidence and the Defendants' required knowledge is too great to sustain the jury's verdict.

> ### b. *The evidence was insufficient to show the Defendants were willfully blind to the obliteration of the serial numbers.*

A willful blindness theory does not provide the missing link here. As discussed *infra* Section IV, the willful blindness instruction was improper in this case, but even if this Court disagrees, the evidence is insufficient for a reasonable jury to have concluded that the Defendants were willfully blind. Under the test for willful blindness articulated by the Supreme Court in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011), a defendant must (1) subjectively believe there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of the fact. Under this rubric, a willfully blind defendant is one who "takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have known the critical facts." *Id. See also United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017) (noting the risk that a jury may be misled by a willful blindness instruction into convicting a defendant based on mere negligence or recklessness with respect to a key fact). Thus, a willful

blindness instruction was appropriate where the defendant acknowledged at trial that there was a "very big risk" the property he was buying and selling was stolen, he warned an associate to get rid of his product after an arrest, and when the goods he received had stickers indicating they belonged on the shelves of particular stores, he had those stickers removed. *Id.* 168-69. *See also United States v. Jinwright*, 683 F.3d 471, 479 (4th Cir. 2012) (defendants were warned multiple times by auditors and others that they were underreporting their income). In these cases, the Defendants were confronted by tangible evidence, of which they were undisputably aware, of the fact at issue.

Here, in contrast, there is no evidence that the Defendants "deliberately shielded [themselves] from clear evidence of critical facts that are strongly suggested by the circumstances." *Jinwright*, 683 F.3d at 478-79. Even if the Defendants were present during the brief period Mr. Muma spent obliterating serial numbers—and there is no evidence to indicate that they were—awareness that he was wearing goggles while using a machine that made a distinctive noise does not equate to awareness that he was removing the serial numbers from firearms. Mr. St. Michael also used a machine that made a distinctive noise to

work on components of firearms. JA1203-1207. Further, the evidence is undisputed that the Defendants had no knowledge or experience with firearms. JA1262, JA1366. There is thus no evidence suggesting that they should have connected those sights and sounds with the removal of serial numbers.

More problematically, the district court appears to have placed the burden on the Defendants to disprove that they knew Mr. Muma was removing serial numbers. The district judge stated at the post-trial motions hearing, "Are you proffering, for example, that there was evidence that they were polishing the guns, that they were trying to have the barrels be shiny? Are you proffering that they're putting a monogram on the guns? What is the need? Given that you say that a reasonable jury could not find your clients guilty of this the inquiry has to be exactly what do you proffer a reasonable jury would find with respect to this. That's all I'm asking." JA2260. Later, the judge ruled, "No one has been able to proffer any such suggestion as to what else the machines are there for." JA2269. The district court's reasoning shifted the burden of proving knowledge from the government to the defense, requiring the Defendants to disprove any knowledge of Mr. Muma's

activities. This misunderstands the narrow function of a "willful blindness" theory, which applies only "in the face of evidence supporting an inference of deliberate ignorance," but not where the defendant should have known something but for negligence or recklessness. *Hale*, 857 F.3d at 168. In a very real sense, "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts." *Global–Tech Appliances,* 563 U.S. at 766 (citing *United States v. Jewell,* 532 F.2d 697, 700 (9th Cir.1976) (en banc)). Even if the willful blindness instruction is proper here, the government's evidence falls far short of showing what amounts to actual knowledge by Mr. Nji, Mr. Tita, or Mr. Fonguh.

The Defendants' interest in concealment of the shipments from the Cameroonian government does not equate to knowledge or willful blindness that the serial numbers on weapons had been removed. First, although the jury was instructed that willful intent or guilty knowledge may be inferred from "the secretive or irregular manner in which a transaction is carried out," JA1476, such an inference is not supported where the evidence showed that the members of the group in general were concerned about concealing their actions from the Francophone

Cameroonian government. *See, e.g.,* JA1218-1219 ("Concern was that if it get caught over there, whoever is receiving it probably would have been killed."). The evidentiary value of the Defendants' interest in concealment is substantially diminished when it has an alternate explanation. Further, regardless of the Defendants' individual feelings, secrecy was a tenet of the group, JA2095, and thus does not indicate any guilty knowledge by the Defendants individually. Finally, although there is also evidence that members of the group were concerned about the authorities in the United States learning about their activities, nothing ties that concern specifically to the obliteration of serial numbers on the firearms.

c. *The evidence was insufficient to support the Defendants' vicarious liability under* Pinkerton v. United States.

Finally, as noted *infra* Section IV, the district court erred in giving a *Pinkerton* instruction in this case. But even if that instruction was properly given, it does not salvage the government's position, because the government failed to offer sufficient evidence that the serial numbers were removed from the firearms pursuant to a common plan or understanding among the conspirators or that the Defendants could reasonably have foreseen that the serial numbers might be removed by the conspirators.

The district court instructed the jury that to find a defendant guilty under *Pinkerton*, the jury must find: (1) that the crime charged in the substantive count was committed; (2) that it was committed by a member of the conspiracy; (3) that it was committed pursuant to a common plan or understanding among the conspirators; (4) the defendant was a member of the conspiracy at the time the crime was committed; and (5) that the defendant could reasonably have foreseen that the substantive crime might be committed by his coconspirators. *See* JA1503.

First, there was no discussion of the need to remove the serial numbers from firearms on any of the group chats nor any testimony that any members of the group discussed it verbally. In the face of other potential breaches of the group's security, such another member's social media posts or the return of the shipping container to the port of Baltimore, members of the group engaged in extensive group-chat discussion of actions to take. But there is no evidence of any such discussion when, according to Mr. Muma's testimony, one of the rifles sent to Cameroon was traced by the authorities. *See* JA934. Instead, it appears that Mr. St. Michael simply told Mr. Muma to begin

obliterating the serial numbers on guns sent to Cameroon. JA934. As such, the evidence does not support that the obliteration of serial numbers was part of a common scheme or plan.

In addition, not all the firearms sent to Cameroon had their serial numbers removed. JA1125-1126. This lack of discussion and inconsistent application demonstrate that the removal of serial numbers was not part of the common plan or understanding among the group. Rather, the evidence suggests that it was a step Mr. St. Michael took to protect himself, because he had bought all the purchased weapons, and his name was on any relevant paperwork. To the degree that these weapons fell into Francophone Cameroonian hands, they could thus be traced to him.

Under any of the government's theories, the evidence was insufficient for a reasonable jury to find that the defendant had the *mens rea* required for guilt on Count 4. This Court should therefore reverse the district court's decision on this issue and vacate the Defendants' convictions on this count.

*d. The evidence was insufficient for the jury to find that the guns at issue met the federal definition of a firearm.*

The government also failed to introduce sufficient evidence that the items transported were firearms. To qualify as a firearm, an item must be a weapon which "will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Various government witnesses, both law enforcement and cooperators, described the weapons in question as firearms or guns, *see, e.g.,* JA427-428, JA464, JA1076-1077, but the government offered no expert testimony that the weapons met the statutory definition.

This Court has ruled that expert testimony that a weapon meets the statutory definition of a firearm is unnecessary where eyewitness testimony establishes that a "gun" was used. *United States v. McNeal*, 818 F.3d 141, 149 (4th Cir. 2016); *United States v. Torrez*, 869 F.3d 291, 321 (4th Cir. 2017). Here, however, the government offered neither expert testimony regarding the putative firearms' operation nor eyewitness testimony regarding how they were used. Mr. Muma, for example, testified that he handled the weapons in question but never testified that he saw one used. None of the members of the group who

testified stated that they had seen the weapons fired or used in any way. Nor did the government offer any testimony to explain to the jury how the putative firearms operated.

Instead, the government relied on the testimony of the law enforcement officers who found the weapons and identified them by model. These witnesses simply stated the weapons were firearms without providing any further information regarding how or whether the weapons complied with the statutory definition under 18 U.S.C. § 921(a)(3). This post-discovery law enforcement testimony is distinguishable from the testimony of eyewitnesses who saw the weapons used; a witness to a robbery, for example, who sees a weapon used in a threatening manner may reasonably assume that it will operate as a firearm. *See McNeal*, 818 F.3d at 149 ("[L]ay testimony of eyewitnesses that a gun was used in a robbery is a sufficient basis for the jury to find" that the weapon was a firearm).

But the law enforcement witnesses who locate putative firearms after the fact are in a different position. Absent expertise—and none of the law enforcement officers who testified were offered as experts, *see* JA1-26—their statements are necessarily assumptions and are based on

the putative firearm's appearance. The same is true for the jury; while the government provided photos and, in some cases, the physical items themselves to be viewed by the jurors, the jurors were left to make assumptions based on what the putative firearms looked like. These assumptions, however, cannot substitute for testimony that the items in question satisfy the statutory definition and are not, for example, nonfunctional replicas or designed to expel a projectile by some other means than explosion.

Congress has provided a specific definition of "firearm" that encompasses only one of the ways a projectile may be expelled from a gun. 18 U.S.C. § 921(a)(3). The evidence presented to the jury was insufficient for them to conclude that the guns at issue fell within this definition, and for that reason as well, the government's evidence is insufficient as to Count 4.

2. <u>The evidence was insufficient to support the Mr. Nji, Fonguh, and Tita's convictions under Count 5, violation of 18 U.S.C. § 554.</u>

For the same reason the evidence failed as to Count 4, the evidence was insufficient for a reasonable jury to find that the Defendants knew the weapons were being exported in violation of

United States law. The district court instructed the jury that to find the Defendants guilty of Count 5, smuggling in violation of 18 U.S.C. § 554, they must find, *inter alia*, that the export of any item listed in Count 5 was "contrary to law." JA1498. In particular, the district court instructed that "contrary to law" refers to other statutes and regulations and that the government specifically alleged violations of three federal statutes in Counts 2 through 4 of the indictment. JA1498-1499. Thus, to find the Defendants guilty, the jury would have to find that their actions were contrary to those laws, and that they knew that they were violating the law, even if they did not know precisely which law. *See also* JA70-71 (Indictment), referring to the laws and regulations listed in Counts 2, 3, and 4.

Here, the jury found that the government had not proven that any of the Defendants violated Counts 2 or 3. Thus, to be guilty of Count 5, the Defendants' predicate violation of law must be Count 4, transport of firearms with the serial number removed. For the reasons described above, the evidence was insufficient to sustain that conviction. And without a predicate violation of law, Count 5 must similarly be invalidated. To put it another way, because the government's evidence

was insufficient to show that the Defendants knew the serial numbers had been obliterated, it was similarly insufficient to show that the Defendants knew the weapons were intended for export in violation of the law.

In cases where guilt may be based on multiple predicates, the invalidation of one for insufficiency does not require reversal as long at least one of the predicates is supported by sufficient evidence. *Griffin v. United States*, 502 U.S. 46, 57 (2016). But here, the jury has already recognized that the evidence is insufficient to support two of the three possible predicates by finding the Defendants not guilty of Counts 2 and 3. Thus, if this Court agrees that the evidence is insufficient as to Count 4, no predicate violation of law remains, and Count 5 must be dismissed as well.

   3. <u>The government's evidence was insufficient to support Mr. Nji, Fonguh, and Tita's convictions under Count 1, violation of 18 U.S.C. § 371.</u>

"[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the [g]overnment must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975). The government

failed to do so here, for the reasons discussed above, as to Counts 4 and 5; because the government failed to prove the Defendants had *the mens rea* required to violate Counts 4 and 5, the evidence of *mens rea* for conspiracy to violate those statutes was equally lacking.

Generally, a defendant may be guilty of conspiracy even where a jury finds them not guilty of the substantive offense. *See, e.g., Iannelli v. United States*, 420 U.S. 770, 777 (1975) (noting that the law treats conspiracy to commit an offense and the substantive offense itself as separate crimes). Here, however, the jury was instructed under *Pinkerton v. United States* that even if it found the government had not met its burden of proving the defendant guilty of the substantive offenses generally, it could nonetheless find him guilty under the principle that members of a conspiracy are vicariously liable for the acts of their coconspirators.[1] The *Pinkerton* instruction thus imported coconspirator liability into the substantive offenses. Jurors were instructed that they could convict a defendant for a substantive offense if, *inter alia*, they found it was committed by a member of the

---

[1] Appellants also challenge the district court's granting of the *Pinkerton* instruction, as presented in Section IV of this brief.

conspiracy; that it was committed pursuant to a common plan or understanding among the conspirators; the defendant was a member of the conspiracy at the time the crime was committed; and that the defendant could reasonably have foreseen that the substantive crime might be committed by his coconspirators. *See* JA1503. Consequently, the acquittals on Counts 2 and 3 signify that not only did the jury reject that individual liability but also that they rejected any coconspirator liability. Thus, the jury's rejection of *Pinkerton* liability as well as individual liability as to Counts 2 and 3 signifies that it did not rely on violations of Counts 2 and 3 as objects of the conspiracy.

The government's evidence was, therefore, insufficient to prove a violation of Count 1, given that the government offered insufficient evidence of the Defendants' *mens rea* as to Counts 4 and 5 and the jury acquitted the Defendants of Counts 2 and 3 despite the *Pinkerton* instruction. For these reasons, Mr. Nji, Mr. Fonguh, and Mr. Tita's convictions under Count 1 must be vacated as well.

II. THE DISTRICT COURT ABUSED ITS DISCRETION IN ITS GATEKEEPING FUNCTION BY EXCLUDING EXPERT TESTIMONY FROM THE APPELLANTS' EXPERT WHEN THE TESTIMONY WENT TO ELEMENTS THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT

A.   Standard of Review.

This Court reviews for abuse of discretion the district court's decision to admit or exclude expert testimony under Federal Rule of Evidence 702. *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999). A court abuses its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (quotation marks omitted).

For constitutional legal errors, the standard of review is de novo. *United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010).

B.   Argument.

Before a Court can determine if evidence should be admitted, it must determine if evidence is relevant. Relevant evidence is admissible unless a rule, statute, or constitutional bar exists. Fed. R. Evid. 402. The test for relevance seems straightforward: Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and
**(b)** the fact is of consequence in determining the action.

Fed. R. Evid. 401.

Relevant evidence may include testimony by experts who give their opinion, evaluation, or experience about a matter that is "of consequence to determining the action." *Id*. Expert testimony can be admitted based on the expert's experience and expertise without the need for testing of methodology, peer review, and higher education degrees. Routinely, courts admit testimony from prosecution experts who have no scientific training or established, testable scientific methodology. In those cases, the admissibility of testimony is typically based on some "others specialized knowledge." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (affirming admission of expert testifying on gang activities, colors and signs).

The defense expert in this case had the type of specialized knowledge that would have assisted the trier of fact in resolving a crucial question: Why were the Appellants acting in secrecy? The testimony was relevant because it would have proposed to the jury another theory of why the acts were clandestine, which would have contradicted the government's theory.

1. <u>The trial court erred in excluding Mr. Tembon's testimony when it held him to the standards of a scientific expert.</u>

A trial court may not conclude that an expert is unreliable because the proposed expert's testimony or credentials do not conform to that of a science-based expert. Yet the court ruled:

> I think of him as an experiential witness. It's not the kind of experience that can be reliability consistently applied across the board. Obviously its not something that's going to be peer-reviewed or subjected to testing or anything of that nature, it's just, frankly, his opinion and his experience which again, looking at the entire context of the congressional testimony as I did it represents one point of view.

JA297.

The court discounted Mr. Tembon's extensive experience in Cameroon, his work with civil societies and non-profits, and the research he had done and presented to other agencies worldwide. Instead, the court dismissed Mr. Tembon simply as someone who had lived in Cameroon and knew there was fighting. This, the court reasoned, was not something that required an expert.

The Government used concealment as a proxy for *mens rea*, which they needed to prove beyond a reasonable doubt. They relied primarily on WhatsApp chat messages where Appellants and others discussed the

need for secrecy and their extreme concern when their group activities were recorded and publicized. These messages do not explain who or what they were afraid of.

Despite the Court's insistence otherwise, the expert was not being called for his specific point of view or the 'rightness' of a side in the conflict (even though expert witnesses can have a point of view subject to cross-examination). Appellants needed his testimony to provide relevant information on the ongoing conflict and to combat the government's assertions that the secrecy was to avoid detection by the United States authorities. In denying the expert but allowing the introduction of all the evidence of the secrecy, the Court allowed the government "free run to lay out their side." JA295.

This Court, in an unpublished opinion, citing to *Hankey*, affirmed the use of "other specialized knowledge" expert testimony. *United States v. Thomas,* No. 10-4725, No. 10-4729 (4th Cir. Jul 20, 2012).

In *Thomas*, the Government wanted to admit expert testimony from an individual who had developed extensive knowledge on gangs based on working with them. The defense argued that the witness training and experience were insufficient. *Id.* at 2. An extensive voir

dire was done. The proposed expert presented no formal education in politics, soci-economics, or the history of gangs. However, the expert did testify about many hours of exposure to working with gangs and observing gang activity. *Id*. This Court said for this type of knowledge-based expertise, many of the science-based factors just don't apply:

> The Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony [from a gang expert], whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.

*Id*. citing *Hankey* at 1168. ("In [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience.").

In this case, the court suggested the facts underlying the war in Cameroon were in dispute, but they were not. A reading of the Congressional testimony shows that the history and the violence are not disputed by any party on any side. At no point was any person going to testify that they were sending weapons to the 'correct' side or to garner sympathy, but to explain why these acts were conducted secretly and why there was so much concern when they were discovered. The Appellants asked for the indictment to be sealed to protect their families, and the court denied this request. As soon as the indictment

became public, one of the Appellant's family's houses was burned down. JA2653.

The indictment, jury instructions, and the prosecutor's closing argument frequently mentioned secrecy, that Appellants were afraid of being caught or having the shipment confiscated, so they took extra steps to ensure their acts were clandestine.

The prosecution argued that this meant the appellants knew what they were doing was illegal and, therefore, tried to hide it. Appellants, on the other hand, contended that the reason for the secrecy was two-fold: first, that the Cameroonian government would confiscate the supplies if they were found out, and secondly, that the families of the Appellants would be retaliated against if it was discovered that they were sending weapons to their villages. There was no discussion of right or wrong, which side was 'correct' despite the Court's continued discussion of these issues. Instead, this testimony would have provided an overview and an explanation as to why the Appellants believed it was essential to keep these things secret.

The district court completely dismissed the testimony's reliability; however, country condition experts are frequently permitted in federal

courts in immigration matters. These experts explain a country's conditions when exploring the issue of fear of returning. *See Alvarez Lagos v. Barr*, 927 F.3d 236 (4th Cir. 2019); *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

The expert's background in the ongoing conflict was critical so that the jurors could understand events in Cameroon at the time of the alleged offense and to assist the jurors not to see "the evidence through an American lens." JA285. The defense expert would have offered helpful evidence to the jury about the ongoing civil strife in the area and why secrecy was paramount. The Government did all in its power to convince the jury that the only rational reason for the men in this case to conceal their acts was to avoid detection from the United States Government because they knew what they were doing was illegal. It was essential for the Appellants to be able to explain an alternative theory; in fact, it was the basis for their entire defense.

The expert would have offered geopolitical context that likely none or very few of the jurors knew about. With this evidence and background would have clearly "assisted the trier of fact" in trying to understand what was going on in Cameroon at the time that led the

Appellants to hide their acts. The expert would not have testified that any Appellant had the mental state to conceal their shipments because fear of local theft or local Government retribution. However, the expert would have shared facts supporting the Appellants' desire for concealment. Without geopolitical context, the jury was left with the Appellants' word that their reasons for concealment were not to avoid U.S. detection. But that testimony could have seemed self-serving without the broader overview the expert could provide.

The Council on Foreign Relations and the National Geographic Society commissioned Gallup to ask 2,000 Americans questions about the United States' role in the world, geography, foreign policy and demographics.[2] Only six percent of respondents got at least 80 percent of the questions correct — the equivalent of a B- or better. *Id.* Just over half could identify Iraq on a map, even though 100,000 American soldiers were in the country just a decade ago. *Id.* This jury would have benefited from Mr. Tembon's geopolitical knowledge. It was helpful

---

[2] Council on Foreign Relations, *U.S. Adults' Knowledge About the World,* December 2019, available at: https://www.cfr.org/sites/default/files/report_pdf/NatGeo_CFR_US%20Knoweldge.pdf

enough for Congress to take his testimony, and the issue of concealment made his testimony relevant in this case.

> 2. The trial court erred in excluding Mr. Tembon's testimony because it would somehow go to the Appellants' state of mind.

The district court also excluded the expert's testimony because it would have inappropriately gone to the Appellants' state of mind:

> More problematic and in terms of relevance, what we're really talking about is the defendants' state of mind. What was in their heads as far as trying to keep this secret. What is their experience, what is their realistic concern. And an expert, in general, cannot come in and offer testimony which I don't even know exactly what it would be he would say which is a problem, but he can't come in and offer testimony that essentially is supposed to prove the defendants' state of mind.

JA297.

The Supreme Court recently handed down a decision that addresses this issue in *Diaz v. United States,* 144 S. Ct. 1727, 219 L.Ed.2d 240 (2024).

Diaz was accused of smuggling drugs from Mexico to the United States. *Id.* at 1731. She was stopped at the border, and after a stop, the police tore apart the door of her car and discovered a large amount of methamphetamine. *Id*. Diaz's defense was that she was a "blind mule" and did not know that there were drugs hidden. The Government gave

notice of an expert who would testify that traffickers would "*never* use unknowingly couriers." *Id*. (emphasis in original) The trial court partially agreed with the defense but did allow the Government expert to testify that "most couriers know they are transporting drugs." *Id*. at 1732.

The Supreme Court pointed out that Rule 704 allowed what many States had banned which was testimony on the "ultimate issue." *Id*. The *Diaz* decision is a comprehensive history of developing "ultimate issue" jurisprudence in the United States.

Rule 704 originally had no limitations. There was no barrier to testimony on the "ultimate issue." But, as it sometimes happens, a controversial case changed things. In the 1980's, John Hinckley was charged with shooting then-President Ronald Reagan; both the prosecution and defense presented expert testimony on the ultimate issue of sanity. Hinckley prevailed. However, this victory was short-lived because Hinckley's victory was the undoing of the liberal Rule. Congress carved out one limitation to the ultimate issue rule under 704(b):

> in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense....

*Id*. at 1727.

Because the Government expert did not opine about Ms. Diaz's mental state specifically, the limitation to Rule 704 did not apply, and the Court found that the expert's testimony did not violate the 704(b) "ultimate issue" carve-out in the rules.

In the current case, the Appellants' expert would never testify as to his opinion on the Appellants' actual state of mind. Instead, like in *Diaz*, the expert would give information and an explanation that the jury could use in deciding on the state of mind or mental state of the Appellants.

Justice Jackson drafted a lengthy concurring opinion in the *Diaz* case. *Id.* at 1736. Justice Jackson notes that 704(b) is party agnostic and that the type of evidence allowed in *Diaz* could "prove essential not only for prosecutors, but for defendants as well." (*Id.* at 1736)

*Diaz* is illustrative in another way. Ms. Diaz herself introduced an expert that stated people would not necessarily know if there were drugs in the door frame of a car as an alternative to the government testimony to the contrary. Both experts gave one side or perspective of the same facts in the case; both gave explanations that could either exculpate or inculpate the defendant; and both would help the jury sort

through the difficult issue of what the defendant might have known when she was driving in that car. These were two very different points of view on the same issue the jury had to decide – if the defendant knew that she had drugs in her car when she attempted to come into the United States at the border. The jury had to evaluate each expert and then come to their conclusion.

The trial court abused its discretion through legal error when it found that the expert could not testify as to evidence related to the potential mental state of the Appellants. All that was required was that the expert not testify as to the exact mental state of the Appellants.

      3.    <u>The trial court erred in finding that the expert testimony should be excluded under the Rule 403 balancing test.</u>

The trial court also excluded the defense expert's testimony under Rule 403 because the "expert "has a point of view" and because "Rule 403 clearly argues against letting in the details of the Cameroonian conflict." JA297-298.

Rule 403 "is a rule of inclusion, generally favoring admissibility." *United States v. Udeozor*, 515 F.3d 260, 264-65 (4th Cir. 2008) (cleaned up). In other words, "[w]here evidence is probative, 'the balance under

Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.' " *United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).

To exclude evidence under Rule 403's high bar, it must be unfairly prejudicial. " '[U]nfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 136 L.Ed.2d 574 (1997).

None of the proposed testimony suggested that one side in the conflict was righteous or that the Appellants were giving weapons to the "good guys." To the extent the Government thought that the expert's testimony would suggest those conclusions, the Court could have fashioned a limiting instruction, and the Government would have had ample opportunity to cross-examine on that issue.

All evidence helpful to one side is generally prejudicial to the other. To be excluded, it must be unfairly prejudicial. The Government was allowed to present evidence and to argue that the Appellants

sought specifically to conceal their actions from the U.S. Government. Admitting testimony to counter that assertion could not be construed as unfairly prejudicial.

The trial court abused its discretion by committing legal error in erroneously applying Rule 403, a rule of liberal inclusion.

4. <u>Excluding the expert deprived the Appellants of their constitutional rights by preventing them from fully presenting their defense.</u>

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

Where exclusion of evidence is "arbitrary" or "disproportionate" — that is, "important defense evidence" is excluded without serving "any legitimate interests" or in a manner that is "disproportionate to the ends that [the rationale for exclusion is] asserted to promote" — it may violate a defendant's constitutional rights. *Id.* at 324, 326.

The expert's testimony was important defense evidence because it would have given critical context to the Cameroonian conflict, and even more importantly, it would have provided evidence to negate an element of the crimes against the Appellants.

The decision of the trial court to exclude the evidence at trial, when it allowed the almost unfettered ability of the Government to present evidence to the contrary, was "disproportionate" to the ends that were the original basis for the exclusion.

In this case, the basis for exclusion and the Court's analysis was almost entirely legally incorrect. The evidence was not unfairly prejudicial to the Government. Allowing the Appellants to present an explanation of their actions within the context of what was happening in Cameroon would not move the jury to acquit simply on that basis. To believe otherwise gives too little credit to the logic and reason of jurors.

> 5. The trial court's error in excluding the expert testimony was not harmless.

"A constitutional error is harmless when it appears 'beyond a reasonable doubt that the error ... did not contribute to the verdict obtained.' " *Neder v. United States*, 527 U.S. 1, 2 (1999) (emphasis

added) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). That is not possible here.

This is not a case of "overwhelming evidence" of guilt. See *United States v. Grooms*, 2 F.3d 85, 89 (4th Cir.1993), *cert. denied,* 114 S. Ct. 1550 (1994). The Appellants were acquitted on Counts 2 (AECA violation) and 3 (ECRA violation), which are two out of the five charges.

Appellants adopt and incorporate by reference all the factual weakness arguments under Part I (sufficiency of the evidence) as additional support that the errors by the trial court in this case were not harmless beyond a reasonable doubt.

Because the trial court committed non-harmless error, the Appellants' convictions must be vacated and the cases remanded for retrial.

III. BARRING THE APPELLANTS FROM EXAMINING MR. BANGARIE ON A QUESTION-BY-QUESTION BASIS VIOLATED THEIR RIGHT TO COMPEL TESTIMONY AND HAVE A FAIR TRIAL UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION

A. Standard of Review

For legal issues, this Court reviews a district court decision de novo. *United States v. Cortez*, 930 F.3d 350, 355 (4th Cir. 2019).

B. Argument

Tse Ernst Bangarie is a member of the Cameroonian community who owned a shipping business and frequently sent containers to Nigeria and Cameroon. JA1153, JA1185.

More specifically, in a proffer with the Government, Bangarie shared what St. Michael told him when Bangarie had concerns about a shipment.

> St. Michael claimed that he had military training on how to conceal shipments and even had a 'badge' to get what he needed accomplished. Further, St. Michael suggested to Bangarie that his military superiors knew what he planned to do and thus convinced Bangarie there was no need for concern. Bangarie did think it was possible that he could have been being guided by his military superiors.

*ECF 87 (Notice of Out of Court Statement by Wilson Che Fonguh)*

Mr. Bangarie also told the government that Mr. St. Michael introduced him to one of his military superiors, Col. Taku Nelson, "to tamp down BANGARIE's concerns about the shipment of arms and ammunition." ECF87.

Mr. Bangarie did not proceed to trial but pled guilty via an Information charging him with Conspiracy and Unlawful Export of Defense Articles. At the time of the trial, Mr. Bangarie had not yet been sentenced, and it was clear that the Government would not give him immunity if he testified on behalf of the Appellants. Therefore, trial counsel expected Mr. Bangarie to be unavailable because he was invoking his Fifth Amendment privilege against self-incrimination. (Federal Rule of Evidence 804 (a)(1) and 804 (b)(3)(B)) and under Rule 807. In support, trial counsel argued the following:

> It's not a prior transcript, but, you know, it was given to Government officials under the penalty of a false statement and it was accepted by the Government apparently because -- if I could take this off for a moment, this was -- the proffer statement was made before the plea. And apparently the Government was aware of the statement that was made, concluded that it was acceptable and moved forward with the plea and presented it to the Court, the overall package of acceptance of responsibility. And he was given three points for his plea.

JA1107.

The Government objected, and the trial court indicated it was inclined to deny the request to allow the introduction of the out-of-court proffer statement and would allow Bangarie to plead a blanket fifth instead of going "through this exercise." JA1108.

Appellants asked to go "question by question" to explore what questions Mr. Bangarie might be willing to answer. JA1197. Appellants only wanted to delve into the issues he discussed with the government during his proffer, and therefore, there could be no real risk to Mr. Bangarie because a proffer agreement contains immunity for the things told to the government if they are true. JA1197, JA1198. Mr. Bangarie did not invoke his privilege; his counsel did it for him. JA1199.

Before issuing a final ruling, the trial court allowed the Appellants to proffer why Mr. Bangarie's statement would be helpful to the defense:

> Well, because with respect to the statement, it would be an issue that goes to the understanding as to whether Mr. St. Michael made statements with respect to the -- whether he had licenses or not for the shipping part. And so the issue would be from our perspective that the statement that Mr. St. Michael made was a false statement, for sure. And the understanding that Mr. Bangarie carried away from that would go to his state of mind, but also would be relevant to us because it's from the standpoint of the understanding that as we've heard from other testimony, that there was some degree

of understanding that Mr. St. Michael had represented that he had the paperwork to do the shipping -- well, with respect to the weapons and the shipping.

JA1432-1433.

After further questioning from the Court, defense counsel continued:

So this is the full statement and this is from USA 7737 which is a report of investigation that the Government produced from the proffer session with Mr. Bangarie. And it reads -- the part we're interested in, "Bangarie warned St. Michael about the illegality of shipping arms from the U.S. to Cameroon. St. Michael claimed that he had the military training on how to conceal shipments and even had a badge to get what he needed accomplished. Further, St. Michael suggested to Bangarie that his military superiors knew what he had planned to do and thus convinced Bangarie that there was no need for concern. Bangarie did think it was possible that he could have been being guided by his military superiors."

So I agree with the Court about the second part with respect to the military authorization, but the other part is the badge aspect of it, as well. Obviously the badge is connected to the military piece but, you know, something that he had the authority to do what he was doing.

JA1433.

The Government argued that Mr. Bangarie lied in his proffer session concerning these statements and that since he lied, the general rule of immunity for what was said in the proffer sessions did not apply. Therefore, Mr. Bangarie would be subject to additional criminal 'exposure' if he were to testify about those statements. JA1437.

The judge denied the Appellants' request and found that Mr. Bangarie had a Fifth Amendment right not to testify because he had not yet been sentenced. JA1440, JA1443. The trial court focused on why what Mr. St. Michael told Mr. Bangarie would not be admissible anyway. JA1441. The defense argued it went to the Appellants' state of mind, an essential element that needed to be explained and explored, but the trial court ruled that it was "not directly relevant to the defendants in this case." JA1441. Finally, as to the Rule 807 argument, the Court found that the proffer statement did not contain "sufficient guarantees of trustworthiness." JA1442.

There is great tension between the Sixth Amendment right to compel testimony and the Fifth Amendment right against self-incrimination. A strict balancing act that must occur:

> Sixth Amendment grants a defendant the right to compel testimony by witnesses in his defense. When a defendant's right to compel testimony conflicts with a witness' privilege against self-incrimination, however, a court must make a proper and particularized inquiry into the legitimacy and scope of the witness' assertion of the privilege. A court can excuse a witness from testifying only if the Court finds that the witness could legitimately refuse to answer any and all relevant questions.

*United States v. Sayles*, 296 F.3d 219, 223 (4th Cir. 2002) (citing

*Gaskins v. McKellar,* 916 F.2d 941, 950 (4th Cir. 1990) (internal

quotations omitted)); *accord, Hoffman v. United States*, 341 U.S. 479, 486-88 (1951).

Only as to genuinely threatening questions should [a witness'] silence have been sustained." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976); *United States v. Anglada*, 524 F.2d 296, 300 (2d Cir. 1976).

Although trial courts have "wide discretion in resolving a self-incrimination claim . . . discretion is not unlimited." *Melchor Moreno*, 536 F.2d at 1050 (footnote omitted). The district court erred when it denied the admissibility of this testimony, which was material to the defense and could have easily been compartmentalized and limited to avoid the feared self-incrimination. As the Supreme Court noted, "the right to offer testimony of witnesses, and compel their attendance, if necessary, is in plain terms, the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

The privilege operates on a question-by-question basis, *United States v. Castro*, 129 F.3d 226, 229 (1st Cir. 1997) (cited by *U.S. v. Miller*, No. 10-4297 (4th Cir. Jun 14, 2011) (affirming the handling of witness' privilege against self-incrimination by allowing objections on a

question-by-question basis with witness' defense counsel by their side)(unpublished)). A witness can only be totally excused if the trial court finds that the witness can legitimately refuse to answer any and all relevant questions. *Gaskins v. McKellar*, 916 F.2d 941,950 (4th Cir. 1990).

There are legitimate concerns when a witness also pending federal sentencing is called to testify. However, there is no balancing act here when the witness is excused completely. There was no danger to the witness to have him sit in that witness box and face each question as it came. The witness would have their counsel at their side. Allowing a blanket excuse from the trial favors Mr. Bangarie's right against self-incrimination over the Appellants' right to compel testimony and receive a trial.

Moreover, the Court should have granted the Appellants' alternative request to admit the relevant portions of Mr. Bangarie's statement under FRE 807. Appellants had given the government written notice about their intent to offer the statement. In addition, when the Court excused Mr. Bangarie from testifying, he became unavailable under FRE 804(a)(1) and the residual exception under FRE

807(a) was applicable. Given the probative value of Mr. Bangarie's statement, Appellants should have been allowed to offer it as evidence.

Because the trial court denied the Appellants their right to compel testimony, the convictions must be vacated, and the case remanded for retrial.

IV.  THE DISTRICT COURT ERRED BY INSTRUCTING THE JURY UNDER THE *PINKERTON* STANDARD, BY GRANTING A WILLFUL BLINDNESS INSTRUCTION, AND WITH ITS ERRONEOUS CONSPIRACY INSTRUCTION DEFINING KNOWINGLY

A.  Standard of Review

When a defendant timely objects to the giving of an erroneous instruction, the conviction may be affirmed only if this Court is satisfied, beyond a reasonable doubt, that the error was harmless. *United States v. Hastings*, 134 F.3d 235, 241 (4th Cir. 1998); *see also Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.Ed.2d 705 (1967).

In undertaking harmless error review, this court should impose the burden on the government to show, beyond a reasonable doubt, that the error did not affect the defendant's substantial rights or, in other words, that it did not prejudice him. *See United States v. Stokes*, 261

F.3d 496, 499 (4th Cir. 2001); *United States v. Hastings*, 134 F.3d

235,240-41 (4th Cir. 1998).

This court must review any alleged erroneous content of the

instruction for abuse of discretion. *See United States v. Ebersole*, 411 F.3d

517, 526 (4th Cir. 2005); *United States v. Higgs*, 353 F.3d 281, 309 (4th

Cir. 2003).

B.    Argument

As presented in Section I of this brief, the government failed to

provide evidence sufficient to satisfy its burden of proof beyond a

reasonable doubt as to the Appellants' guilt under Counts 1, 4 and 5. In

addition to the failure by the government to present sufficient evidence

of guilt, and the district court's error in failing to find as such, erroneous

instructions were presented to the jury with respect to the following: (1)

the *Pinkerton* instruction; (2) allowing the jury to be instructed under the

willful blindness standard; and (3) a legally insufficient definition of

"knowingly" was provided to the jury under the conspiracy instructions.

Each of these errors constituted abuses of discretion by the district court,

deprived the Appellants of their substantial rights, and resulted in

prejudice to all of the defendants. Together, these instructions deprived

Appellants of a fair trial, reducing the standard of the government's proof well below the constitutional requirement of proof beyond a reasonable doubt. The convictions must be overturned.

1. The District Court Erroneously Instructed the Jury Under the *Pinkerton* Standard

A *Pinkerton* instruction allows a jury to find a defendant guilty of a substantive charge, when there is also a conspiracy allegation, based on a standard that a defendant could have reasonably foreseen that the substantive crime might have been committed. This instruction was not supported by the facts presented in this case.

Under the law, *Pinkerton* liability requires a baseline level of proof by the government that the offense conduct at issue "is reasonably foreseeable and in furtherance of the conspiracy." *See United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012). Additionally, an instruction under *Pinkerton* should be denied when the facts and circumstances presented are significantly complex. *See United States v. Serrano-Delgado*, 29 F.4th 16, 26 (1st Cir. 2022). Under the facts and circumstances of this case, and as argued in Section I of this brief (*infra*, pp. 24-29), the Appellants could not have reasonably foreseen that the serial numbers of the firearms were being ground out or obliterated.

No such instruction of law should have been approved by the district

court and provided to the jury. The district court's erroneous instruction

under *Pinkerton* requires reversal of Counts Four and Five, the

substantive counts of conviction.

This Court has held that:

> The principles of conspiratorial liability articulated in *Pinkerton* provide that a person is "liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v. Ashley,* 606 F.3d 135, 142–43 (4th Cir. 2010). Thus, *Pinkerton* liability encompasses a person who, while not directly committing an offense, has "participat[ed] in a conspiracy that leads a confederate to engage in that conduct." *Ashley,* 606 F.3d at 143. The principle underlying the *Pinkerton* doctrine is that "conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." *United States v. Aramony,* 88 F.3d 1369, 1379 (4th Cir.1996) (quoting *United States v. Manzella,* 791 F.2d 1263, 1267 (7th Cir.1986)).

*Dinkins*, 691 F.3d at 384. Appellants' involvement in the packing of

ammunition, loading of materials, including wrapped and packaged

firearms, onto containers, and participation in providing humanitarian

aid to countrymen in Cameroon, by no means indicated that a

"confederate" – Muma and St. Michael – would engage in the conduct of

grinding out serial numbers from firearms. *See*, *infra*., pp. 24-28. Far

more evidence suggesting actual knowledge of such conduct should have

been required by the district court before the *Pinkerton* instruction was approved.

The First Circuit has warned that "a *Pinkerton* charge 'should not be given as a matter of course.'" *United States v. Serrano-Delgado*, 29 F.4th 16, 24 (1st Cir. 2022), citing to *United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir. 1990) and *United States v. Sperling*, 506 F.2d 1323, 1341 (2d Cir. 1974). Concerns about the *Pinkerton* instruction have also been raised because in complex cases, "the charge can cause confusion." *See Serrano-Delgado*, 29 F.4th at 24; *United States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir. 1986).

This Court has addressed *Pinkerton* liability often in cases involving a firearm and whether the use of that firearm is reasonably foreseeable. *See Ashley,* 606 F.3d 135, 142–43 (*Pinkerton* liability found under an 18 U.S.C. § 924(c) charge); *Dinkins*, 691 F.3d at 384 (*Pinkerton* principles applied in drugs and firearms case). In these cases which involve robbery and narcotics, the underlying criminal activity was inherently dangerous; the foreseeability of the use of a firearm in these types of cases was simple and straightforward.

This case can be clearly contrasted from the *Pinkerton* cases referenced above. There was no reasonable foreseeability that firearms shipped to Africa by St. Michael would have their serial numbers obliterated. St Michael was a U.S. military service man believed by Appellants to have had licenses for the shipping of those firearms.

*Pinkerton* liability has also attached in situations in which leaders of conspiracies are aware of the substantive crimes of their underlings. *See United States v. Singh*, 518 F.3d 236, 253 (4th Cir. 2008) (*Pinkerton* liability as a leader of a Mann Act conspiracy); *United States v. Aramony,* 88 F.3d 1369, 1379 (4th Cir.1996) (fraud case involving *Pinkerton* liability by leader of the fraudulent scheme). In such cases, it is the principals who are bound by the conduct of the agents under *Pinkerton*, not the other way around – as we have here. Under *United States v. Aramony*, 88 F.3d 1369, 1379 (4th Cir. 1996), this Court found that, "[t]he idea behind the *Pinkerton* doctrine is that the conspirators are each other's agents; and a *principal* is bound by the acts of his *agents* within the scope of the agency." (emphasis added); *see also United States v. Manzella,* 791 F.2d 1263, 1267 (7th Cir. 1986).

In this case, the government seeks to bind Appellants, as agents, to the conspiratorial objectives of the principals. The objectives at issue were by no means reasonably foreseeable by the lesser culpable agents, the Appellants, in their narrower roles in the conspiracy, as compared to Muma and St. Michael. The government in this case has sought to impose *Pinkerton* liability on the Appellants mostly through inferences of foreseeability. There was no direct evidence that the Appellants were aware of the obliteration of serial numbers, as pointed out in Section I of this brief. The evidence in this case failed to include any texts or WhatsApp messages discussing the serial numbers; there was no testimony of any statements made by the Appellants about serial numbers, much less the grinding of serial numbers; there were no pictures of any of the Appellants' presence in the room where the grinding took place.

This is not a case that qualified for a *Pinkerton* instruction, and allowing this instruction was unlawful as confusing and misleading to the jury. The charges at issue were too complex, the collection of charges considered under the conspiracy count too broad, and the substantive charges to be considered independently of the conspiracy

charge too numerous to allow such a liberal construction of reasonable foreseeability that the substantive crime **might** have been committed to be applied in this case.

The complexity of this case cannot be understated. The Superseding Indictment in this case was 27 pages in length. The conspiracy allegations covered specific and detailed allegations of: (1) violations of the Arms Export Control Act; (2) violations of the Export Control Reform Act; (3) transporting firearms with obliterated serial numbers; and (4) smuggling of firearms.

The conspiracy allegations encompassed 13 pages of the charging document. They included a listing of overt acts from paragraphs 24(a) to 24(ff) – a total of 31 overt acts. *Pinkerton* instructions are not intended for a case and a situation in which the allegations before the jury are so complex.

Upon review of a district court's decision to grant the request for a jury instruction, this Court's role is to assess the decision "for abuse of discretion, and review whether a jury instruction incorrectly stated the law *de novo.*" *United States v. McCauley*, 983 F.3d 690, 694–95 (4th Cir. 2020); *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018) (citations

omitted). Such review considers the jury instruction "in light of the whole record," and requires a determination of whether the instruction "adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.* (internal quotation marks omitted); *McCauley*, 983 F.3d at 694. Review by this Court requires a finding that an erroneous instruction "seriously prejudiced the challenging party's case" before the verdict will be set aside. *Id.*

This Court has determined that, generally, a district court is provided significant discretion in decisions regarding the instructions to provide the jury due to their unique perspective in seeing the evidence and assessing the witnesses. *Id.* And appellate courts will usually "exercise restraint and review the instructions in the context of the whole trial, not act as a particularly strict teacher grading a student essay for perfection." *Id.* at 694; *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1293 (4th Cir. 1995).

"[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *McCauley* at 694-695, citing *Boyd v. United States*, 271 U.S. 104, 107,

46 S. Ct. 442, 70 L.Ed. 857 (1926). In this case, however, the instructions provided to the jury included (1) the *Pinkerton* instruction, (2) the willful blindness instruction (3) a contested definitional instruction of "knowingly" under the conspiracy charge, and (4) an aiding and abetting instruction. Granting this instruction amid that array of questionable instructions constituted an abuse of the district court's discretion. The instructions as provided to the jury in this case did not "accurately and fairly state the controlling law" under the facts and circumstances presented, and failed to provide the jury with a fair and appropriate legal guide to follow. *See United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010).

2.   The District Court Improperly Instructed the Jury Regarding Willful Blindness

In the rare instances in which a willful blindness instruction may be appropriate, it should never be given under circumstances in which there is no clear evidence of a defendant's actual awareness of the illegal conduct *and* insufficient evidence of purposeful efforts of the defendant to deliberately ignore the clear indications of wrongdoing. In this case, there was neither clear evidence of such awareness by the Appellants, nor was there evidence of purposeful

efforts to ignore such evidence, as addressed in Section I(b) of this brief. Especially when the jury is instructed on a reasonable foreseeability standard under *Pinkerton*, which merely requires that the substantive crime **might** be committed, allowing for a willful blindness instruction to substitute for an actual finding by the jury of a knowing violation of the law is particularly disconcerting. In this case, the facts and circumstances failed to warrant the court's findings that the legal standards under either *Pinkerton* or willful blindness should have guided the jury; ultimately, these instructions set forth a legal standard well below one of proof beyond a reasonable doubt.

The principle that willful blindness will satisfy a knowledge element in criminal law is premised on the understanding that defendants should not be permitted to escape the reach of criminal statutes that require proof that a defendant acted knowingly or willfully "by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *See United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012) ("To allow the most clever, inventive, and sophisticated wrongdoers to hide behind a

constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right"); *see also United States v. Hale*, 857 F.3d 158, 168–69 (4th Cir. 2017).

This Court must be mindful that a court's reliance on the willful blindness instruction is limited, and district courts must be cautious in avoiding a conviction based on a reduced standard of recklessness or even negligence with this instruction. *See Jinwright*, 683 F.3d at 478. Assurances must be in place to satisfy the two basic requirements of proof that: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id*. No such assurances were in place in this case.

Additionally, this Court has found that the "requests for willful blindness instructions should be handled with caution" and "should be rarely given." *Jinwright*, 683 F.3d at 478. There is a serious risk that the willful blindness instruction could lead to a conviction based on less than a proof beyond a reasonable doubt standard "with respect to a key fact making his conduct illegal." *See United States v. Lighty*, 616 F.3d 321, 378 (4th Cir. 2010); *United States v. Nguyen*, 493 F.3d 613, 619

(5th Cir. 2007); *see also, e.g., United States v. Oti*, 872 F.3d 678, 697

(5th Cir. 2017) (observing "'[w]e have often cautioned against the use of

the deliberate ignorance instruction'") (quoting *United States v.

Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003); *Global–Tech

Appliances, Inc. v. SEB S.A.,* 653 U.S. 754, 767 (2011).

As referenced in Section I, there was insufficient evidence of

Appellants' knowledge of obliterated serial numbers. Also as pointed

out in Section I, there was no evidence of avoidance.

As this Court found in *Lighty*, the willful blindness instruction

was not appropriate because there was no evidence presented at trial

that the defendant, Flood, was deliberately indifferent to or avoided the

criminal activity at issue. *Lighty*, 616 F.3d 321 at 378. The defense

presented was one of not being present for the criminal conduct and

"[u]nder such circumstances, a willful blindness instruction was not

appropriate because the evidence did not suggest that Flood engaged in

deliberate acts to avoid actual knowledge of the" crimes. *Id*.

A willful blindness instruction provides the government, under

appropriate circumstances, with an alternative method of proving

knowledge. *United States v. Ravenell*, 66 F.4th 472, 490 (4th Cir. 2023),

*cert. denied,* 144 S. Ct. 1344, 218 L. Ed. 2d 422 (2024) ("the government may 'prove knowledge by establishing that the defendant *deliberately shielded himself* from *clear evidence of critical facts* that are strongly suggested by the circumstances.'" *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017)) (emphasis added). The record lacks any evidence that the defendants took deliberate actions to avoid finding out that the serial numbers on the firearms were being grinded or obliterated, or that such an inference arose from the defendants' conduct. *See United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994) ("A deliberate avoidance instruction, like all jury instructions, is proper only if there is a foundation in evidence to support a finding of deliberate avoidance.").

Willful blindness instructions from this Circuit are often found in cases involving drug dealing when an accused person says he or she did not know that obvious indications of drug dealing was going on. *See Ravenell*, 66 F.4th 472, 477 (money laundering conspiracy relating to two drug organizations); *Abbas*, 74 F.3d 506, 515 (involved drug conspiracy charges). This instruction can also be found in fraud and theft cases that involve very clear evidence of criminal conduct and deliberate efforts of an accused person to shield from obvious and clear evidence of criminal

activity. *See Whittington*, 26 F.3d 456, 463 (conspiracy to defraud elderly victim); *Vinson*, 852 F.3d 333, 357 (conspiracy to defraud a bank); *Jinwright*, 683 F.3d 471, 478 (conspiracy to defraud the United States); *Hale*, 857 F.3d 158, 169 (involved willful blindness of conspiracy to steal goods). There is a reason why this instruction is seldom used. The evidence supporting this instruction must fit squarely within the requirements set forth under the law. In this case, the evidence does not support the instruction.

Any error in providing this instruction was far from harmless, especially in the context of the other wrongful instruction provided by the district court to the jury. The convictions must be reversed based on this erroneous instruction.

### 3. The District Court Improperly Instructed the Jury Regarding the Conspiracy

The instruction provided to the jury to define "knowingly" under the conspiracy count placed far too much emphasis on finding an inference of guilt. The jury was instructed that "[t]he defendant's knowledge, again, it's a matter of inference. It's a matter you may infer from the facts that have been proved." JA1481. The defendants objected to this reading of the instruction. 1508.

To satisfy the government's burden of proving a conspiracy beyond a reasonable doubt, it must establish: "(1) an agreement between two or more persons to engage in conduct that violates a federal . . . law; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy." *See United States v. Watkins*, 111 F.4th 300, 309 (4th Cir. 2024); *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010). Although inferences may be drawn based on circumstantial evidence, this Court has specifically found that proof of a conspiracy offense necessarily requires proof of the "presence of a knowing and voluntary agreement," while making clear that the "gravamen of the crime of conspiracy is an agreement to effectuate a criminal act." *United States v. Moody*, 2 F.4th 180, 194 (4th Cir. 2021). Placing such an emphasis on a jury's reliance on inferences diverts them from their principal obligation – to find that there was an agreement to violate the law and that the defendant knowingly and voluntarily entered into that unlawful agreement. The instructions in this case by no means preserved and protected the Appellants' rights by assuring that the government met its burden of proof.

4.    This Court must look upon all instructions cumulatively

The jury was presented with an aiding and abetting instruction in addition to the *Pinkerton* instruction, which allowed for a finding of guilt premised only on reasonable foreseeability that a crime might be committed, a willful blindness instruction that allowed for a guilty verdict based on avoidance of evidence of guilty, and a knowledge instruction for the conspiracy count that encouraged findings of guilt based on inferences. In this case, the district court abandoned its responsibility to properly instruct the jury on the law, and allowed for a series of instructions that reduced the government's burden well below the reasonable doubt standard. The convictions must be overturned.

It is well established that instructions of law "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Constitutional error exists only if "'there is a reasonable likelihood that the jury has applied the ... instruction in a way'" that would lead to conviction without proof beyond a reasonable doubt for each element of the charged offense. *McGuire*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).

The standard for determining whether an error is harmless beyond a reasonable doubt is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained. This involves reviewing the entire record and considering the likely impact of the error on the minds of the jurors *United States v. McLellan*, 959 F.3d 442, 466 (1st Cir. 2020).

Unlike cases containing a single tainted instruction, the instructions in this case do not provide the possibility to a reviewing court to excise and isolate the bad and find that the jury would have returned a verdict of guilty even if the jury had never heard the bad instructions. The whole process was infected. *See Chapman v. California,* 386 U.S. 18, 22–23 (1967). The errors were far from harmless.

One instruction after another allowed the jury to infer and speculate as to the defendants' guilt. In addition to a "reasonable foreseeability" instruction under *Pinkerton* was a "deliberate ignorance" or willful blindness instruction. The conspiracy instruction encouraged the jury to draw unreasonable inferences from confusing facts. An aiding and abetting instruction was presented which resulted in the whole mix of instructions being terribly confusing and misleading.

In the sufficiency of the evidence section of this brief, it was explained that the government failed to provide evidence sufficient for a finding of guilt as to all of the charges. In addition to those errors, the district court provided the jury with instructions that were unwarranted under the facts presented. The errors were not harmless. This Court must reverse the Appellants' convictions.

## V. THE DEFENDANT'S SENTENCES WERE PROCEDURALLY UNREASONABLE BECAUSE THE DISTRICT COURT IMPROPERLY CALCULATED THEIR SENTENCING GUIDELINES

### A. Standard of Review

This Court evaluates the sentence imposed by a district court for abuse of discretion, "which translates to review for reasonableness." *United States v. Evans*, 90 F.4th 257, 261–62 (4th Cir. 2024) (quoting *United States v. Crawford*, 734 F.3d 339, 341–42 (4th Cir. 2013) (internal quotation marks omitted)). "A sentence is procedurally unreasonable if the district court committed a serious procedural error, such as improperly calculating the Guidelines range." *United States v. Morehouse*, 34 F.4th 381, 387 (4th Cir. 2022) (quoting *United States v. Gillespie*, 27 F.4th 934, 944 (4th Cir. 2022) (internal quotation marks omitted)). "In determining whether a district court properly applied the

advisory Guidelines, including application of any sentencing enhancements, [this Court] review[s] the district court's legal conclusions *de novo* and its factual findings for clear error." *Id.* (quoting *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009) (internal quotation marks omitted)). "But that [clear error] review can be undertaken only if a district court first makes the findings necessitated by the relevant legal standard." *Evans*, 90 F.4th at 262 (citing *United States v. Flores-Alvarado*, 779 F.3d 250, 254–56 (4th Cir. 2015), *as amended* (Mar. 11, 2015)). *See also United States v. Bright*, No. 23-4624, — F.4th—, 2025 WL 21384 (4th Cir. Jan. 3, 2025).

Where a party does not preserve an objection to a sentence enhancement below, this Court reviews for plain error. *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010). To show plain error, the proponent must show that an error was made, that it was clear or obvious, and that it affects his substantial rights. *United States v. Massenburg*, 564 F.3d 337, 342-43 (4th Cir. 2009). In addition, this Court should correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 343.

B.     Argument

Each of the defendant's sentences was procedurally unreasonable because the district court failed to properly calculate the sentencing guidelines; in particular, the district judge applied the wrong legal standard when evaluating relevant conduct and failed to make the required particularized findings supporting sentence enhancements under § 2K2.1(b)(1)(C) and (b)(5) (2021). Rather than "determine the scope of the criminal activity the particular defendant agreed to jointly undertake," U.S.S.G. § 1B1.3, note (3)(B) (2021), the district court relied simply on the fact of the defendants' convictions to impose the enhancements in this case. This was error, because jury instructions permitted the defendants to be convicted under *Pinkerton v. United States*, 328 U.S. 640 (1946), which provides for broader liability than does the relevant conduct standard set forth in § 1B1.3.

As discussed *supra, Pinkerton* provides for a form of vicarious liability if the jury finds that a substantive offense was committed by a member of the conspiracy pursuant to a common plan and was reasonably foreseeable to the defendant. JA1502-1503.

But the standard for relevant conduct under § 1B1.3 of the Guidelines is narrower, as this Court recently recognized in *United States v. Evans*, 90 F.4th 257, 262-263 (4th Cir. 2024). "For purposes of substantive liability under *Pinkerton*, a defendant may be held vicariously liable for the acts of his co-conspirators, so long as those acts are within the scope of the conspiracy as a whole and reasonably foreseeable to the defendant." *Id.* at 262. In contrast, "for purposes of sentencing, the Guidelines have adopted a different and narrower principle of accountability . . . . Only acts of co-conspirators that fall within the scope of the criminal activity the particular defendant agreed to jointly undertake—as opposed to the scope of the *entire* conspiracy—count as relevant conduct under the Sentencing Guidelines." *Id.* at 262-263 (citations omitted) (emphasis in original). For that reason, before conduct within the scope of a conspiracy may be attributed to a defendant at sentencing, "a district court must make *particularized* findings as to the scope of the defendant's agreement to jointly undertake criminal activity as well as to foreseeability." *Id.* (citations omitted) (emphasis in original).

This Court recently applied this principle to chapter 3 enhancements under the Sentencing Guidelines in *United States v. Bright*, noting that where the district court "conflated the standard for substantive *Pinkerton* liability with the standard for sentencing accountability pursuant to Guidelines § 1B1.3" it committed "significant procedural error." 2025 WL 21384 at *11.

Here, as in *Evans* and *Bright*, the district court made no particularized findings regarding the scope of the criminal activity the defendants jointly undertook, whether the acts or omissions of others were in furtherance of that activity, and whether those acts or omissions were reasonably foreseeable to the defendants. *Id.*; U.S.S.G. § 1B1.3(a)(1)(B). Instead, the district court simply relied on defendants' convictions as the basis for the sentence enhancements, although the jury was instructed that they could be convicted under the broader *Pinkerton* approach. Here, as in *Evans*, "because the district court did not apply the § 1B1.3 standard, it also failed to make the necessary factual findings. . . . And without those findings, there is nothing for [this Court] to review." *Evans*, 90 F.4th at 263.

As to the 6-level enhancement under § 2K2.1(b)(1)(C) based on the quantity of firearms, to which both Mr. Nji and Mr. Fonguh objected, the district court explicitly relied on the fact that the defendants had been convicted of smuggling in Count 5 as well as of participation in the conspiracy in Count 1. But conviction of Count 5 does not suffice to establish the relevant conduct necessary for an enhancement under the Guidelines. To begin with, the jury was instructed that, to convict under Count 5, they need only find that the defendant knowingly exported or attempted to export, or received, bought, sold, concealed or in any manner facilitated such action as to "*any item* . . . identified in Count Five," JA1498 (emphasis added), not as to all the items identified in that count. In other words, a guilty verdict on Count 5 does not equate necessarily to a finding that 28 firearms were involved. In addition, because of the *Pinkerton* instruction, the jury was able to convict the defendants based on the scope of the entire conspiracy rather than conduct that they agreed to jointly undertake. *See Evans*, 90 F.4th at 262-63.

The defendants' individual circumstances do not support the application of a 6-level enhancement for 28 firearms. As Mr. Nji and

Mr. Fonguh argued, there is no indication that they were aware of how many firearms had had the serial numbers removed or even that removal of serial numbers was within the scope of the criminal activity that they jointly undertook. They were not part of the conversation with Mr. St. Michael where Mr. Muma was assigned to grind off serial numbers. JA933-934. Although they helped load the shipping container, the firearms were either wrapped or sealed in tanks. JA948-949. There is no evidence that Mr. Tita was present in the lab when Mr. St. Michael directed Mr. Muma to grind off serial numbers, and Mr. Muma testified that Mr. Tita did not engage in any of the hands-on work in the lab. Similarly, Mr. Tita did not participate in loading the shipping container, other than directing how to fit the various wrapped items together. JA949-950. There is thus no evidence that the scope of each of the defendants' mutually agreed activity under § 1B1.3 encompassed 28 firearms, or that the obliteration of serial numbers from 28 firearms was reasonably foreseeable to them. *See* § 1B1.3(a)(1).

Similarly, regarding the 4-level enhancement for trafficking under § 2K2.1(b)(5), to which all three defendants objected, the district court made no particularized findings and simply relied on the defendants'

convictions. But as with the enhancement for the number of firearms, the elements of the conviction are not a match for the requirements of the enhancement. As an initial matter, § 2K2.1(b)(5) requires that the defendant transported, transferred, or otherwise disposed of at least two firearms to apply. U.S.S.G. § 2K2.1 cmt. 13 (2021). In contrast, the district court instructed the jury that to find the defendants guilty of Count 4 of the Superseding Indictment, alleging a violation of 18 U.S.C. § 922(k), they must find only that he "transported or caused to be transported *one or more* of the firearms identified in Count Four." JA1494-1495. Thus, on a basic level, a finding of guilt as to Count Four does not necessarily equate, as the district court believed, to the applicability of the enhancement under subsection (b)(5).

The district court made a further error in determining that because the defendants had been convicted of conspiracy under Count 1 as well as of Count 4, that necessarily satisfied the relevant conduct requirements for subsection § 2K2.1(b)(5). This is incorrect, because here as well, the guidelines require a narrower standard than does liability under *Pinkerton*. *See* § 1B1.3 cmt. (3)(B). Indeed, the scope of subsection (b)(5)'s coverage is even narrower than the general scope of

relevant conduct, because it provides that "[t]he term "defendant", consistent with §1B1.3 (Relevant Conduct), *limits* the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." § 2K2.1 cmt. (13)(B) (emphasis added). In other words, it explicitly does not encompass jointly undertaken criminal activity under § 1B1.3(a)(1)(B).

For both enhancements, the district court simply relied on the scope of the conspiracy as a whole to support the enhancements, rather than making findings regarding the scope of the criminal activity the defendant agreed to jointly undertake. *See* U.S.S.G. § 1B1.3 cmt. (3)(B). Because the district court did not make these findings, "there is nothing for [this Court] to review." *Evans*, 90 F.4th at 263. Nor may this Court "guess at the district court's rationale by searching the record for statements that might explain a sentence." *Bright*, *supra,* at *12. The district court thus imposed a procedurally unreasonable sentence in failing to make the necessary guideline findings and in ultimately applying inapplicable guideline enhancements to the defendants.

Mr. Tita did not object to the enhancement based on the number of firearms under § 2K2.1(b)(1)(C). Nonetheless, the application of § 2K2.1(b)(1)(C) to him was plainly erroneous, because the district court relied on the fact of his conviction, rather than on the particular facts of his case, to apply the enhancement. As discussed above, given the difference between *Pinkerton* liability and § 1B1.3 relevant conduct, this was error. Further, this error was plain. Not only did comment (3)(B) to § 1B1.3 note that the scope of a defendant's relevant conduct is not necessarily the same as the scope of the entire conspiracy, necessitating particularized findings, but this Court has repeatedly recognized that "Conspiracy liability, as defined in *Pinkerton*, is generally much broader than jointly undertaken criminal activity under § 1B1.3." *United States v. Flores-Alvarado*, 779 F.3d 250, 255 (4th Cir. 2015). *See also Evans*, 90 F.4th at 262-63; *Bright, supra*, at *11.

This error affected the Mr. Tita's substantial rights by altering his guideline calculations. *See Rosales-Mireles v. United States*, 585 U.S. 129, 134-35 (2018) (to show that an error affected the defendant's substantial rights, the defendant must show "a reasonable probability that but for the error, the outcome of the

proceeding would have been different.") (citations omitted). The district court calculated that each defendant's guideline score was 26 and criminal history score was I, and he sentenced each defendant to the low end of his guidelines, 63 months. Because the district court clearly relied on the applicable guideline range in sentencing the defendants, had their guideline scores been different, there is a reasonable probability that their sentences would have been as well. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) ("When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.") Finally, the Supreme Court has recognized that "a plain Guidelines error that affects a defendant's substantial rights is precisely the type of error that warrants relief under Rule 52(b)." *Rosales-Mireles*, 585 U.S. at 139. Because a miscalculation of the Guidelines range establishes a reasonable probability that the defendant will serve a prison sentence longer than necessary to fulfill the purposes of incarceration, the public perception of fairness and

equity in the justice system weighs in favor of the court's exercising its discretion to correct the error. *Id.* at 139-40.

Because the district court erred in imposing the enhancements under § 2K2.1 in reliance on the incorrect standard of liability and without making the required particularized findings, the defendants' sentences must be vacated and remanded.

## VI. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR AS TO EACH OF THE DEFENDANTS BY IMPOSING WRITTEN CONDITIONS OF SUPERVISED RELEASE THAT DIFFERED FROM THOSE PRONOUNCED ORALLY AT SENTENCING

### A. <u>Standard of Review</u>

This Court reviews de novo whether the written judgment is consistent with the district court's oral pronouncement. *United States v. Mathis*, 103 F.4th 193, 196 n.5 (4th Cir. 2024).

### B. <u>Argument</u>

Under Federal Rule of Criminal Procedure 43(a)(3), the defendant must be present at sentencing. Based on this requirement, this Court has repeatedly required a district court to pronounce orally all conditions of supervised release at the sentencing hearing. *See United States v. Singletary*, 984 F.3d 341, 344 (4th Cir. 2021); *Rogers*, 961 F.3d 291, 296-99 (4th Cir. 2020). "And under those precedents, our remedy is

guided by a 'clear rule.' Discretionary conditions that appear for the first time in a subsequent written judgment are nullities; the defendant has not been sentenced to those conditions, and a remand for resentencing is required." *Mathis*, 103 F.4th at 197 (citing *Singletary*, 984 F.3d at 344) (cleaned up). Similarly, "a material discrepancy between a discretionary condition as pronounced and as detailed in a written judgment may constitute *Rogers* error." *Mathis*, 103 F.3d at 197.

At each of the defendants' sentencings, the district court pronounced conditions of supervision that differed materially from those provided on the written judgment. In Mr. Nji's and Mr. Tita's sentencings, the district court stated, "You must work full time at a lawful type of employment." JA2472, JA3579. In Mr. Fonguh's sentencing, the district court stated, "You must make every effort to work full-time, at least 30 hours per week." JA2676. In contrast, each of the written judgments provided,

> You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. *If you do not have full time employment, you must try to find full time employment, unless probation excuses you from doing so. If you plan to change your work or anything about your work (such as your position or your job responsibilities), you must*

*notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change."*

JA2481 (Nji); JA2558 (Tita); JA2684 (Fonguh) (emphasis added).

In addition, at Mr. Nji's and Mr. Tita's sentencings, the district court stated, "You must allow the probation officer to visit you at any time at your home or elsewhere." JA2472 (Nji); JA3579 (Tita). At Mr. Fonguh's sentencing, the district court stated, "You must allow the probation officer to visit you at any time." JA2676.

In contrast, each of the defendants' written judgments stated:

You must allow the probation officer to visit you at any time at your home or elsewhere, *and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.*

JA2481 (Nji); JA2558 (Tita); JA2684 (Fonguh) (emphasis added).

The conditions pronounced orally at sentencing differed materially from the defendants' written judgments. While orally the defendants were told only that they had to work full time, the written judgment required them to notify probation ten days in advance not only if they change jobs, but if they changed "anything about [their] work (such as [their] position or job responsibilities." The defendants must seek

probation's preapproval not only when changing jobs but when accepting a promotion or a raise, taking on new tasks that impose new job responsibilities, or transferring between departments. Further, the written conditions also require the defendants to notify probation within 72 hours after a change in their employment, even if they were not able to see preapproval beforehand.

These additional conditions are significantly more onerous than simply maintaining employment, and nothing about the requirement that the defendants work full time would suggest these additional conditions also apply. *See Mathis*, 103 F.4th at 198 (noting that the additional written condition "is not something that could reasonably be expected to flow from the district court's pronouncement at sentencing."). They therefore amount to a material alteration of the conditions pronounced at sentencing.

In addition, the district court also added an additional requirement not pronounced at sentencing when it provided that during a visit, the defendants must permit the probation officers to remove any items prohibited by the conditions of supervision that they observe in plain sight. Nothing about the requirement that the defendants must

allow probation officers to visit them indicates that those probation officers could immediately take away any prohibited items they found. This also amounts to a new, material term not included in the orally pronounced conditions of supervision.

This Court has recognized that similar inconsistencies result in reversible error under *Rogers* and *Singletary*. In *Mathis*, the district court's oral pronouncement excluded the requirement that the defendant warn other occupants that the premises may be subject to searches. *Mathis*, 103 F.4th at 196. *See also United States v. Gilbert*, No. 21-4696, 2025 WL 66684 (4th Cir. Jan. 10, 2025) (vacating and remanding for full resentencing where the orally pronounced condition prohibited contact with minors and the written condition included an "additional obligation" that the defendant report any unapproved contact with a minor to probation within 24 hours); *United States v. Ulysse*, No. 23-4062, 2024 WL 3874677 (4th Cir. Aug 20, 2024) (vacating and remanding for resentencing where the district court did not pronounce conditions requiring the defendant to disclose information to the probation officer or to third parties); *United States v. Reyes*, No. 23-4598, 2024 WL 4381162 (4th Cir. Oct. 3, 2024) (vacating and remanding

where the oral pronouncement regarding which probation office the defendant was to report to upon release did not match the written pronouncement); *United States v. Martinez-Molina*, No. 23-4652, 2024 WL 3565310 (4th Cir. July 29, 2024) (vacating and remanding where the oral judgment required the defendant to abstain from alcohol and not associate with individuals consuming alcohol, but the written judgment included a condition prohibiting the defendant from frequenting businesses whose "primary product to the consumer is alcoholic beverages.")

In the face of such an inconsistency, the remedy is clear, as this Court recognized in *Mathis*: "we have only one option—vacate and remand for a full resentencing." 103 F.4th at 200. For that reason, the defendants' sentences must be vacated and their cases remanded for a full resentencing, consistent with this Court's rule in *Rogers* and *Singletary*, as recently affirmed by *Mathis*.

## <u>CONCLUSION</u>

For the above reasons, this court should reverse the judgment of the trial court as to Eric Nji, Wilson Fonguh, and Wilson Tita.

Respectfully submitted,

/s/ Robert J. Wagner
Robert J. Wagner
ROBERT J. WAGNER PLC
101 Shockoe Slip, Suite J
Richmond, VA 23219
(804) 814-8172
robwagnerlaw@gmail.com

*Counsel for Appellant Eric Nji*

Erin Trodden
Va. Bar No. 71515
ASSISTANT FEDERAL PUBLIC DEFENDER
401 E. Market St., Ste. 106
Charlottesville, VA 22902
(434) 220-3380
Erin_Trodden@fd.org

*Counsel for Appellant Wilson Tita*

Mirriam Z. Seddiq
SEDDIQ LAW FIRM
PO Box 1127
Rockville, MD 20850
301.513.7832
mirriam.seddiq@seddiqlaw.com

*Counsel for Appellant Wilson Che Fonguh*

## REQUEST FOR ORAL ARGUMENT

Appellants each respectfully request oral argument on this appeal.

/s/ Robert J. Wagner
Robert J. Wagner

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the January 21, 2025, Order of this Court because excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This Brief contains <u>19,948 words</u>.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook</u>.

*/s/ Robert J. Wagner*
Robert J. Wagner