Nos. 23-4236(L), 23-4284, 23-4387

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ERIC NJI, WILSON NUYILA TITA,
and WILSON CHE FONGUH,

Defendants - Appellants.

*Appeal from the United States District Court for the
District of Maryland, Northern Division
Honorable Catherine C. Blake and Richard D. Bennett, District Judges*

RESPONSE BRIEF OF APPELLEE
UNITED STATES OF AMERICA

Kelly O. Hayes
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

M.J. Kirsch Muñoz
Assistant United States Attorney
6406 Ivy Lane, 8th Floor
Greenbelt, Maryland 20770
(410) 736-8276

May 21, 2025                          *Attorneys for the Appellee*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE ............................................................3

    A.    Defendants' Criminal Conduct...............................................3

    B.    Procedural History...............................................................10

            1.    Pretrial Motions and Trial..........................................10

            2.    Posttrial Motions and Sentencings...........................12

SUMMARY OF ARGUMENT .........................................................15

ARGUMENT ...................................................................................20

I.      THE EVIDENCE WAS SUFFICIENT TO SUPPORT DEFENDANTS' CONVICTIONS ..........................................................20

    A.    Standard of Review ...............................................................20

    B.    Substantial Evidence Supported Defendants' Count IV Convictions...............................................................................20

            1.    The Evidence Supported the Jury's Conclusion that Defendants Knew of the Obliteration .......................21

            2.    The Evidence Demonstrated that the Obliterated Firearms Were "Firearms" .....................................39

    C.    Substantial Evidence Supported Defendants' Count V Convictions...............................................................................42

    D.    Substantial Evidence Supported Defendants' Count I Convictions...............................................................................45

II.     THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN EXCLUDING DEFENDANTS' EXPERT TESTIMONY ..........................47

A.     Standard of Review ........................................................47

B.     The Exclusion of Tembon's Testimony Was Not an Abuse of Discretion .........................................................48

C.     The Exclusion of Tembon's Testimony Was Harmless....................53

III.   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN REFUSING TO COMPEL THE TESTIMONY OF DEFENDANTS' COCONSPIRATOR OR ADMIT HIS HEARSAY STATEMENT.............55

A.     Standard of Review ........................................................55

B.     The Refusal to Compel Bangarie's Testimony Was Not an Abuse of Discretion .........................................................56

C.     The Refusal to Admit Bangarie's Statement Under Rule 807 Was Not an Abuse of Discretion.............................................61

IV.   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN GIVING THE CHALLENGED INSTRUCTIONS TO THE JURY ............62

A.     Standard of Review ........................................................62

B.     The *Pinkerton* Instruction Was Proper.................................63

C.     The Willful Blindness Instruction Was Proper ......................69

D.     The Court's Definition of "Knowledge" Was Proper.....................72

E.     Any Error in the Instructions Was Harmless ......................73

V.    THE DISTRICT COURT DID NOT PROCEDURALLY OR PLAINLY ERR IN APPLYING THE CHALLENGED ENHANCEMENTS..............74

A.     Standard of Review ........................................................74

B.     The District Court Committed No Procedural or Plain Error in Applying the Sentence Enhancements............................74

VI.    THE DISTRICT COURT DID NOT COMMIT *ROGERS* ERROR ............82

    A.    Standard of Review ...........................................................................82

    B.    The District Court Properly Announced the Standard Conditions
            Clarified by the Later-Issued Written Judgments ...............................82

CONCLUSION ......................................................................................................87

STATEMENT REGARDING ORAL ARGUMENT ............................................88

CERTIFICATE OF COMPLIANCE ....................................................................89

CERTIFICATE OF SERVICE .............................................................................90

# TABLE OF AUTHORITIES

## CASES

*Burgess v. Goldstein*,
997 F.3d 541 (4th Cir. 2021) ........................................................56

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................50

*Diaz v. United States*,
144 S. Ct. 1727 (2024)....................................................................52

*Djado v. Holder*,
662 F.3d 265 (4th Cir. 2011) ........................................................51

*Gall v. United States*,
522 U.S. 38 (2007)..........................................................................74

*Gaskins v. McKellar*,
916 F.2d 941 (4th Cir. 1990) ..................................................57, 58

*Grayson O Co. v. Agadir Int'l LLC*,
856 F.3d 307 (4th Cir. 2017) ........................................................60

*Holmes v. South Carolina*,
547 U.S. 319 (2006)........................................................................55

*In re Conditions of Supervised Release*,
No. 1:00-mc-00308 (D. Md. June 10, 2020) ................................83

*In re Mandatory & Standard Conditions of Probation & Supervised Release*,
No. 21-SO-5 (E.D.N.C. May 6, 2021)............................................85

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................50

*Le Doux v. W. Express, Inc.*,
126 F.4th 978 (4th Cir. 2025) ................................47, 50, 52, 53

*Mitchell v. United States*,
526 U.S. 314 (1999)........................................................................58

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) ........................................................49

*Pinkerton v. United States*,
328 U.S. 640 (1946)..............................................................12, 67

*United States v. Alvarez*,
755 F.2d 830 (11th Cir. 1985) ......................................................65

*United States v. Aramony*,
88 F.3d 1369 (4th Cir. 1996) ........................................................68

*United States v. Armetta*,
191 F.3d 448 (4th Cir. 1999) (table)............................................68

*United States v. Arnaout*,
431 F.3d 994 (7th Cir. 2005) ........................................................79

*United States v. Ashley*,
606 F.3d 135 (4th Cir. 2010) ........................................................37

*United States v. Askew*,
98 F.4th 116 (4th Cir. 2024) ........................................................62

*United States v. Banks*,
10 F.3d 1044 (4th Cir. 1993) ........................................................46

*United States v. Barronette*,
46 F.4th 177 (4th Cir. 2022) ........................................................20

*United States v. Bernardino*,
444 Fed. App. 73 (5th Cir. 2011) (per curiam) ............................43

*United States v. Bostic*,
168 F.3d 718 (4th Cir. 1999) ........................................................77

*United States v. Branch*,
537 F.3d 328 (4th Cir. 2008) ................................................56, 60

*United States v. Brant*,
188 F.3d 503 (4th Cir. 1999) (table).......................................................47, 54

*United States v. Bright*,
125 F.4th 97 (4th Cir. 2025) .............................................................80

*United States v. Bullard*,
301 Fed. App. 224 (4th Cir. 2008) (per curiam) ...........................................76

*United States v. Bullis*,
122 F.4th 107 (4th Cir. 2024) ............................................................85

*United States v. Burgess*,
99 F.4th 1175 (10th Cir. 2024) ...........................................................61

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996) (en banc) ........................... 25, 29, 30, 31, 34, 45

*United States v. Burnett*,
37 F.4th 1235 (7th Cir. 2022) ............................................................76

*United States v. Cardenas*,
810 F.3d 373 (5th Cir. 2016) (per curiam) .....................................................43

*United States v. Carr*,
2022 WL 5434313 (4th Cir. Oct. 7, 2022) (per curiam) ..............................86

*United States v. Chaudhri*,
134 F.4th 166 (4th Cir. 2025) ............................................................63

*United States v. Chorman*,
910 F.2d 102 (4th Cir. 1990) .......................................................64, 67, 68, 71

*United States v. Cisson*,
33 F.4th 185 (4th Cir. 2022) ........................................................84, 86

*United States v. Clapp*,
54 F.3d 774 (4th Cir. 1995) (table)............................................................76

*United States v. Cobbs*,
233 Fed. App. 524 (6th Cir. 2007) ..............................................................27

*United States v. Dinkins*,
   691 F.3d 358 (4th Cir. 2012) ........................................................63

*United States v. Farrell*,
   921 F.3d 116 (4th Cir. 2019) .......................................................20

*United States v. Flores-Rivera*,
   56 F.3d 319 (1st Cir. 1995)..........................................................47

*United States v. Forrest*,
   402 F.3d 678 (6th Cir. 2005) .......................................................39

*United States v. Foster-Torres*,
   40 Fed. App. 528 (9th Cir. 2002) (mem.).........................27, 29, 32

*United States v. Elliott*,
   849 F.2d 554 (11th Cir. 1988) .....................................................63

*United States v. Evans*,
   90 F.4th 257 (4th Cir. 2024) ............................................77, 79, 80

*United States v. Evans*,
   No. 5:18-cr-14 (N.D.W.V. Dec. 4, 2018) ...................................78

*United States v. Garnes*,
   587 Fed. App. 60 (4th Cir. 2014) (per curiam) ...........................72

*United States v. Gillespie*,
   27 F.4th 934 (4th Cir. 2022) .......................................................63

*United States v. Gomez*,
   774 Fed. App. 136 (4th Cir. 2019) (per curiam) ....................61, 62

*United States v. Graham*,
   275 F.3d 490 (6th Cir. 2001) .......................................................79

*United States v. Hackley*,
   662 F.3d 671 (4th Cir. 2011) .......................................................72

*United States v. Haile*,
   685 F.3d 1211 (11th Cir. 2012) ...................................................31

*United States v. Hale*,
857 F.3d 158 (4th Cir. 2017) ........................................................33

*United States v. Henderson*,
2025 WL 1318001 (4th Cir. May 7, 2025)....................................74

*United States v. Heyward*,
729 F.2d 297 (4th Cir. 1984) ..................................................61, 62

*United States v. Howard*,
216 F.3d 1074 (2d Cir. 2000) (summary order) ..........................27

*United States v. Ivey*,
60 F.4th 99 (4th Cir. 2023) ...........................................................47

*United States v. Jackson*,
126 F.4th 847 (4th Cir. 2025) .........................................................3

*United States v. Jones*,
907 F.2d 456 (4th Cir. 1990) ........................................................40

*United States v. Lacouture*,
495 F.2d 127 (5th Cir. 1974) ........................................................60

*United States v. Lighty*,
616 F.3d 321 (4th Cir. 2010) ..................................................70, 71

*United States v. Limbaugh*,
2023 WL 119577 (4th Cir. Jan 6, 2023)..................................84, 85

*United States v. Mathis*,
103 F.4th 193 (4th Cir. 2024) .......................................................86

*United States v. Mathis*,
No. 21-4578 (4th Cir. July 12, 2024) ...........................................82

*United States v. McGowan*,
423 F.2d 413 (4th Cir. 1970) ........................................................45

*United States v. McNeal*,
818 F.3d 141 (4th Cir. 2016) .............................................39, 40, 41

*United States v. Moore,*
54 F.3d 92 (2d Cir. 1995) ...............................................................32

*United States v. Murillo-Lopez,*
2023 WL 2799712 (E.D. Va. Apr. 5, 2023) ....................................40

*United States v. Naranjo-Rosario,*
871 F.3d 86 (1st Cir. 2017) ............................................................32

*United States v. Naum,*
134 F.4th 234 (4th Cir. 2025) ........................................................72

*United States v. Oliver,*
133 F.4th 329 (4th Cir. 2025) ....................................................55, 59

*United States v. Olla,*
754 Fed. App. 168 (4th Cir. 2018) (per curiam) .....................35, 71

*United States v. Pizzuto,*
2022 WL 16646653 (4th Cir. Nov. 3, 2022) (per curiam) ............77

*United States v. Price,*
111 F.4th 392 (4th Cir. 2024) (en banc) ........................................20

*United States v. Ragan-Armstrong,*
2023 WL 1817470 (4th Cir. Feb. 2, 2023) ....................................86

*United States v. Ragan-Armstrong,*
2023 WL 3018422 (4th Cir. Apr. 20, 2023) (per curiam) ............86

*United States v. Ramos,*
763 F.3d 45 (1st Cir. 2014) ............................................................59

*United States v. Rivero,*
889 F.3d 618 (9th Cir. 2018) .........................................................43

*United States v. Rogers,*
961 F.3d 291 (4th Cir. 2020) .........................................................84

*United States v. Royal,*
731 F.3d 333 (4th Cir. 2013) .........................................................20

*United States v. Ruiz-Castillo,*
432 Fed. App. 229 (4th Cir. 2011) ...............................................70

*United States v. Russell,*
971 F.2d 1098 (4th Cir. 1992) ......................................................62

*United States v. Salameh,*
152 F.3d 88 (2d Cir. 1998) ......................................................66, 67

*United States v. Santiago,*
344 Fed. App. 847 (4th Cir. 2009) (per curiam) ....................27, 29

*United States v. Sayles,*
296 F.3d 219 (4th Cir. 2002) ..................................................56, 57

*United States v. Schnabel,*
939 F.2d 197 (4th Cir. 1991) .......................................................69

*United States v. Seigler,*
990 F.3d 331 (4th Cir. 2021) ..................................................20, 31

*United States v. Serrano-Delgado,*
29 F.4th 16 (1st Cir. 2022) .....................................................66, 67

*United States v. Sherifi,*
107 F.4th 309 (4th Cir. 2024) .....................................................74

*United States v. Simpson,*
910 F.2d 154 (4th Cir. 1990) .......................................................49

*United States v. Smart,*
501 F.3d 862 (8th Cir. 2007) .......................................................60

*United States v. Smith,*
117 F.4th 584 (4th Cir. 2024) ................................................82, 84

*United States v. Smith,*
21 F.4th 122 (4th Cir. 2021) .......................................................62

*United States v. Soteras,*
770 F.2d 641 (7th Cir. 1985) .......................................................46

xi

*United States v. Strieper*,
   666 F.3d 277 (4th Cir. 2012) ..........................................................74

*United States v. Sullivan*,
   455 F.3d 248 (4th Cir. 2006) .................................................25, 31

*United States v. Thomas*,
   29 Fed. App. 241 (6th Cir. 2002) (per curiam) ......................56, 58

*United States v. Thomas*,
   490 Fed. App. 514 (4th Cir. 2012) .............................................51

*United States v. Thornton*,
   463 F.3d 693 (7th Cir. 2006) .......................................................27

*United States v. Torres*,
   162 F.3d 6 (1st Cir. 1996)............................................................63

*United States v. Torrez*,
   869 F.3d 291 (4th Cir. 2017) .................................................40, 41

*United States v. Tylkowski*,
   9 F.3d 1255 (7th Cir. 1993) .............................................21, 27, 32

*United States v. Watkins*,
   111 F.4th 300 (4th Cir. 2024).............................................3, 18, 20, 73

*United States v. Whittington*,
   26 F.3d 456 (4th Cir. 1994)...............................33, 36, 69, 70, 71

*United States v. Wooderts*,
   189 F.3d 468 (5th Cir. 1999) (per curiam) .................................64

**STATUTES**

18 U.S.C. § 371 ...............................................................................10, 45

18 U.S.C. § 554(a) ...........................................................................10, 42

18 U.S.C. § 921(a)(3) ..................................................................21, 39, 41

18 U.S.C. § 922(k) ...........................................................................10, 20

18 U.S.C. § 3231 ...................................................................................1

18 U.S.C. § 3742(a) ..............................................................................1

22 U.S.C. § 2778 .............................................................................10, 42

22 U.S.C. § 2778(c) .............................................................................43

28 U.S.C. § 1291 ....................................................................................1

50 U.S.C. § 4819 .............................................................................10, 42

50 U.S.C. § 4819(b) .............................................................................43

## OTHER AUTHORITIES

Fed. R. Evid. 403 ................................................................................52

Fed. R. Evid. 702, advisory comm. notes, 2000 amends...........49, 50, 51

Fed. R. Evid. 807 ................................................................................61

U.S.S.G. § 1B1.1, cmt. 1(I) ...............................................................76

U.S.S.G. § 1B1.3(a)(1)(B) ..................................................................77

U.S.S.G. § 2K2.1 ................................................................................82

U.S.S.G. § 2K2.1(b)(1) .......................................................................76

U.S.S.G. § 2K2.1(b)(1)(C) ................................................2, 14, 18, 74

U.S.S.G. § 2K2.1(b)(5) ......................................................2, 14, 18, 74

U.S.S.G. § 2K2.1, cmt. 13(A)(i) ........................................................80

U.S.S.G. § 2K2.1, cmt. 13(B) ............................................................81

U.S.S.G. § 5D1.3(c) .......................................................................83, 85

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal offenses of defendants-appellants Eric Nji, Wilson Nuyila Tita, and Wilson Che Fonguh (collectively, defendants) pursuant to 18 U.S.C. § 3231. It entered judgments of conviction against them on March 22, 2023 (Nji), April 5, 2023 (Tita), and May 25, 2023 (Fonguh). J.A.2479, J.A.2556, J.A.2682. Defendants timely filed their notices of appeal on March 31, 2023 (Nji), April 18, 2023 (Tita), and June 2, 2023 (Fonguh). J.A.2554, J.A.2562, J.A.2692. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I. Whether sufficient evidence supported defendants' three convictions after a 10-day jury trial in which the Government presented nearly 300 exhibits, over 530 pages of documentary evidence, and 12 witnesses, in addition to defendants' own four witnesses, including two of defendants themselves.

II. Whether the district court abused its discretion in excluding defendants' expert testimony on the ground that it was unreliable and likely to confuse the factual issues by suggesting that defendants had some justification for their actions, while, simultaneously, the testimony was unlikely to help the jurors, who did not need an expert to explain the existence or consequences of a war that multiple witnesses were

1

planning to—and did—discuss.

III. Whether the district court abused its discretion in refusing to compel the testimony of defendants' coconspirator after he validly invoked his Fifth Amendment privilege as to all questions defendants sought to ask him.

IV. Whether the district court abused its discretion in instructing the jury on *Pinkerton* liability and willful blindness, and in defining "knowledge" consistent with the law, where ample evidence supported the jury's finding of knowing conspiracy, connected the substantive offenses to that conspiracy, and could support a finding that defendants were deliberately ignorant of their coconspirators' acts.

V. Whether the district court procedurally or plainly erred when it applied the enhancements in U.S.S.G. § 2K2.1(b)(1)(C) and (b)(5) based on defendants' substantive convictions for unlawfully transporting and smuggling more than 25 firearms, when the firearms were enumerated in the superseding indictment and were confirmed at trial to be involved in defendants' offenses.

VI. Whether the district court committed *Rogers* errors when it announced at defendants' sentencings that it would impose the "standard conditions," summarized what those conditions entailed, and issued written judgments clarifying the conditions, which were the same 13 standard conditions in both the Guidelines and the District of Maryland's virtually identical standing order.

## STATEMENT OF THE CASE

### A.    Defendants' Criminal Conduct[1]

Defendants are native-born Cameroonians who immigrated to the United States and became citizens.    J.A.1246 (Fonguh); J.A.1335 (Nji); J.A.3499 (Tita). When, in 2017, longstanding sectional tensions in their home country erupted into armed conflict, defendants decided to do something about it.    With a handful of other Cameroonian Americans, they started a group based in Baltimore County, Maryland, with the goal of funding, purchasing, and exporting a full-blown arsenal to arm their chosen side in the Cameroonian conflict.    J.A.75-76 (superseding indictment); J.A.336 (opening); J.A.445 (Matney); J.A.664-665 (Akem); J.A.929, J.A.931 (Muma).    Between November 2017 and July 2019, defendants threw themselves into this goal, spending an untold number of hours and much of their own disposable income in readying the arsenal for shipment to Cameroon.    J.A.53-79 (superseding indictment).

Along with defendants, the group comprised about ten principal members, including Tamufor St. Michael—whose house served as the group's homebase—as

---

[1]    The following facts are derived from the evidence at trial, taken in the light most favorable to the Government, the prevailing party.    *United States v. Jackson*, 126 F.4th 847, 852 n.1 (4th Cir. 2025).    On appeal of a post-verdict Rule 29 motion, the Court considers all the evidence admitted at trial, including that introduced by defendants.    *See United States v. Watkins*, 111 F.4th 300, 307 (4th Cir. 2024).

well as Alambi Walters Muma, Roger Akem, Edith Ngang, and Tse Ernst Bangarie. Many of these individuals were close with one another. Nji, Fonguh, and Muma were described as "friends." J.A.929 (Muma). So, too, were St. Michael and Bangerie. J.A.478 (Matney). Nji and Fonguh are cousins. J.A.1373 (Nji). Tita and St. Michael were "like brothers," J.A.443 (Matney), with Tita also named as St. Michael's "Godfather," J.A.1227 (St. Michael). The group's WhatsApp chats often reflected these affectionate relationships. J.A.695, J.A.741, J.A.750 (Akem regularly referring to colleagues as "brethren"); J.A.736-737 (St. Michael describing Muma as "a dedicated soldier, our brother"); J.A.3237 (members referring to Ngang as "Ma").

But the chats betrayed more sinister activities as well. Many of their discussions and CashApp transactions relating to guns, ammunition, or explosives (but not humanitarian goods) were shrouded in code: "sticks" for firearms, "peanuts" or "ground nuts" for ammunition, and "popcorn" for incendiary devices. J.A.444 (Matney). The group itself was variously called the "Peanut Project," "Stick and Peanut Project," or "Farm Project," with different offshoots innocuously named. J.A.662, J.A.666 (Akem); J.A.1962 (Mizell). And when a member of the group divulged its secrets, the result was expulsion. J.A.689-690 (Akem); J.A.2906 (by-laws). In other words, the group's success depended on "concealment," a fact of

4

which everyone, including defendants, was hyperaware.

Indeed, according to the "Peanut Project Membership Bylaws" drafted by Tita, the group's "concealment methods" were "sacred" to their exploits. J.A.2906 (bylaws). Some of these methods provided instruction on how members were to package "sticks" and "peanuts" for shipment. This involved encasing the items in "layers and layers" of cling wrap, tinfoil, tape, and carbon paper. J.A.458; *see* J.A.390, J.A.394, J.A.418 (Matney); J.A.670 (Akem); J.A.795, J.A.806 (Thomas). The wrapped packages were then placed in cut-open compressor tanks (codename: "consignments") that were subsequently filled with spray foam, welded back together, and repainted to hide that they had ever been tampered with. J.A.468-469 (Matney); J.A.692 (Akem); J.A.1222 (St. Michael). One by one, these "consignments" were loaded into a shipping container along with miscellaneous goods, like cars and trucks, chairs, clothing, and window frames. J.A.948-949 (Muma); J.A.1284 (Fonguh). As Akem testified, this was to thwart the port authorities, since "it's very easy for [them] to go through" a partially loaded container," but "if you have a full container probably they rely more on the scanning and stuff like that. So it's ideal to have a full container … to accomplish what we're trying to accomplish." J.A.699.

The group employed other concealment methods as well. They put false

names and addresses on shipping papers, J.A.384-385, 508-509, J.A.575-578 (Matney), and furnished other people's names when they were later asked about the shipment by U.S. authorities, J.A.752, J.A.848 (Akem describing plan by "Response Team," which included Nji and Tita, to misdirect U.S. customs). They used "coded language," J.A.951 (Muma), and sought to change their codenames at least once to further "classify our projects and control of information," J.A.729-731 (Fonguh WhatsApp message, with agreement from Nji and Tita). For substantive conversations, they tried to avoid text messaging if they could meet in person, over Zoom, or by telephone instead, "reserv[ing]" WhatsApp "for general communication" only. J.A.771 (Akem WhatsApp message). And importantly, the group also removed identifying marks from the guns they shipped abroad, so that authorities "cannot track the weapon" back to the Peanut Project. J.A.933 (Muma). All of these methods, as witnesses later confirmed, were used to avoid detection not only by Cameroonian authorities, but also by American ones. J.A.670, J.A.690 (Akem); J.A.932-933, J.A.941-942, J.A.976, J.A.988 (Muma); J.A.1158 (St. Michael).

Many of the group's concealment activities took place in the basement of St. Michael's house (codename: "the lab"), which was "a very small space, like about three, three meter square." J.A.932, J.A.934 (Muma). Defendants spent significant time in that basement, with Nji and Fonguh there sometimes thrice a week

6

during the relevant period, J.A.696, J.A.946 (Nji WhatsApp messages), and Tita there "often" as well, J.A.939 (Muma). The lab was not only where the group typically convened for in-person meetings. J.A.879-880 (Akem); J.A.930-931 (Muma). It was also where the group members cleaned, primed, and refurbished ammunition; removed the serial numbers from the firearms they purchased; built their own "ghost guns"; and packaged all of these various items for shipment, before loading them into the compressor tanks and eventually into the shipping container. *E.g.*, J.A.696, J.A.870 (Akem); J.A.932-939 (Muma); J.A.1186-1191 (St. Michael). Defendants supervised or partook in many of these tasks, including all things ammunition-related, as well as loading the consignments and the shipping container. J.A.710-711 (Akem); J.A.934, J.A.937-939, J.A.948-951 (Muma); J.A.1208 (St. Michael). And they almost always overlapped in the lab with colleagues who were engaged in other concealment activities—like Muma, who was responsible for grinding off the serial numbers from the firearms, J.A.931 (Muma), and St. Michael, who did every kind of work in the lab, J.A.1206 (St. Michael), J.A.1261 (Fonguh). As Muma later testified, 80% of the time he was in the lab, Nji and Fonguh were with him, and Tita was there "often" as well. J.A.932, J.A.935, J.A.939, J.A.947, J.A.967-968. St. Michael, too, was in the lab with the others about 50% of the time. J.A.1221-1223.

The upshot, in Muma's words, was that "[a]ll of us knew what was being done" with the firearms and ammunition.   J.A.973; *see also* J.A.674 (Akem stating, "That was the understanding of the group, we had to conceal it.   There was no way you could send it out without concealing.").   In fact, the evidence demonstrated that it was difficult *not* to know what was going on in the lab.   The ammunition, packaging materials, and gunsmithing tools were everywhere.   J.A.401-405 (Matney). The firearms, too, were "stored all over the place in the basement."   J.A.1221 (St. Michael).   And some of the concealment tasks were especially conspicuous. Muma testified that whenever he filed off a firearm's serial number, which took up to five minutes each time, he wore goggles and special gloves and used a machine that made a loud noise that could be heard throughout the lab.   J.A.934-937.   Similarly, Fonguh told the jury that he could hear "hum[ming]" when St. Michael ran the milling machine, J.A.1296—a noise that he and Nji were curious enough to ask about, J.A.1257-1260.   Nji and Fonguh also testified about other machines and tools in the lab, J.A.1293-1294 (Fonguh); J.A.1362-1363, J.A.1403 (Nji), which they likewise knew about and used for "concealment work," J.A.740 (St. Michael WhatsApp message).

As a result of these activities, the Peanut Project loaded and launched a shipping container from the Port of Baltimore in January 2019.   J.A.436 (Matney).   The

cargo ship bearing that container was headed for Nigeria, where Akem was to meet it and transport it from Nigeria to Cameroon. J.A.741-742 (Akem). Alerted to possible smuggling, however, Homeland Security Investigations Agent Tonya Matney pulled the paperwork associated with the container. J.A.382. Seeing red flags, she ordered the shipping container to be redelivered to Baltimore, where Matney and other agents "painstakingly unloaded everything" inside it. J.A.385, J.A.389. They discovered, among other weapons and ordnance, over 35,000 rounds of ammunition and 39 firearms, 28 of which had their serial numbers obliterated. J.A.428, J.A.480. The 39 firearms included Savage Lapua sniper rifles, SKS variant rifles, Ruger precision rifles, a Remington shotgun, and nine personally manufactured rifles and handguns. J.A.423-427 (Matney).

"Through surveillance and other tools," Matney determined that the shipment belonged, not to "Mathew Akinlomi Obansanjo," who was listed as the exporter, but to St. Michael. J.A.384-385. Matney obtained a search warrant for St. Michael's house, J.A.399, and there seized his phone, J.A.434, as well as notebooks and other written information in which defendants were identified, J.A.437, J.A.440-441. In August 2020, all three defendants came in for voluntary interviews. J.A.441-445, J.A.448-450. They were arrested following an investigation.

## B.    Procedural History

In March 2022, a federal grand jury returned a superseding indictment charging defendants with five counts: conspiracy, in violation of 18 U.S.C. § 371 (Count I); unlawfully exporting defense articles controlled under the Arms Export Control Act (AECA), in violation of 22 U.S.C. § 2778 (Count II); unlawfully exporting items prohibited by the Export Control Reform Act (ECRA), in violation of 50 U.S.C. § 4819 (Count III); transportation of firearms with their serial numbers obliterated, in violation of 18 U.S.C. § 922(k) (Count IV); and smuggling, in violation of 18 U.S.C. § 554(a) (Count V).   J.A.53-79.

### 1.    Pretrial Motions and Trial

The month before trial, defendants noticed their intention to call an expert witness, Efi Tembon, to explain that "the Cameroonian government has been involved in an armed conflict with the Anglophone Cameroonians since at least 2016." J.A.134.   Defendants insisted that Tembon's testimony would help the jury rationalize their clandestine behavior:   They were afraid of retaliation by the Cameroonian government, not of detection by U.S. authorities.   J.A.134-135.   Agreeing with the Government's opposition, the district court declined to admit that proffered testimony, concluding it was not sufficiently reliable and more likely to confuse the jury than help it.   J.A.296-299.

10

Defendants' case proceeded to trial, where the Government presented 12 witnesses, nearly 300 exhibits, and over 530 pages of documentary evidence showing, as relevant here, that defendants transported the 28 obliterated firearms seized from the shipping container while knowing their serial numbers were obliterated; that they knowingly smuggled overseas those 28 firearms, as well as the remaining 11 firearms and over 35,000 rounds of ammunition; and that they knowingly and willfully participated in a conspiracy to commit these acts. On the defense side, Tita presented the testimony of a witness, St. Michael, J.A.1140-1237, while Nji and Fonguh both took the stand. J.A.1238-1327 (Fonguh); J.A.1332-1343, J.A.1353-1430 (Nji). Fonguh also offered a character witness, Desma Nicholson. J.A.1328-1332.

Before they rested, defendants returned to an earlier-raised issue of whether they could call Bangarie, who had invoked his Fifth Amendment privilege against self-incrimination, to testify about a statement he made in a proffer to the Government. J.A.1431. After examining the scope of Bangarie's asserted privilege and the questions that defense counsel sought to ask of him, the district court declined to compel Bangarie, who was still awaiting sentencing, to take the witness stand. J.A.1440-1441, J.A.1442. It also denied defendants' alternative request to admit Bangarie's proffer statement, which contained undisputed hearsay, under Federal Rule of Evidence 807. J.A.1441-1443. The defense then rested.

At that point, the court provided the jury instructions. The court instructed the jurors on willful blindness, telling them that "[i]n determining whether the defendant acted knowingly" as to Count IV, they "may consider whether a defendant deliberately closed his eyes to what would otherwise have been obvious to him." J.A.1495. The court also instructed the jury pursuant to the *Pinkerton* doctrine. *See Pinkerton v. United States*, 328 U.S. 640, 646-647 (1946). The jurors were told that under that doctrine, if they "find beyond a reasonable doubt that a defendant was a member of the conspiracy charged in Count One … and guilty of the conspiracy charge, then you may also, but you are not required to find him guilty of the substantive crimes," so long as the jurors also found the five elements to support *Pinkerton* liability. J.A.1502-1503. Defendants objected to both instructions. J.A.1506-1517.

Following the 10-day trial, the jury returned a verdict of guilty on conspiracy (Count I), transportation of obliterated firearms (Count IV), and smuggling (Count V). The jury acquitted defendants of the AECA and ECRA violations (Counts II and III, respectively).

### 2. Posttrial Motions and Sentencings

After their convictions, defendants each filed a posttrial motion for a judgment of acquittal under Rule 29(c) or alternatively for a new trial. J.A.1705-1712 (Nji);

J.A.1782-1799 (Fonguh); J.A.1801-1817 (Tita). Fonguh additionally asked the court to dismiss his counts of conviction under Rule 12(b)(2) and (b)(3)(B)(v). J.A.1782-1799. These motions challenged almost every aspect of the district court's pretrial and trial rulings, as well as the sufficiency of the jury's convictions.

In December 2022, the district court, now Judge Richard D. Bennett,[2] held a hearing on defendants' motions. At the hearing, and as memorialized in a later opinion, J.A.2329-2349, the court denied the motions across the board. As relevant here, it found that the evidence was "more than sufficient" for a jury to find that defendants knew that the serial numbers had been obliterated from the 28 firearms, J.A.2256-2257, and that the firearms were indeed statutory "firearms," J.A.2302. It also rejected defendants' argument that if Count IV fell away, the jury could not have rendered a guilty verdict on Counts I and V. J.A.2310-2316. This was incorrect, the court concluded, since conspiracy is a separate crime from the substantive offense, J.A.2311, and the smuggling statute requires a different mens rea than that required for a Count II or III conviction, J.A.2316.

The Presentence Investigation Report (PSR) for each defendant assigned a total offense level of either 26 (Tita) or 28 (Nji and Fonguh), which—combined with

---

[2] After trial, this case was reassigned to Judge Bennett from Judge Catherine C. Blake, who had presided until that point. J.A.2166. In addition to resolving the posttrial motions, Judge Bennett also presided over defendants' sentencings.

a criminal history category of I—resulted in a recommended sentencing range of 63 to 87 months (Tita) and 78 to 97 months (Nji and Fonguh). J.A.3475 (Nji); J.A.3604 (Fonguh); J.A.3503 (Tita). These offense level calculations included a six-level enhancement for an offense involving more than 25 firearms, U.S.S.G. § 2K2.1(b)(1)(C), and a four-level enhancement for trafficking two or more firearms, *id.* § 2K2.1(b)(5). All three defendants objected to this latter enhancement. J.A.2418-2420 (Nji); J.A.2629-2633 (Fonguh); J.A.3527-3534 (Tita). Nji and Fonguh also objected to the former. J.A.2354-2355 (Nji); J.A.2568 (Fonguh). In deciding to apply both, the district court determined that defendants' convictions served as sufficient factual proof to bring defendants within the enhancements' scopes. J.A.2419-2422 (Nji); J.A.2632-2633 (Fonguh); J.A.3532-3536 (Tita).

After rejecting the recommended obstruction-of-justice enhancement for Nji and Fonguh, the court calculated a Guidelines range of 63 to 78 months for all defendants and sentenced them to the low-end of that range: 63 months, with a supervision term of two years. J.A.2479-2482 (Nji); J.A.2682-2685 (Fonguh); J.A.2557-2559 (Tita). At each of defendants' sentencings, the court announced that it was imposing the "standard conditions" of supervised release and summarized those conditions orally before issuing the written judgments. J.A.2471-2473 (Nji); J.A.2675-2677 (Fonguh); J.A.3578-3579 (Tita). These consolidated appeals followed.

# SUMMARY OF ARGUMENT

I.     The evidence was more than sufficient to support defendants' three convictions.  As an initial matter, defendants do not bring a real sufficiency challenge to their convictions on Count I (conspiracy) or Count V (smuggling), instead arguing that those convictions collapse if this Court finds the evidence insufficient on Count IV (obliterated firearms).  Not so.  The law is clear that conspiracy is an offense wholly separate from the crime that serves as the object of the conspiracy.  And their Count V argument similarly misses the mark:  Even assuming Count IV falls off, the other predicate acts supporting a smuggling conviction—acts taken contrary to AECA and ECRA—remain valid.  This is notwithstanding defendants' acquittals on Counts II and III, since direct violations of those statutes require a higher mens rea (willfulness) than does smuggling (knowledge) and, in any event, the jury may return an inconsistent verdict.

As for defendants' sufficiency challenge to Count IV, that also fails. No special testimony was required to prove that the firearms were, in fact, "firearms," since the jury was able to examine them for itself and numerous witnesses confirmed that the firearms were at least designed to be operable.  Plus, the trial evidence more than sufficed to prove that defendants knew of the obliteration of serial numbers from the firearms.  It showed that the conspirators were close-knit and concerned

with "concealment" above all else.  It showed that defendants spent considerable time in St. Micheal's small, three-meter-square basement, where firearms with obviously obliterated serial numbers, as well as the machine used to obliterate them, were within plain view and arms' reach.   It showed that much of the time defendants spent there overlapped with the time that Muma, the primary obliterator, also spent in the basement.  It showed that obliteration was a noisy, attention-grabbing task that someone in a small space could not fail to notice.   And it showed that Muma did the obliterating when conspirators were in the basement with him, and that Nji and Fonguh were present when Muma and St. Michael discussed it.   On these facts, the jury was entitled to find knowledge.   But at a minimum, it was entitled to infer knowledge based on the theories of willful blindness and *Pinkerton* liability.

II.    The district court acted within its discretion in excluding Tembon's expert testimony.  That testimony was intended to explain to the jury that the Cameroonian government was prone to retaliation against those, like defendants, who armed the other side.   But whatever else it was, Tembon's testimony was not needed to explain the concept of retaliation, which was within the jury's lay understanding. On the other hand, testimony purporting to furnish grim, one-sided details about the Cameroonian conflict was more likely to turn defendants' case into a referendum on that conflict than it was to help the jury decide the issues before it.   This balancing

under Federal Rule of Evidence 403 was not error, much less one that requires reversing defendants' convictions. On the contrary, any error—if it existed—was harmless, given that all of defendants' testifying coconspirators, and the two testifying defendants themselves, supplied plenty of evidence traversing the same ground that Tembon was supposed to cover.

III. The district court also acted within its discretion in refusing to compel Bangarie to testify after he invoked his Fifth Amendment right as to any questions relating to his proffer statement to the Government. The court's decision was made only after it had inquired into the scope of Bangarie's asserted right and the questions that defense counsel sought to ask him—all of which had to do with the same proffer statement he was refusing to discuss. No more was required for the court to find that Bangarie, who was still awaiting sentencing, had validly invoked the privilege. Nor did the court abuse its discretion in alternatively declining to admit Bangarie's proffer statement under the residual hearsay exception found in Federal Rule of Evidence 807. That exception is to be used only in rare circumstances, and certainly not where, as here, the statement—which was not made under oath, and which the Government maintained was false—lacked any indicia of trustworthiness.

IV. The district court did not abuse its discretion in giving the jury any of the three instructions defendants now challenge. The *Pinkerton* instruction, which

gave the jury discretion whether to invoke vicarious liability on the substantive counts, straightforwardly applied in this conspiracy case, where the conspirators all tried to avoid detection by authorities in their mission to ship weapons to Cameroonian combatants.   The willful blindness instruction, which was also discretionary and given only as to Count IV anyway, was likewise justified here, where the evidence gave rise to a reasonable inference of actual knowledge but at a minimum supported a finding that defendants closed their eyes to avoid knowing what was taking place around them, including the conspicuous obliteration of the firearms in the very same small basement where they spent significant amounts of time.   And the court's instruction defining "knowingly" was similarly appropriate, since it does not stray from the law.   After all, "knowledge or intent is ordinarily not susceptible to proof by direct evidence.   It is generally through reasonable inferences from circumstantial evidence that a jury understands the defendant's mind."   *Watkins*, 111 F.4th at 309.

V.   The district court did not procedurally or plainly err in applying the sentence enhancements in U.S.S.G. § 2K2.1(b)(1)(C) and (b)(5).   The text of subsection (b)(1)(C) straightforwardly allows for a six-level enhancement whenever an "offense," like defendants' Count IV and V convictions, "involved" more than 25 firearms.   Since this text requires no separate finding about defendants' knowledge,

18

it neither requires any "particularized findings" of attribution where, as here, there is zero question that defendants were charged with and factually committed crimes that "involved" the same firearms specifically enumerated in their superseding indictments. And if that is true (it is), the four-level enhancement in subsection (b)(5) also applies. That subsection likewise requires no separate finding of knowledge. And because defendants' substantive offenses "involved" more than 25 firearms, and because the jury had to find that defendants "transported" the firearms in order to convict them of Counts IV and V, defendants necessarily fell within the scope of subsection (b)(5). The court therefore committed no procedural error, much less a significant one, that requires upending the court's sentencing decision.

VI. Lastly, the district court committed no *Rogers* error when it announced at defendants' sentencings that it was imposing by incorporation the "standard conditions," gave a rundown of what those conditions entailed, and issued written judgments that cohered with, and flowed naturally from, the oral conditions—which were, at any rate, a verbatim match to the 13 standard conditions in the District of Maryland's standing order, which themselves were virtually identical to the 13 standard conditions in the Guidelines.

# ARGUMENT

## I. THE EVIDENCE WAS SUFFICIENT TO SUPPORT DEFENDANTS' CONVICTIONS

### A. Standard of Review

The denial of a Rule 29 motion based on the sufficiency of the evidence is reviewed de novo. *United States v. Farrell*, 921 F.3d 116, 136 (4th Cir. 2019). "But, like the district court, [this Court] must give deference to the jury's determination." *Watkins*, 111 F.4th at 308. "A jury verdict *must be sustained* if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Barronette*, 46 F.4th 177, 203 (4th Cir. 2022) (cleaned up). "Put another way, reversal is limited to cases where the prosecution's failure is clear," *United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021) (cleaned up), and only where "no rational trier of fact could have found the essential elements of the crime," *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013).

### B. Substantial Evidence Supported Defendants' Count IV Convictions

The evidence adduced at trial was more than sufficient to sustain defendants' convictions for transporting firearms with their serial numbers obliterated in violation of 18 U.S.C. § 922(k) (Count IV). To prove this charge, the Government had to show that defendants knew of the obliteration of the serial numbers. *United States v. Price*, 111 F.4th 392, 407 n.11 (4th Cir. 2024) (en banc). It also had to

show that the firearms involved in the offense met the statutory definition of a "fire-arm." 18 U.S.C. § 921(a)(3).[3]  The Government made these showings to the jury's satisfaction below, as the district court recognized in its Rule 29 decision. J.A.2344.  And nothing in defendants' brief on appeal warrants displacing the jury's conclusion on this front, which is owed the Court's considerable deference.

### 1.    The Evidence Supported the Jury's Conclusion that Defendants Knew of the Obliteration

For starters, the evidence admitted at trial "and the reasonable inferences drawn therefrom" established that defendants knew of the serial numbers' obliteration.  *United States v. Tylkowski*, 9 F.3d 1255, 1259 (7th Cir. 1993).  That evidence revealed that defendants were knowing and enthusiastic members of a conspiracy to smuggle weapons to Cameroon to support their chosen side in the armed conflict there.  J.A.665 (Akem); J.A.930 (Muma).  The core tenet of this conspiracy was secrecy, as all of the testifying coconspirators admitted, J.A.674, J.A.699 (Akem); J.A.942, J.A.955, J.A.957-958 (Muma); J.A.1158 (St. Michael), and as defendants clearly knew.  They wanted to avoid detection of their activities not just by Cameroonian authorities, but also by American ones.  J.A.670, J.A.690 (Akem); J.A.932-933, J.A.941-942, J.A.976, J.A.988 (Muma); J.A.1158 (St. Michael).  To achieve

---

[3]  Defendants do not challenge the sufficiency of the evidence on the remaining elements of a Section 922(k) offense.

this goal, the conspirators used various "methods of concealment" before shipping the firearms, J.A.2906 (Peanut Project Membership Bylaws, drafted by Tita), including the obliteration of most of the firearms' serial numbers and other identifying marks, J.A.897 (Esposito). This ensured that if the firearms landed in the wrong hands, neither the "Government of Cameroon … [n]or the U.S. Government" could "track" them back to the conspirators. J.A.932-933 (Muma).

The task of obliterating serial numbers was primarily entrusted to Alambi Walters Muma. J.A.931, J.A.933-934. It required a tool that Muma called a "grinder," which he used to file off each firearm's identifying information. J.A.931, J.A.935. Using the grinder required Muma to don "special gloves" and "goggles" to protect himself from debris. J.A.935. When the grinder was on, it made a loud, apparently shrill ("cheeeeeeeeeeee") noise that traveled throughout St. Michael's basement, also known as "the lab." J.A.936-937. This was not surprising, as witnesses later testified, since the lab was "a very small space … about three, three meter square," J.A.934 (Muma), "very tight and difficult to [navigate]"—"[not] very large," J.A.405 (Matney). When not in use, the grinder sat visibly on the back of a toilet in the basement, some feet from where the conspirators otherwise worked and met. J.A.936; *see* J.A.2756-2757, J.A.2763. Muma himself was also visible, goggles and gloves included, whenever he was operating the grinder. J.A.936-937.

According to Muma, it took five minutes or fewer to obliterate a serial number from a firearm.   J.A.936.

Meanwhile, all three defendants spent considerable time in St. Michael's basement, frequently *with* Muma.   "8 out of 10 times" Muma visited the lab, he carpooled with Nji and Fonguh.   J.A.932, J.A.947, J.A.967-968.   In fact, when St. Michael gave Muma the task of obliterating serial numbers, Nji and Fonguh were in the basement with him—if "not like listening," at least within earshot in that "very small space."   J.A.933-934.[4]   Tita, too, "often" came to the lab when Muma was present.   J.A.939.   And while lab responsibilities varied among the conspirators, they all worked as part of a "team," J.A.933, J.A.937 (Muma), one that "always tried to seek consensus and get everybody's input" on "steps that were being taken in the project," J.A.709 (Akem).   Nji would typically "help in packaging and … reloading," J.A.937, as well as "tak[ing] inventory … [of] the amount of ammunitions and the guns just to keep stock of the things that we are shipping out," J.A.934, J.A.938.   Fonguh "would do some type of loading and reloading" of the ammunition, J.A.934, in addition to "packag[ing]" and "repackag[ing] things," J.A.939.   Tita was a

---

[4]   The jury did not have to credit Muma's belief that Nji and Fonguh were "not like listening" when St. Michael ordered him to obliterate the serial numbers.   Similarly, it could have inferred that because Nji and Fonguh were nearby when the order was given, they overheard it.

supervisor of sorts, wanting to "see what we [were] doing" and giving instructions on how to do it, although he usually forwent "the hard work."  J.A.939.

Even without Muma, defendants had free, round-the-clock access to the lab using a key that St. Michael hid on the premises.  J.A.1221 (St. Michael).  This included access to the grinder, as well as to the dozens of firearms "stored all over the place in the basement."  J.A.1220-1221 (St. Michael); *see also* J.A.402-404 (Matney describing firearms found on the floor, chairs, tables, etc.).  Most of these firearms—including 28 out of the 39 eventually seized by law enforcement[5]— had their serial numbers conspicuously and tangibly altered, as the admitted photos made clear.  *E.g.*, J.A.2708, J.A.2718, J.A.3161.  And the conspiracy overall lasted more than eighteen months, during which defendants visited St. Michael's an untold number of times, sometimes thrice a week, J.A.946, to "package," "repackage," "load," "reload," "inventory," and supervise work on the items being shipped, J.A.934, J.A.937, J.A.939.  *See also* J.A.455 (in-person meeting on April 25, 2019, involving all defendants); J.A.693-694, J.A.943 (Nji confirming "few nights" of lab work); J.A.693, J.A.705, J.A.707-708 (Fonguh confirming several days of lab work); J.A.708-710 (Akem confirming "quite a few days" of lab work involving all

---

[5]  Of the 39 seized firearms, nine of them were privately manufactured firearms, or "ghost guns," and did not have serial numbers to obliterate.  J.A.1125.  So only two of the 39 firearms did not have their serial numbers removed.

24

defendants); J.A.866-867 (in-person meeting in "summer of 2018" involving all defendants); J.A.869-870, J.A.879-880 (Akem confirming "so many meetings" and lab work involving all defendants).

This evidence was more than enough for a jury to conclude that defendants "must know" of the serial numbers' obliteration. *United States v. Sullivan*, 455 F.3d 248, 261 (4th Cir. 2006). While defendants now split hairs with the facts underlying that conclusion, none of the arguments they raise on appeal requires reversing defendants' valid jury convictions.

*a. Defendants had knowledge.* Defendants first insist that no rational juror could infer they knew of the obliterated serial numbers, because there was no evidence that defendants saw or handled the firearms, no testimony that defendants were present when Muma "did the obliterating," and no indication that they discussed it with their coconspirators. Br. 24-28. But defendants are wrong, and their cramped, one-sided reading of the record overlooks critical facts, as well as "the complete picture that the evidence presents." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (en banc).

To begin with, the evidence that places defendants in St. Michael's basement dozens of times over an 18-month period, amounting to probably a hundred or more hours of exposure to the firearms there, subverts the narrative that defendants never

saw or touched those firearms.  *E.g.*, J.A.932, J.A.965, J.A.967 (Muma testifying that he worked at the lab "16, 32" hours per week, and that Nji and Fonguh were with him "8 out of 10 times," putting Nji and Fonguh at the lab around 12 to 26 hours per week during the relevant period); J.A.1221, J.A.1223 (St. Michael placing Nji at the lab "once a week during the time frame," but suggesting he could not account for all visits because he was only present "50 percent of the time"); J.A.1366-1367 (Nji stating that he went to the lab "regularly on Sundays" and on federal holidays, and occasionally on weekdays).[6]  On the contrary, it is hard to imagine how they could have avoided it—especially since Nji, for one, was charged with inventorying "the guns" before they "shipped out," J.A.934, J.A.938, and all three defendants attended meetings, did lab work, or oversaw such work in close proximity to scads of firearms, J.A.1220-1221.  *See also* J.A.1361, J.A.1392, J.A.1412-1413, J.A.1419 (Nji discussing "guns that I saw at St. Mike's house"); J.A.1255 (Fonguh stating that he "never had the physical contact with any firearm except … in St. Mike's basement"); J.A.1265 (Fonguh discussing leaked video showing him and "a lot of guns").  "[G]iven that one need only look at the gun[s]"

---

[6]  To be sure, Fonguh testified that he visited the lab only 15 times, spending around two hours there each time, sometimes up to five hours.  J.A.1259, J.A.1278. But the jury was not required to credit that testimony over Muma's, or any of the WhatsApp messages or meeting minutes suggesting otherwise, especially given Fonguh's other self-serving statements.  *Infra* at 33-34.

to know their serial numbers were obliterated, the frequency of defendants' visits to the lab alone permits an inference that they had the requisite knowledge. *United States v. Thornton*, 463 F.3d 693, 699 (7th Cir. 2006); *accord United States v. Cobbs*, 233 Fed. App. 524, at *10 (6th Cir. 2007). This is especially true where, as here, the firearms had "very obvious obliterated serial number[s]"—a fact that the "jury was able to examine" for itself both photographically and in person. *United States v. Howard*, 216 F.3d 1074, at *2 (2d Cir. 2000) (summary order); *see also Cobbs*, 233 Fed. App. at *10 (because the "firearm was introduced into evidence as an exhibit[,] [t]he jury could reasonably have determined that Cobbs would have observed the obliteration"); *United States v. Santiago*, 344 Fed. App. 847, 851 n.7 (4th Cir. 2009) (per curiam) (sufficient evidence of knowledge where, inter alia, "the gun displayed physical evidence of scratches and obliteration").

Similarly, while defendants fault a lack of evidence that they "ever discussed" the obliterations, Br. 27—which would have been *direct* evidence of knowledge, and not required in any event, *see Tylkowski*, 9 F.3d at 1260—defendants certainly had ample opportunity to do so. And that, too, creates a reasonable inference: that through their involvement in this close-knit, long-running conspiracy, defendants became aware of the obliterations. *See United States v. Foster-Torres*, 40 Fed. App. 528, 530 (9th Cir. 2002) (mem.) (sufficient evidence of knowledge given

defendant's "degree of involvement" in the conspiracy). Indeed, the conspirators spent significant amounts of time together, not just at St. Michael's but in car rides (Nji, Fonguh, and Muma), fundraisers, Zoom and phone meetings, and other off-site meetings. They enjoyed a close relationship, with Nji, Fonguh, and Muma described as "friends," J.A.929, and Tita and St. Michael "like brothers," J.A.443. *See also* J.A.1227 (St. Michael testifying that Tita is his "Godfather" and agreeing they were "very close," like "brothers"). The conspiracy was collaborative in nature, rather than hierarchical or hub-and-spoke, with members "always tr[ying] … to get everybody's input" on different "steps" of the project. J.A.709; *see* J.A.973 (Muma testifying that "[a]ll of us knew what was being done" with the ammunition and firearms in the basement). And everyone, including defendants, knew that "concealment" was the priority. J.A.2906 (bylaws). This is true even accepting defendants' alleged motivation for keeping the conspiracy a secret: to ensure the Cameroonian government did not discover the conspirators' involvement in arming the other side— a goal, incidentally, that would have been particularly well served by obliterating any means of tracing individual guns back to them. J.A.932-933 (Muma). Any of these uncontroverted facts, and especially all of them combined, support the jury's conclusion that defendants knew "the scope of the conspiracy," and therefore "had to know that someone … would fulfill the role of obliterating the

28

serial numbers." *Foster-Torres*, 40 Fed. App. at 530; *see Santiago*, 344 Fed. App. at 851 n.7 (sufficient evidence of knowledge where, inter alia, the secrecy required by defendant's gang membership made it "reasonable for the jury to find that [defendant] would have possessed a firearm with an obliterated serial number, rather than one that could have been more easily traced or identifiable").

Finally, defendants pick apart "each individual fiber" of Muma's testimony, *Burgos*, 94 F.3d at 863, arguing that Muma never said defendants were present when he used the grinder, and what he did say was not enough for the jury to assume otherwise. But these contentions rest on an acontextual, hyperliteral reading of the transcript. Muma confirmed that "others" were in the lab when he did the obliterating, J.A.935, that he, Nji, and Fonguh were in the lab together 80% of the time, J.A.932, J.A.935, J.A.947, J.A.967-968, and that Tita was also in the lab "often" when Muma was present, J.A.939. While defendants read that testimony as prohibiting a conclusion that defendants were the "others" Muma was talking about, the jury was not required to do the same. And defendants' calculation of how much time, exactly, Muma would have spent obliterating serial numbers—five minutes times ten firearms equals "less than an hour total," Br. 26—elevates technicality over common sense. For one thing, because the firearms were purchased at different times, J.A.3231, the obliteration almost certainly occurred not all at once, but over

many of Muma's visits to the lab, most of which defendants were present for. For another, running a machine that makes a loud distinctive noise in a small space, even just for five minutes at a time, is attention-grabbing—something a juror, applying her intuition and experience, was permitted to consider. This, combined with the fact that defendants were familiar with and curious about *other* machines and activities in the lab, J.A.1257-1258 (Fonguh); J.A.1362-1363 (Nji), while renouncing any knowledge of the grinder, was yet another piece of the puzzle adding to the evidence here. *See Burgos*, 94 F.3d at 867 ("Relating implausible … tales to the jury can be rationally viewed as further circumstantial evidence indicating guilt.").

At any rate, defendants' "less than an hour" calculation—the cornerstone of their argument in this section—turns the standard of review on its head by viewing the evidence in a light more favorable to the defense than to the jury's guilty verdicts. Muma testified that it took him up to five minutes to obliterate "a serial number," J.A.972, but many of the seized firearms bore evidence of obliteration in multiple places, since the conspirators removed other identifying marks besides the serial number, J.A.897-901. And while, to be sure, Muma claimed credit for obliterating "more than 10" of the 25 firearms identified in his plea agreement, J.A.1003, the other 18 seized firearms with obliterated serial numbers must have been altered by *someone* in the conspiracy. On top of that, the 28 seized firearms forming the basis

of Count IV were not the only guns the conspirators shipped to Cameroon, J.A.724, J.A.770, J.A.945, suggesting that the obliteration defendants purportedly knew nothing about occurred far more frequently than the seized firearms alone would indicate. Instead of viewing the evidence in the proper light, defendants try to poke holes in "the garment of which the evidence is woven," *Burgos*, 94 F.3d at 863, based on a rigid and lopsided reading of the record, which arrogates the role of "determining which among different, reasonable interpretations of the evidence to believe." *Seigler*, 990 F.3d at 338 (cleaned up). But that is for the jury to decide, not anyone else.

In short, a rational jury could infer from the totality of the evidence that defendants knew of the obliterations. And none of defendants' cited cases compels a different result. Their two Section 922(k) cases, *Sullivan* and *Haile*, both stand for the proposition that something more is needed to ascribe knowledge of an obliterated serial number than the defendant's mere or constructive possession of the firearm. *See Sullivan*, 455 F.3d at 261; *United States v. Haile*, 685 F.3d 1211, 1220-1221 (11th Cir. 2012). Here, of course, there is something more—a lot more, including regular proximity and access over a long period of time to many firearms (not just one firearm) with obviously obliterated serial numbers; extensive involvement in a conspiracy where "concealment" was the name of the game; close relationships with

two coconspirators who unquestionably knew of the obliteration; and defendants' presence in the lab not only when some or all of the obliteration occurred, but also when it was discussed between St. Michael and Muma.    Courts have upheld Section 922(k) convictions on far less evidence.    *See United States v. Naranjo-Rosario*, 871 F.3d 86, 91, 95 (1st Cir. 2017) (sufficient evidence of knowledge where obliterated firearm was found in a bedroom where defendant was "staying as a guest," and where defendant "delay[ed] in opening the door [of the bedroom] to the police"); *United States v. Moore*, 54 F.3d 92, 101 (2d Cir. 1995) (sufficient evidence of knowledge where defendant gave a gun to another person "in a brown paper bag," since it was reasonable to infer that defendant "had inspected" the gun before distributing it); *Tylkowski*, 9 F.3d at 1259-1261 (finding it "a reasonable inference" that a defendant who transported "sealed boxes" containing obliterated firearms in his car "knows of [the boxes'] contents," especially given his involvement in the sale of the firearms); *Foster-Torres*, 40 Fed. App. at 530 (sufficient evidence of knowledge given defendant's "degree of involvement" in the conspiracy to sell obliterated firearms, despite no other evidence that defendant knew of the obliteration).

    *b.   Defendants were willfully blind.*    The evidence at trial was more than sufficient to show that the defendants knew of the obliterated serial numbers.    But even if it was not, the jury was entitled to infer that they knew of the obliterations from

their "self-imposed ignorance," as the district court charged in its willful blindness instruction. *United States v. Whittington*, 26 F.3d 456, 462 (4th Cir. 1994). That instruction is appropriate, as it was here (*infra* at 63-69), whenever a defendant believes there is a high probability that a fact exists and takes deliberate actions to avoid learning of that fact. *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017). Both conditions are met in this case.

*First*, the evidence was sufficient to show that defendants recognized a high probability that serial numbers would be removed from the firearms they were trying to conceal, and that they knew needed to be concealed, from the authorities. Although defendants now complain they had no such recognition—primarily because it was "undisputed" that they "had no knowledge or experience with firearms," Br. 31—that point *was* disputed. The only evidence that defendants lacked familiarity with firearms was Nji's and Fonguh's self-serving testimonies, which the jury was entitled to discredit for any number of reasons—one of them being the WhatsApp messages saying just the opposite. *E.g.*, J.A.764-765 (messages from Nji and Fonguh expressing excitement over "50 BMG single shot with scope" and contributing money to the purchase of that gun); J.A.768-770 (messages from Tita explaining "use of anti-material rifles in the larger calibers such as the 50 BMG"). In other respects, too, Nji's and Fonguh's testimonies rang "dubious, if not wholly

incredible," *Burgos*, 94 F.3d at 868 (cleaned up), with both men insisting that the only thing they did in St. Michael's basement was prime bullets, J.A.1260-1261; J.A.1362-1364; that they never saw what others were doing in the same basement at the same time, J.A.1262, J.A.1294-1295; J.A.1391, J.A.1400, J.A.1405; that they never knew that guns (as opposed to other products) had serial numbers, J.A.1262; J.A.1423-1424; and that the language the conspirators used to describe firearms and ammunition—"sticks," "ground nuts," and "peanuts"—were "not hidden code" but commonly used nicknames, J.A.1272-1273; J.A.1357, J.A.1394-1395. *See also* J.A.1280-1281, J.A.1284 (Fonguh denying that he ever helped package the compressor tanks and claiming that the only thing he loaded into the shipping containers was "a chair"); J.A.1368, J.A.1411, J.A.1418 (Nji testifying similarly). The jury was not required to accept this testimony blanketly disavowing defendants' awareness of the nature of the conspiracy. And Nji's and Fonguh's vague, evasive, and implausibly self-serving answers "could have been viewed as affirmative evidence" of defendants' knowledge. *Burgos*, 94 F.3d at 867.

Defendants are similarly mistaken that their "interest in the concealment of the shipments," Br. 32, likewise does not show recognition that the serial numbers would be obliterated. On the contrary, that interest would have benefitted tremendously by the removal of identifying marks that could lead authorities back to the

conspirators.   This is true, as discussed (*supra* at 28), even if defendants were only concerned about discovery by the government of Cameroon, which had previously "traced the serial number" of a firearm that St. Michael had sent and "track[ed]" where it was from.   J.A.933 (Muma).   In fact, that prior tracking of a firearm "taken from one of the soldiers in the field" was the reason why St. Michael "assigned" Muma the task of obliterating in the first place.   J.A.933.   And that reason remains valid if the authorities of concern were American, since the conspirators' concealment methods were aimed not just at obscuring what goods lay in the shipping container to ensure they made it to their destination.   J.A.699 (Akem).   They were also aimed at preventing identification of the goods in a way that would expose the conspiracy.   J.A.932-933, J.A.984 (Muma); J.A.1158 (St. Michael).   Far from having "no[] ties" to that goal, Br. 33, obliteration of the serial numbers was probably the best way to achieve it.

*Second*, even if the jury had to credit defendants' claimed ignorance of the obliterations and reject these reasonable inferences of their knowledge, the evidence was still sufficient to establish that defendants took actions to avoid knowing that the firearms they secretly shipped to Cameroon had their serial numbers removed. Because "failures to act or investigate can constitute deliberate actions taken to avoid learning facts," *United States v. Olla*, 754 Fed. App. 168, 171 (4th Cir. 2018) (per

curiam), defendants' failure, among others, to investigate the grinder they collectively spent hundreds of hours within feet of, to inquire about its purpose or the noise it was making, or even to ask their coconspirators what they were doing in the lab with them is dispositive. On this point, defendants reiterate that due to their supposed firearm inexperience, they could not possibly "have connected th[e] sights and sounds" of the grinder with obliteration. Br. 31. They also accuse the district court of improper burden shifting when it questioned them about this explanation in the posttrial Rule 29 hearing. But defendants are wrong twice over. The district court, like the jury, was permitted to evaluate the lack of evidence supporting defendants' exculpatory explanations, including their explanation that they had no idea what the grinder was for and no idea that the distinctive sights and sounds associated with the grinder's use equaled obliteration. This questioning was especially appropriate given the ample evidence demonstrating that defendants knew about every *other* machine in the basement, J.A.1257, J.A.1293-1294; J.A.1362-1363, J.A.1403, including the noises they made, J.A.1296; J.A.1402, and when they did not know what a machine did, they asked, J.A.1257-1260. In these circumstances, defendants' claimed ignorance of the grinder and Muma's use of it raises exactly the kind of inference of deliberate avoidance that the willful blindness instruction was meant to target. *See Whittington*, 26 F.3d at 463 ("[A]ll that is necessary is evidence from

which the jury could infer deliberate avoidance of knowledge.").

    *c. Defendants were vicariously liable.*  Lastly, and for many of the same reasons, the jury had overwhelming evidence from which to find defendants vicariously liable for the obliterations, even if their knowledge of it could not be reasonably inferred (it could).  The district court's *Pinkerton* instruction allowed the jury to find defendants liable if, among other conditions not challenged here, the obliterations were reasonably foreseeable and in furtherance of the conspiracy.  *See United States v. Ashley*, 606 F.3d 135, 142-143 (4th Cir. 2010).  Both conditions again are met, and none of defendants' counterarguments changes that outcome.  For starters, the absence of WhatsApp messages discussing obliteration does not carry the weight defendants assign it.  None of the conspirators' various "concealment methods" was specifically discussed in group chats, which instead referred only to "lab work," "concealment work," or "concealment" generally.  *E.g.*, J.A.696, J.A.740.  This makes sense, since the conspirators viewed those methods as "[o]ur most sacred possession" by which to avoid detection by authorities.  J.A.2906 (bylaws).  And it does not diminish "the understanding of the group" on this point:  Concealment, including obliteration, "was not a question. … There was no way you could send it out without concealing."  J.A.674 (Akem).

    Nor did the conspirators' "inconsistent" obliteration somehow undermine

their common understanding.  Br. 35.  As an initial matter, of the 39 seized firearms, only 30 of them had serial numbers that required removal; the other nine were privately manufactured.  J.A.1125.  So in fact, all but two of the guns that needed obliterating were obliterated, revealing far less "inconsisten[cy]" than defendants now suggest.  At any rate, the failure to remove serial numbers from two firearms can be chalked up to any number of things, including mistake or inexperience on the obliterator's part, and the evidence offers no reason to impart a deeper meaning. Likewise, the fact that St. Michael may have had a heightened interest in the obliteration because he purchased the firearms does not mean the other conspirators did not share that interest, or failed to understand that obliteration occurred.  On the contrary, the conspirators were close, some of them family, and were connected by numerous photos, videos, chats, CashApp transactions, and events together; the exposure of one exposed them all.  J.A.1227 (Tita and St. Michael were like "brothers," Tita is St. Michael's Godfather); J.A.1373 (Nji and Fonguh are cousins); J.A.929 (Muma, Nji, and Fonguh are "friends"); J.A.1216-1217 (St. Michael and Nji attended each other's family parties).  Under this theory, too, defendants' attempts to shrug off liability fall flat.

### 2. The Evidence Demonstrated that the Obliterated Firearms Were "Firearms"

In addition, the evidence was more than enough to find that the firearms involved in defendants' Section 922(k) offenses were, indeed, "firearms." 18 U.S.C. § 921(a)(3). "[A]bsent some indication that the firearm[s] [were] … fake," the Government was not required to "present expert testimony" that they were "capable of expelling a projectile." *United States v. McNeal*, 818 F.3d 141, 149 (4th Cir. 2016). So long as the jury could conclude that the firearms were so capable, "or at least that they had been designed for that purpose," the jurors had a sufficient basis for determining that they met the statutory definition. *United States v. Forrest*, 402 F.3d 678, 686-687 (6th Cir. 2005).

The jury had that basis here. Because nothing indicated that any of the guns were fake—much less all of them, as would be required for defendants to overturn their convictions on this ground—the jurors were entitled to rely on lay witness testimony and other evidence, as well as their common sense, in determining whether the guns were "firearms." And clearly they did just that. The jury had many of the actual guns before it, as well as multiple photographs of each weapon identified in the superseding indictment. On this ground alone, it could have resolved that those weapons were "firearms," since in all relevant respects, a juror is no different from the eyewitness whose testimony has been deemed sufficient to sustain a Section

921(a)(3) determination.  *See United States v. Torrez*, 869 F.3d 291, 321 (4th Cir. 2017); *McNeal*, 818 F.3d at 149; *United States v. Jones*, 907 F.2d 456, 460 (4th Cir. 1990).  "If, as in [*Torrez,*] *Jones* and *McNeal*, a witness to an armed robbery can determine that a gun is a firearm, it follows *a fortiori* that jurors, when given … the opportunity to examine a gun, can also determine that a gun is a firearm." *United States v. Murillo-Lopez*, 2023 WL 2799712, at *5 (E.D. Va. Apr. 5, 2023).

But the jurors had more evidence here than just their own intuition.  Tonya Matney (Homeland Security), Alex Douville (State Department), and Jennifer Marks (Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF))—each of whom are long-serving federal agents with more experience with firearms than the average person—all described the seized weapons as "firearms" and demonstrated in-depth knowledge of them.  *E.g.*, J.A.422-428 (Matney variously identifying GXs 1-7); J.A.1019-1020 (Douville); J.A.1091-1094 (Marks).  So, too, did Arnold Esposito (ATF), who *was* admitted as an expert in the related field of "firearms and toolmark examination."  J.A.888; *see* J.A.888-890.  In fact, Esposito specifically told the jury that semiautomatic firearms, like those in this case, J.A.1016, J.A.1019-1020 (Douville), were "designed to fire, extract, and eject the fired cartridge case … and then chamber another round, and so on and so forth as the trigger is pulled," J.A.889 (Esposito)—which is exactly the kind of connective testimony that

defendants complain is missing. *Compare id.*, *with* 18 U.S.C. § 921(a)(3) (defining a firearm as any weapon "designed to … expel a projectile by the action of an explosive"). While defendants belittle these statements as impermissible "post-discovery law enforcement testimony," Br. 37, they offer no real reason why a jury should find them less valuable than, say, the testimony of a contemporaneous eyewitness who saw the firearm brandished but not discharged. *See Torrez*, 869 F.3d at 321; *McNeal*, 818 F.3d at 149. After all, defendants do not dispute that the firearms discussed were the same firearms involved in their Section 922(k) offenses. That fact established, the federal agents were just as well-positioned as anyone else, if not more so, to identify the weapons as statutory "firearms."

At any rate, to whatever extent eyewitness testimony is required, St. Michael offered plenty to assuage defendants' current concerns. He testified that he is a "gun enthusiast," J.A.1186, that he went to "gunsmithing school," J.A.1201, and that he otherwise had experience with weapons because of his military service, J.A.1146-1147. He then went on to testify that he used this experience to make and procure firearms that could be used in the armed conflict in Cameroon. J.A.1146, J.A.1182. The jury was entitled to credit St. Michael's proficiency in this area, as well as his desire to achieve the conspiracy's goal of arming Cameroonian combatants, which depended on having working firearms. Accordingly, the jury was not wrong in

concluding that the firearms recovered from the shipping container were indeed operable, or at least designed to be that way.

### C. Substantial Evidence Supported Defendants' Count V Convictions

The evidence was likewise sufficient to support defendants' convictions for smuggling in violation of 18 U.S.C. § 554(a) (Count V). As defendants acknowledge, their convictions on this count must stand if substantial evidence supports their convictions on Count IV, since the smuggling of obliterated firearms is one of the acts that Section 554(a) prohibits. This concession ends the matter, as the evidence just discussed was more than sufficient for a jury to convict defendants of violating Section 922(k).

But even if it were not, defendants are wrong to argue that their Count V convictions demand vacatur. That argument hangs on the fact that defendants were acquitted of Counts II and III of the superseding indictment, charging them with violations of the Arm Export Control Act (AECA), 22 U.S.C. § 2778, and the Export Control Reform Act (ECRA), 50 U.S.C. § 4819. J.A.66-67. Defendants insist these acquittals mean that when it comes to Count V, they did not take any actions "contrary to law" that could serve as predicates for smuggling. Br. 39. But while it is true that a *conviction* on Count II or III (or Count IV) requires a conviction on Count V, it is not true that an *acquittal* on Count II and III requires the same. This

is because Section 554(a) requires only "the mens rea of *knowingly* exporting …
items [contrary to law]," whereas AECA and ECRA impose criminal penalties on
persons who "willfully" do so. *United States v. Rivero*, 889 F.3d 618, 622-623 (9th
Cir. 2018); *see* 22 U.S.C. § 2778(c); 50 U.S.C. § 4819(b). In other words, Section
554(a) does not "incorporate[] the mens rea of 'willfully'" from these other statutes.
*Rivero*, 889 F.3d at 623. And a conviction under AECA or ECRA cannot be made
"an element of the offense of violating § 554(a)." *Id.*; *accord United States v. Ber-
nardino*, 444 Fed. App. 73, 74 (5th Cir. 2011) (per curiam).

Accordingly, "to establish an offense under § 554(a)," the Government did
not have to prove, and the jury did not have to find, willfulness. *United States v.
Cardenas*, 810 F.3d 373, 374 (5th Cir. 2016) (per curiam). The Government instead
had to show only that defendants "knew" they were "dealing with ammunition [and
firearms] that [were] intended for export, and that the exportation was illegal." *Id.*
The Government made these showings multiple times over. The *Pinkerton* charge,
for starters, allowed the jury to find defendants liable based on their coconspirators'
knowledge that the exportation was illegal—knowledge that Akem and Muma freely
conceded they had. J.A.673 (Akem); J.A.957-958 (Muma).

But the jury also had ample evidence to infer defendants' knowledge on its
own terms. This included evidence of defendants' efforts at "concealing" their

activities, which involved, among other things, employing and proposing code names for the defense items (but not the humanitarian goods) they were shipping, J.A.729-731, as well as packaging those items in a way that would avoid detection from port authorities, J.A.458 (Matney describing "layers and layers of wrapping"); J.A.699 (Akem). It also included St. Michael's testimony that he *never* told defendants he had a license to ship guns and ammunition, which was the linchpin of their defense: that they were informed, and believed, that St. Michael had a lawful license to ship those articles overseas. *Compare* J.A.347, J.A.351, J.A.365 (defendants' opening statements), *with* J.A.1160, J.A.1162, J.A.1209-1210, J.A.1215-1217 (St. Michael); *see also* J.A.958 (Muma testifying that St. Michael never told him he had a license to ship overseas).

St. Michael's testimony went even further on this point, disclosing that Tita had urged the conspirators to obtain their guns from Nigeria "because it was illegal to ship the guns from [the U.S.] overseas." J.A.1228. Similarly, Akem revealed that when the conspirators discovered the shipping container was on its way back to Baltimore, the so-called "Response Team," which included Nji and Tita, concocted a plan to disavow ownership of the firearms if they were asked about them, and "to give someone else's name as the owner." J.A.749-751. Months later, Tita "delete[d]" his previous WhatsApp messages "[d]ue to the sensitivity of this topic."

44

J.A.770-771. And Fonguh, for his part, admitted that he had experience with exporting cars from the U.S., and that he filled out the required paperwork in those instances, yet implausibly denied any awareness that items leaving U.S. shores would be subject to inspection by U.S. customs officials. J.A.1287-1289. "A defendant's credibility is a material consideration in establishing guilt." *Burgos*, 94 F.3d at 868.

This and other record evidence established a reasonable inference that defendants knew their exportation of firearms and ammunition was illegal, even if they did not commit the offenses willfully. For that reason, and regardless of whether sufficient evidence supports their Section 922(k) convictions (it does), defendants' convictions on Count V must be affirmed.

### D. Substantial Evidence Supported Defendants' Count I Convictions

Finally, the evidence was also sufficient for a jury to find defendants guilty of conspiracy in violation of 18 U.S.C. § 371 (Count I). This holds true regardless of defendants' convictions or acquittals on Counts II through V, since "[i]t is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes." *United States v. McGowan*, 423 F.2d 413, 416 (4th Cir. 1970) (cleaned up). While defendants claim to agree with this settled law, they somehow theorize that since the evidence was not sufficient on

Counts IV and V (it was), and because defendants were acquitted of Counts II and III, their convictions on Count I wither on the vine.

But defendants do not adequately explain why this is so. Even tabling their valid Count IV and V convictions, which were plenty on their own to find guilt on Count I, there is no inconsistency in convicting for conspiracy to violate AECA or ECRA while acquitting of the substantive offenses—*Pinkerton* or no *Pinkerton*. *See United States v. Soteras*, 770 F.2d 641, 646-647 (7th Cir. 1985). Since the *Pinkerton* charge was permissive—"you may" find but "are not required to find [defendants] guilty of the substantive crime," J.A.1502—a jury could have simply decided not to apply the *Pinkerton* doctrine, and therefore to acquit on the substantive counts (whether out of leniency, compromise, or a factual finding on the elements), while still believing that the AECA- or ECRA-related objects of the conspiracy were achieved. Or it could have applied the *Pinkerton* doctrine but determined, rightly or wrongly, that defendants did not willfully violate those laws and did not reasonably foresee such willful violations by their coconspirators, likewise leading to acquittal. Conspiracy requires neither of these proofs. "It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993).

In any event, "verdict inconsistency"—to whatever extent it exists in this case—"is not a sufficient basis for vacating a conviction." *United States v. Flores-Rivera*, 56 F.3d 319, 327 (1st Cir. 1995). "As long as the trial and appellate courts are convinced on independent review that there was sufficient evidence to sustain a rational verdict of guilty beyond a reasonable doubt," the verdict must stand. *Id.* (cleaned up). The evidence of defendants' participation in a conspiracy to unlawfully ship weapons to Cameroon was extensive in this case, leading the jury to conclude that a conspiracy conviction was proper. This Court should affirm that reasonable conclusion.

## II.   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN EXCLUDING DEFENDANTS' EXPERT TESTIMONY

### A.   Standard of Review

A district court's decision to exclude expert testimony is reviewed for abuse of discretion. *United States v. Ivey*, 60 F.4th 99, 115 (4th Cir. 2023). This standard "requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Le Doux v. W. Express, Inc.*, 126 F.4th 978, 983 (4th Cir. 2025) (cleaned up). "Further, even assuming an abuse of discretion occurred, the erroneous exclusion of expert testimony is subject to harmless error analysis." *United States v. Brant*, 188 F.3d 503, at *1 (4th Cir. 1999)

(table).

## B. The Exclusion of Tembon's Testimony Was Not an Abuse of Discretion

The district court did not abuse its discretion in excluding the proffered testimony of defendants' expert witness, Efi Tembon. Tembon, the executive director of a Bible translation and literacy group, "is a native of the Anglophone section of Cameroon who was forced to flee the country … [due to] the Francophone government's human rights abuses." J.A.135. Defendants intended for Tembon "to explain to the jury that the Cameroonian government has been involved in an armed conflict with Anglophone Cameroonians since at least 2016." J.A.134. Such testimony, defendants insisted, would "explain the efforts[] of the Defendants … to keep their activities secret," because it "would make clear that the Cameroonian government engaged in violent acts of retaliation" and "abuses." J.A.134-135.

The court excluded this testimony because it was not reliable, not appropriate for establishing motive, and more confusing or misleading than probative. J.A.296-299. Indeed, as anticipated in defendants' notice, J.A.134-135, and as previewed in Tembon's statement to Congress, J.A.171-190, the testimony represented a singularly one-sided view of the conflict in Cameroon, based on Tembon's "personal experience fleeing the Cameroonian Government," J.A.297-298. This, the court found, was "not the kind of experience" susceptible to a reasonable measure of

"reliability." J.A.297. Nor was it appropriate for Tembon to testify about "[w]hat is [defendants'] experience, what is their realistic concern" for "trying to keep [their exploits] secret." J.A.297. And "even more significant is [Federal Rule of Evidence] 403 in this case." J.A.297. As the court explained, "it's not necessary to go into the kind of details that it appears from the congressional testimony this witness would go into." J.A.298. While "some corroboration" of defendants' alleged reason for secrecy may be "appropriate," allowing Tembon to share his "point of view … would involve a great risk" of the jury finding "some justification" for defendants' activities "that is not, in fact, present under the law." J.A.297-298. The court therefore declined to admit Tembon's testimony, while still leaving room for defendants "to argue that their secrecy[,] if there was such, was because they were concerned about the Cameroonian Government, not because they knew that what they were doing was illegal." J.A.282, J.A.298-299.

This ruling falls amply within the district court's "broad discretion" under the Federal Rules of Evidence. *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017); *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990). It appropriately considered whether Tembon's opinion about the conflict could be trusted or even helpful based almost entirely on his refugee experience. *See* Fed. R. Evid. 702, advisory comm. notes, 2000 amends. ("The more subjective and controversial the

expert's inquiry, the more likely their testimony should be excluded as unreliable."); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) ("[T]he word 'knowledge' connotes more than subjective belief."). It also appropriately considered the extent to which the jury would "substitute [Tembon]'s opinion for" defendants' motive in concealing their activities. J.A.297. And it rightly decided that Tembon's partisan testimony would likely muddy the issues and confuse the jurors, who, at any rate, did not need extensive details about a war defendants had no specific role in to understand the concept of retaliation. *See Le Doux*, 126 F.4th at 986-987.

Nothing in defendants' dozen-plus pages to the contrary undercuts this reasoned judgment. First off, the district court did not deny that expert status could be based on personal experience alone. It merely questioned whether the experience in Tembon's case "provide[d] a sufficient foundation" for reliable testimony "grounded in an accepted body of learning," or whether it would instead lead to "subjective and controversial" conclusions. Fed. R. Evid. 702, advisory comm. notes, 2000 amends. This inquiry was not misfocused. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (in the case of experience-based expert testimony, "the relevant reliability concerns may focus upon personal knowledge or experience"). Nor was it misfocused for the court to observe, correctly, that some of

the *Daubert* factors otherwise applicable to expert opinions—"peer-review[] or …
testing"—were not useful in evaluating reliability here. J.A.297; *accord United
States v. Thomas*, 490 Fed. App. 514, 520-521 (4th Cir. 2012). And despite now
touting Tembon's "extensive experience," Br. 45, defendants identify zero non-im-
migration cases in which his *kind* of experience—which is less extensive than de-
fendants profess anyway, J.A.136-137—was found to produce "reliable principles
and methods that [could be] reliably applied to the facts of the case," Fed. R. Evid.
702, advisory comm. notes, 2000 amends. Even their immigration cases are inap-
posite, Br. 49, not least because "the Federal Rules of Evidence do not apply in im-
migration hearings," where evidentiary considerations are more relaxed, *Djado v.
Holder*, 662 F.3d 265, 276 (4th Cir. 2011).

At any rate, the reliability of Tembon's testimony was far less worrisome to
the court than its tendency to confuse the issues and mislead the jury. And defend-
ants' criticisms of that reasoning likewise fall flat. For one thing, notwithstanding
the court's references to defendants' "state of mind," it was clearly more concerned
with "testimony simply going to motive," J.A.297-298, which would divert the
jury's attention from a key issue (whether defendants knew their actions were illegal
under U.S. law) to a largely irrelevant one (whether defendants feared retaliation
from the Cameroonian government). Rule 704(b) thus had little impact on the

51

court's decision-making, *contra* Br. 51-54, regardless of whether the Supreme Court later clarified—two years after the fact—that Rule 704(b) does not in all cases exclude expert testimony discussing a defendant's mental state. *See Diaz v. United States*, 144 S. Ct. 1727 (2024).

More to the point, the court was not wrong, and certainly not "clearly" wrong, *Le Doux*, 126 F.4th at 987, in viewing Tembon's testimony as likely to confuse, because it would suggest that defendants had "some justification" for what they did, J.A.297.[7]  Although defendants now insist Tembon "at no point" would have opined about "the 'rightness' of a side in the conflict," Br. 46-47, that assurance rings somewhat hollow given his congressional testimony, in which he pins all responsibility for the violence in Cameroon on the Francophone government, accusing it of "genocide," J.A.173, "mass killings," terrorism, and "atrocities beyond description," J.A.183-187.  And while defendants similarly insist "that the history [of the conflict] and the violence are not disputed," Br. 47, those points *are* disputed, as other congressional witnesses confirmed.  *See* J.A.167-168 (discussing "deadly armed insurgency" on Anglophone side); J.A.193-194 (discussing violence of Anglophone

---

[7]  Defendants argue that the court erred in its Rule 403 balancing because Tembon's testimony would not have been "unfairly prejudicial."  Br. 54-56.  That argument misunderstands the court's conclusion, which did not turn on prejudice but instead on the testimony's tendency to confuse or mislead.  Fed. R. Evid. 403.

"armed separatists").

Meanwhile, the probative value of Tembon's testimony—even assuming it was appropriately circumscribed—was minimal. No expert was needed to establish the existence of a war. *Contra* J.A.134. None was needed to explain "that the Cameroonian government would confiscate the supplies" shipped to anti-government separatists "if they were found out." *Contra* Br. 48. And no expert had to explain that defendants would experience retaliation "if it was discovered that they were sending weapons," *contra* Br. 48—especially since the trial witnesses and defendants themselves could, and did, illustrate that point just fine. "None of these concepts are foreign to the average layperson." *Le Doux*, 126 F.4th at 987. To argue otherwise, the court concluded, was to "underestimat[e] the jury," which was fully capable of understanding on its own why defendants "didn't want the people against whom the[] weapons were going to be used to … realize what was going on." J.A.301.

## C. The Exclusion of Tembon's Testimony Was Harmless

Even if the court abused its discretion in excluding Tembon's testimony (it did not), the error was harmless. This is so for at least two reasons.

*First*, although the district court disallowed Tembon's proposed expert testimony, it permitted and ultimately admitted plenty of evidence "countering the

53

[Government's proposed] reason for secrecy." J.A.298. All of defendants' testi-fying coconspirators, J.A.837-838 , J.A.845 (Akem); J.A.932, J.A.941-942, J.A.947, J.A.969, J.A.792, J.A.976 (Muma); J.A.1157-1157, J.A.1225 (St. Michael), and two of the defendants themselves, J.A.1247-1249, J.A.1252, J.A.1263-1265, J.A.1319 (Fonguh); J.A.1339-1343, J.A.1357-1359, J.A.1376, J.A.1378, J.A.1392, J.A.1394, J.A.1421 (Nji), gave ample testimony about the conflict in Cameroon from which a jury could understand "why the Appellants believed it was essential to keep [their activities] secret," Br. 48.[8] Moreover, defense counsel, J.A.345, J.A.352, J.A.356, J.A.1570-1571, J.A.1596-1597, and the Government, J.A.328, marshalled that evi-dence to provide "critical context to the Cameroonian conflict," Br. 57. Of course, the jury did not buy defendants' explanation of their clandestine behavior, or at least did not buy that the Cameroonian government was the only authority they were try-ing to avoid. But that does not mean the jury had no evidence from which to decide otherwise. *Contra* Br. 56-57. "Because the evidence was before the [jury]" and "considered by" it, "any error in regard to the expert covering this same ground was harmless." *Brant*, 188 F.3d at *2.[9]

---

[8] Defense counsel predicted as much at trial, telling the court shortly after its ruling that "there are [other] witnesses who can talk about" the conflict in Cameroon, which was "the goal of [calling] the expert." J.A.300.

[9] For similar reasons, defendants' claim of constitutional error stumbles out of the blocks. Although they insist that excluding Tembon's testimony denied them

*Second*, the evidence that defendants' secrecy was to avoid detection by U.S. authorities, *in addition to* Cameroonian authorities, was extensive. Akem, Muma, and St. Michael all confirmed that fact, as did WhatsApp messages and other evidence. Defendants offer no reason to believe that Tembon, who was only meant to address one side of this coin anyway—defendants' fear of the Cameroonian government, not their concern with U.S. authorities—would have changed the jury's mind, especially since these concerns were not mutually exclusive. Defendants could— and according to the jury, did—worry about both authorities. In short, the outcome of defendants' case was unaffected by the exclusion of Tembon's testimony, and defendants' convictions must stand.

## III. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN RE-FUSING TO COMPEL THE TESTIMONY OF DEFENDANTS' CO-CONSPIRATOR OR ADMIT HIS HEARSAY STATEMENT

### A. Standard of Review

This Court reviews for abuse of discretion a district court's decision to decline to compel a witness to testify after he invokes his Fifth Amendment right. *United*

a "'meaningful opportunity to present a complete defense,'" Br. 56 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)), that "defense" *was* presented at trial, amply so. Both testifying defendants told the jury that they hid their activities because they were afraid of the Cameroonian government, and multiple other witnesses likewise spoke of that motive. Nor was it "disproportionate" to let the Government "present evidence to the contrary," Br. 57, especially since proving knowledge was the Government's burden.

*States v. Oliver*, 133 F.4th 329, 335 (4th Cir. 2025); *see United States v. Branch*, 537 F.3d 328, 342 (4th Cir. 2008). *Contra* Br. 59. The Court likewise reviews for abuse of discretion the decision to refuse to admit impermissible hearsay testimony under the residual exception found in Federal Rule of Evidence 807. *See Burgess v. Goldstein*, 997 F.3d 541, 559 (4th Cir. 2021). These decisions may be disturbed "only if [they are] arbitrary and irrational," *id.*, or if "the appellate court is left with a definite and firm conviction that the trial court committed a clear error of judgment," *United States v. Thomas*, 29 Fed. App. 241, 248-249 (6th Cir. 2002) (per curiam). Even then, an erroneous decision will not require reversal so long as it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Sayles*, 296 F.3d 219, 223 (4th Cir. 2002) (cleaned up); *see Burgess*, 997 F.3d at 561.

### B. The Refusal to Compel Bangarie's Testimony Was Not an Abuse of Discretion

The district court did not abuse its discretion in refusing to allow defendants to call as a witness one of their coconspirators, Tse Ernst Bangarie, after counsel made clear Bangarie's intention to claim the Fifth Amendment privilege. "When a defendant's right to compel testimony conflicts with a witness'[s] privilege against self-incrimination, … a court must 'make a proper and particularized inquiry into the legitimacy and scope of the witness'[s] assertion of the privilege.'" *Sayles*, 296

F.3d at 223 (quoting *Gaskins v. McKellar*, 916 F.2d 941, 950 (4th Cir. 1990)). If after that inquiry "the court finds that the witness could legitimately refuse to answer any and all relevant questions," it may excuse the witness from testifying. *Id.* (cleaned up).

Here, the court undoubtedly conducted a "proper and particularized inquiry" to ascertain the questions defense counsel sought to ask and the scope of the privilege Bangarie invoked. *Gaskins*, 916 F.2d at 950. It first determined that the only questions counsel wanted to pose had to do with a statement that Bangarie had made in a proffer with the Government, in which he said:

> St. Michael claimed that he had military training on how to conceal shipments and even had a "badge" to get what he needed accomplished. Further, St. Michael suggested to Bangarie that his military superiors knew what he planned to do and thus convinced Bangarie there was no need for concern. Bangarie did think it was possible that he could have been being guided by his military superiors.

Br. 59; *see* J.A.1440.

Bangarie, the court was told, was "going to assert the Fifth" as to this statement. J.A.1106-1108. He had not yet been sentenced but had earlier pled guilty pursuant to a plea agreement, in which he admitted that he knew it was illegal to ship defense items overseas. J.A.1107-1108. The question thus became "whether Mr. Bangarie had the right to assert his Fifth Amendment in regard" to the proffer

statement, J.A.1440, such that he "could legitimately refuse to answer any and all relevant questions" about it if called to testify, *Gaskins*, 916 F.2d at 950.

Plainly Bangarie had that right. As the court recognized, his privilege against self-incrimination extended through to sentencing. J.A.1440; *see Mitchell v. United States*, 526 U.S. 314, 325 (1999). Because "it was not a final conviction in that sense," Bangarie "could be exposing himself" to a more severe sentence if he testified on the stand to something that the Government believed, or the sentencing court determined, was false. J.A.1440. And the Government *did* believe Bangarie's statement was false, as it advised the court multiple times. J.A.1107, J.A.1437. More relevant for the court's Fifth Amendment inquiry was the fact that Bangarie's statement conflicted with the knowledge he later admitted in his plea agreement and, if asserted again on the witness stand, could place him in greater jeopardy. In these circumstances, the court ruled, Bangarie had asserted a valid Fifth Amendment claim and could not be called to testify for the defense. J.A.1443.

This ruling was within the court's "broad discretion." *Thomas*, 29 Fed. App. at 249 (cleaned up). And defendants' handful of counterarguments, Br. 64-65, fail to persuade otherwise. *First*, defendants assign error to the court's failure to have Bangarie invoke his Fifth Amendment privilege "on a question-by-question basis." Br. 64. But neither this Court nor any other has legally required a question-and-

answer format for assessing a Fifth Amendment assertion, which would "elevate[]" the form of the inquiry over its substance." *United States v. Ramos*, 763 F.3d 45, 55 (1st Cir. 2014). "There are various ways for a district court" to inquire into "the nature of the Fifth Amendment claim." *Id.* So long as the court does so with care, it "inform[s] its discretion appropriately." *Id.* So, too, here. In fact, it is difficult to see any reason to require *more* in defendants' case, since everyone agreed that defense counsel's only questions related to the proffer statement; that Bangarie intended to claim the Fifth Amendment right as to that statement; and that the privilege against self-incrimination attaches to defendants, like Bangarie, awaiting sentencing. And his privilege clearly shielded him from needing to answer those questions and any related cross-examination because they "necessarily implicated details of [his] underlying crime, and accordingly ran the risk of [him] offering new or inconsistent information." *Oliver*, 133 F.4th at 336. Defendants do not explain how a question-by-question voir dire would have led to a different record, nor can they.

*Second*, as an alternative to excusing Bangerie "completely," defendants insist "[t]here was no danger" to having him "sit in that witness box and face each question as it came." Br. 65. That position overstates the reach of a defendant's right to compulsory process, which does not include "the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of

59

the jury." *United States v. Smart*, 501 F.3d 862, 866 (8th Cir. 2007) (cleaned up).

"Neither side has the right to benefit from any inferences the jury may draw simply

from the witness'[s] assertion of the privilege[,] either alone or in conjunction with

the questions that have been put to him." *United States v. Lacouture*, 495 F.2d 127,

1240 (5th Cir. 1974); *accord Branch*, 537 F.3d at 342. Given Bangerie's apparent

intention to invoke the privilege at every relevant question, the court was within its

rights to refuse this empty exercise and forestall the "unfair prejudice" that would

result. *Branch*, 537 F.3d at 342

*Finally*, defendants argue that Bangarie's testimony "could have easily been

compartmentalized and limited to avoid the self-incrimination." Br. 64. This as-

sumes, of course, that Bangarie would not have asserted the Fifth at every substan-

tive question, or that defense counsel had questions to ask that were not related to

his proffer statement—which counsel never said they had below and do not say now

on appeal. But even if their assumption were right, defendants do not propose how

to achieve this goal, nor did they propose anything of the kind to the district court.

So they waive this argument for lack of development. *Grayson O Co. v. Agadir

Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Defendants' post hoc claims therefore

fail, and the court's ruling should be affirmed.

### C.    The Refusal to Admit Bangarie's Statement Under Rule 807 Was Not an Abuse of Discretion

The district court likewise acted within its discretion in declining to admit Bangarie's proffer statement under the residual exception to the hearsay rule.    Fed. R. Evid. 807.    "The residual exception should be used only in extraordinary circumstances[,] where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice."    *United States v. Burgess*, 99 F.4th 1175, 1183 (10th Cir. 2024) (cleaned up); *accord United States v. Heyward*, 729 F.2d 297, 299-300 (4th Cir. 1984).    Bangarie's statement satisfied none of these requirements.    For one thing, Bangarie's statement was only minimally probative (if at all) to defendants' case:    Whether *Bangarie* was told that St. Michael had a "badge" authorizing him to export firearms had little to do with what *defendants* were told, much less what they believed.    J.A.1441-1442.    More still, a proffer statement that was "not accepted by the Government" as true, was "not [made] under oath," and was expressly contradicted by St. Michael, "who did testify" under oath and who "denied having made such a statement," does not command "a great deal of … trustworthiness."    J.A.1442.    The court therefore concluded that Rule 807 did not "permit the admissibility" of Bangarie's hearsay statement, notwithstanding his unavailability otherwise.    J.A.1443.

This conclusion was not an abuse of discretion.    *See United States v. Gomez*,

774 Fed. App. 136, 137 (4th Cir. 2019) (per curiam) (no abuse of discretion in declining to admit, under Rule 807, coconspirator's pretrial statement to a Government agent after the coconspirator refused to testify). And defendants' four-sentence argument to the contrary, Br. 65-66, does not demand a different result. That argument, which deals only with the alleged "probative value" of Bangarie's statement, Br. 66, ignores the "most important" of the residual exception requirements: whether the statement "enjoy[s] sufficient guarantees of trustworthiness," *Gomez*, 774 Fed. App. at 137. Bangerie's statement clearly does not, and for that reason alone, the court's refusal to use Rule 807 in these remarkably un-"exceptional circumstances" was not error. *Heyward*, 729 F.2d at 300 (cleaned up).

## IV. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN GIVING THE CHALLENGED INSTRUCTIONS TO THE JURY

### A. Standard of Review

"Both the decision to give (or not to give) a jury instruction and the content of an instruction are reviewed for abuse of discretion." *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992). "In doing so, [the Court] give[s] space to the trial court's discretion, asking only whether the judge ran out of bounds." *United States v. Askew*, 98 F.4th 116, 124-125 (4th Cir. 2024) (cleaned up). Instruction decisions "are entitled to substantial deference, because a district court is much closer than a court of appeals to the pulse of the trial." *United States v. Smith*, 21

F.4th 122, 136 (4th Cir. 2021) (cleaned up).  Any error in instructing the jury is susceptible to harmless-error analysis.  *United States v. Chaudhri*, 134 F.4th 166, 184 (4th Cir. 2025).

## B.  The *Pinkerton* Instruction Was Proper

The district court's decision to give the *Pinkerton* instruction in this clear-cut conspiracy case was within its discretion.  "It is well-established that defendants may be held liable for the substantive offenses of their coconspirators." *United States v. Gillespie*, 27 F.4th 934, 941 (4th Cir. 2022).  The principle underlying this so-called *Pinkerton* doctrine "is that conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012) (cleaned up).  A *Pinkerton* charge is therefore appropriate, if not routine, "if the evidence is sufficient to prove the charged conspiracy and to link the substantive offenses to it." *United States v. Torres*, 162 F.3d 6, 10 (1st Cir. 1996); *see United States v. Elliott*, 849 F.2d 554, 561 (11th Cir. 1988) ("A standard conspiracy charge contains … a *Pinkerton* charge."). In that case, a conspirator "may," in the jury's discretion, J.A.1502, be apportioned criminal responsibility for the commission of his coconspirators' crimes.

The proof at trial comfortably cleared the *Pinkerton* hurdle.  *Supra* at 3-8. That proof established that defendants were witting members of a close-knit group

63

linked by their mutual interest in sending defense items to Cameroon. All of the group's members substantially participated in this enterprise in their respective roles, whether it was raising or contributing funds to buy the defense items, prepping the items for use abroad, "concealing" them for shipment, arranging the shipment, and so on. Because the success of their enterprise hinged on keeping these activities a secret, anything that "implicated" the members in them, J.A.689—like leaked photos or videos, J.A.737-738, using real as opposed to false names or nicknames, J.A.575-577, J.A.752-753, J.A.953, candid versus coded conversations, J.A.729-731, and indeed, identifying marks on firearms, J.A.932-933—was taboo, and everyone knew it. The members therefore took steps to hide these things, including the removal of serial numbers from firearms—a step, like any of the others just described, that was clearly linked to the enterprise and a reasonably foreseeable part of it. *Cf. United States v. Chorman*, 910 F.2d 102, 112 (4th Cir. 1990) (*Pinkerton* appropriate where obliteration of the VINs "was certainly in furtherance of the conspiracy's purposes"); *United States v. Wooderts*, 189 F.3d 468, at *3 (5th Cir. 1999) (per curiam) (similar).[10]

---

[10] Defendants do not directly challenge application of the *Pinkerton* doctrine to their smuggling convictions, presumably believing that if they get vacatur of their Section 922(k) convictions, their Count V convictions will drop off. But as explained (*supra* at 42-45), that is not true. The jury could have predicated their Count

Defendants offer no good rebuttal to these facts. Instead, they largely reprise the same sufficiency arguments raised (and countered) above, *supra* at 25-32, albeit with five new twists. These are not enough to salvage defendants' claims, however.

*First*, defendants argue that the "baseline level of proof" was simply not there for the district court to give the *Pinkerton* instruction. But as just explained, the evidence *was* sufficient for the jury to impose *Pinkerton* liability. So it was also sufficient for the court to have submitted the *Pinkerton* issue in the first place. *See United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir. 1985).

*Second*, defendants argue that their case was just too complex to qualify for a *Pinkerton* instruction, since the superseding indictment was "27 pages in length," charged five offenses, and included a conspiracy count "encompass[ing] 13 pages of the charging document" and listing "a total of 31 overt acts." Br. 72-73. These statistics are not reliable indicia of complexity, even if they are as remarkable as defendants say (they are not). On the contrary, defendants' easy-to-understand case centered on a single conspiracy involving ten principal members, including the three defendants, engaged in a confined universe of illegal activities. That is not the level of complexity that merits denying jurors the choice to apportion culpability as they

V convictions on AECA and ECRA violations, regardless of their acquittals on those substantive counts.

see fit. Nor do these facts raise an "inverse-*Pinkerton*" concern, which is when "the crimes to which the *Pinkerton* charge was relevant were themselves the basis for inferring a conspiracy in the first instance." *United States v. Serrano-Delgado*, 29 F.4th 16, 26 (1st Cir. 2022). The existence of a conspiracy here is beyond question, and not even defendants—who do not challenge the sufficiency of the conspiracy evidence on the merits, Br. 40-42—seriously believe otherwise. In any event, the court cautioned the jury that it needed to find defendants part of a conspiracy *first* before it could consider *Pinkerton* liability. J.A.1502. On top of the strong evidence of conspiracy to start, this was plenty to avert any confusion from the charge. *See United States v. Salameh*, 152 F.3d 88, 149-150 (2d Cir. 1998) (no inverse-*Pinkerton* problem "[g]iven the ample evidence supporting [defendant's] conspiracy conviction," as well as court's instruction "that [defendant] could be found guilty of the substantive crimes only after the jury had concluded that he was a conspirator").

*Third*, defendants insist they were mere low-level conspirators and should not be held liable for the acts of high-level conspirators—whom *Pinkerton* properly binds, but "not the other way around." Br. 71. First off, the evidence does not support defendants' attempt to distance themselves from the conspiracy, in which they all held officer-like roles. *E.g.*, J.A.676 (Nji taking meeting minutes); J.A.702 (Tita meeting with outside investors); J.A.748 (Akem describing Nji and Tita as

66

"people that could handle" information, "know how to manage it and to present it to the other members of the group"); J.A.762 (Tita drafting bylaws). More fundamentally, their argument wrongly views the agency principles underlying *Pinkerton* as a one-way ratchet. Every conspirator is both an agent of and a principal to each other, regardless of their respective responsibilities. *See Pinkerton*, 328 U.S. at 646 ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward."). The "classic example of someone liable under *Pinkerton*" demonstrates this principle nicely—"namely, the lookout who stays behind in the car," *Serrano-Delgado*, 29 F.4th at 26 (cleaned up), who may be less directly responsible for an armed robbery gone wrong than the conspirator who went into the building, but who is, under the law, no less liable for the murder that results.

*Fourth*, defendants nominally take issue with the content of the *Pinkerton* instruction, claiming it "did not accurately and fairly state the controlling law." Br. 75. That is not right, nor do defendants identify any part of the instruction with which they disagree (besides, of course, its application). The court's instruction was black letter. *Compare* J.A.1502-1503, *with, e.g.*, *Salameh*, 152 F.3d at 149. And indeed, it was far more substantive and explanatory than some of the *Pinkerton* charges endorsed by this Court, including in a factually similar case. *See Chorman*, 910 F.2d at 112 (upholding *Pinkerton* instruction that omitted "reasonably

67

foreseeable" language and explaining "we cannot say that attributing the VIN tampering counts to [defendants] was so attenuated as to run afoul of possible due process limitations"); *accord United States v. Aramony*, 88 F.3d 1369, 1381 (4th Cir. 1996).

*Finally*, defendants contend that *Pinkerton* was inappropriate because, in tandem with an aiding and abetting instruction and the willful blindness charge, "it reduced the government's burden well below the reasonable doubt standard."   Br. 82. But these three charges are often given together.   *See*, *e.g.*, *Chorman*, 910 F.2d at 107-108 (affirming submission and content of all three instructions); *United States v. Armetta*, 191 F.3d 448, at *5-6 (4th Cir. 1999) (table) (same).   And this Court has specifically rejected the same argument defendants now press.   Far from misleading the jury by "permitt[ing] the jury, piling inference upon inference, to find the critical element … of knowledge"—as defendants here and in *Chorman* argued, *Chorman*, 910 F.2d at 112-113 —the instructions explained the different theories of liability or knowledge; identified the elements or facts that needed to be satisfied; clarified what facts did *not* constitute guilt or knowledge; and confirmed in all cases that the standard was "beyond a reasonable doubt," JA.1495-1496, J.A.1499-1503.   The court also painstakingly ensured that the jury understood it was not *required* to find knowledge or liability on these theories, and whether to do so was "entirely up to

[them]." J.A.1496. These fulsome instructions undercut defendants' claim of prejudice here.

## C. The Willful Blindness Instruction Was Proper

The district court likewise did not abuse its discretion in giving the willful blindness instruction as to Count IV. The facts adduced at trial provided ample "evidence from which the jury could infer deliberate avoidance of knowledge." *Whittington*, 26 F.3d at 463. These facts, as summarized (*supra* at 32-37), included defendants' presence in St. Michael's "three meter square basement," J.A.934, when some or all of the obliteration occurred; their presence when Muma and St. Michael discussed the obliteration; their frequent presence in the basement generally, where both the grinder and the obviously obliterated firearms sat in plain sight; their awareness of other machines and activities occurring in the basement; their involvement in "concealment work," J.A.740; their understanding that secrecy was required for the success of their venture; and so on. This and other evidence allowed the jury to convict defendants under Section 922(k) based on their actual knowledge or reasonable inference thereof. But the same evidence, viewed in light of defendants' professed lack of knowledge about what was around them, can also be regarded as showing that defendants "purposely closed [their] eyes to avoid knowing what was taking place around [them]." *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir.

1991).

Again, defendants offer nothing new disputing these facts, instead regurgitating many of the same contentions already hashed out.   Two points warrant underlining, however.   *First*, although defendants continue to insist that the willful blindness doctrine led to their convictions "based on less than a proof beyond a reasonable doubt," Br. 77, that instruction—like all the instructions defendants now challenge—did not tell the jury to "presume" anything, "but only that they *could infer* knowledge" from a conclusion of self-imposed ignorance.   *Whittington*, 26 F.3d at 462; *see* J.A.1496.   Similarly, the court took pains to explain that "knowledge may *not* be established by demonstrating that a defendant was negligent, foolish, or mistaken," and a defendant "may *not* be convicted" if the jurors believed he "actually did not know that the serial numbers were removed."   J.A.1495-1496 (emphases added); *see United States v. Ruiz-Castillo*, 432 Fed. App. 229, 231 (4th Cir. 2011). With plenty of guardrails to protect against the outcome defendants now cry wolf over, the willful blindness instruction "in no way reduced the standard of culpability according to which the jury had to find the appellants guilty beyond a reasonable doubt."   *Whittington*, 26 F.3d at 462.

*Second*, defendants rely on *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), and a handful of drug-dealing and fraud cases, Br. 79-80, to pad their

argument that their case did not qualify for a willful blindness instruction. None of these citations help defendants. For one thing, the fact that a willful blindness charge was used in a different criminal context does not mean it cannot be used in the Section 922(k) context. *Cf. Chorman*, 910 F.2d at 107-108 (obliterated VIN numbers). In any case, "all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." *Whittington*, 26 F.3d at 463. Because that evidence exists here, the nature of the crime charged is irrelevant to whether the willful blindness doctrine applies. It does.

For another, *Lighty* is less useful than defendants believe. In *Lighty*, the Court rejected a willful blindness instruction, but not because the defendant (Flood) was unaware of the kidnapping to which he allegedly closed his eyes. In fact, the instruction was ultimately held harmless because Flood "had actual knowledge" of the kidnapping (which is also true of defendants). *Lighty*, 616 F.3d at 379. Instead, the Court rejected the willful blindness instruction because "the evidence did not suggest that Flood engaged in deliberate acts to avoid actual knowledge." *Id.* at 378. Here, though, the jury could find that if defendants were ignorant of the facts lying in plain sight around them, it was because they did take such acts, primarily by "failing to investigate or ask questions" in a deliberate effort to avoid learning what would otherwise have been obvious to them. *Olla*, 754 Fed. App. at

171. *Lighty*, then, does not require invalidating the willful blindness charge, much less overturning defendants' Count IV convictions.

### D.     The Court's Definition of "Knowledge" Was Proper

Lastly, the court did not err when it instructed the jury that defendants' knowledge for purposes of conspiracy was "a matter of inference," "a matter you may infer from the facts that have been proved."   J.A.1481.   That statement is correct.   It accurately reflects the law on knowledge, which "has long [been] recognized" as an element of conspiracy that "the jury may infer … from circumstantial evidence" alone.   *United States v. Garnes*, 587 Fed. App. 60, 62 (4th Cir. 2014) (per curiam); *see United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011).   And nothing defendants now say controverts this well-established proposition.

For starters, although defendants assert that their counsel objected to the court's knowledge instruction, the joint appendix page to which they cite makes no mention of it.   Br. 80 (citing J.A.1508).   That page instead shows that counsel "objected" as "being one-sided" to an instruction stating that "intent may be inferred from the secretive or irregular manner in which a transaction is carried out."   J.A.1508.   Their current assignment of error is therefore reviewed for plain error only, a hurdle defendants undeniably cannot clear.   *See United States v. Naum*, 134 F.4th 234, 241-242 (4th Cir. 2025).   Nor do they even try.

But defendants cannot clear any other standard of review, either, because the challenged instruction was simply not erroneous. Not even defendants, at bottom, believe it was wrong, instead suggesting only that it overemphasized a "reliance on inferences" and diverted the jury from its "principal obligation" to find that defendants "knowingly" entered into the conspiracy. Br. 81. Viewed with the rest of the charge, it did no such thing. The court did not rule out that knowledge and a knowing conspiracy could be established by "direct proof" or "by words or explanations of the act" at the time it was committed. J.A.1475-1476, J.A.1479. It merely explained that such state-of-mind proof is "rarely … available," J.A.1475, which, needless to say, is true. *See Watkins*, 111 F.4th at 309.

## A.    Any Error in the Instructions Was Harmless

None of these instructions was error. But even if the Court disagrees, any such error was harmless because the considerable evidence presented here makes it clear that the jury would have found defendants guilty on Counts I, IV, and V regardless of any single erroneous instruction. This is especially true given that all these instructions were elective, allowing, but not requiring, the jurors to do the thing instructed: convict on vicarious liability ("you may … but you are not required"), find deliberate avoidance ("[i]t's entirely up to you"), or infer knowledge from circumstantial evidence ("you may infer"). J.A.1481, J.A.1496, J.A.1502. Given

these options, defendants offer little reason to believe that all three instructions were actually applied, much less that they "cumulatively" infected the "whole process." Br. 83-84.   Their convictions must be affirmed.

## V.   THE DISTRICT COURT DID NOT PROCEDURALLY OR PLAINLY ERR IN APPLYING THE CHALLENGED ENHANCEMENTS

### A.   Standard of Review

A district court's sentencing decision is reviewed under a "deferential abuse-of-discretion standard."   *Gall v. United States*, 522 U.S. 38, 51-52 (2007).   The Court must "uphold the sentence unless the district court committed significant procedural error," *United States v. Sherifi*, 107 F.4th 309, 314 (4th Cir. 2024) (cleaned up), like "improperly calculating the Guidelines range or selecting a sentence based on clearly erroneous facts," *United States v. Henderson*, 2025 WL 1318001, at *5 (4th Cir. May 7, 2025).   The unpreserved application of a sentence enhancement is subject to plain error review, under which the enhancement stands unless it was error, the error is plain, the error affects substantial rights, and the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."   *United States v. Strieper*, 666 F.3d 277, 295 (4th Cir. 2012) (cleaned up).

### B.   The District Court Committed No Procedural or Plain Error in Applying the Sentence Enhancements

The district court's application of the enhancements in U.S.S.G. § 2K2.1(b)(1)(C) and (b)(5) did not result in procedurally unreasonable sentences.

74

According to the 2021 Guidelines Manual, those enhancements provided for six-level and four-level increases, respectively, on top of defendants' base offense levels "[i]f the offense involved" more than 25 firearms (subsection (b)(1)(C)), and "[i]f the defendant engaged in the trafficking" of "two or more firearms" (subsection (b)(5) and comment 13 of the application notes). Before the district court, Nji and Fonguh objected to application of subsection (b)(1)(C) on the ground that the jury made no finding as to how many firearms, exactly, defendants transported, smuggled, or conspired to transport or smuggle. J.A.2354-2355 (Nji); J.A.2568 (Fonguh). All three defendants objected to subsection (b)(5) on much the same footing: that their convictions did not equate to a finding that defendants' offenses involved "two or more firearms." J.A.2418-2420 (Nji); J.A.2629-2633 (Fonguh); J.A.3527-3534 (Tita).[11]

The district court rejected defendants' arguments on this front, finding that defendants' convictions for conspiracy (Count I), transportation of obliterated firearms (Count IV), and smuggling (Count V) furnished sufficient factual proof for the enhancements to apply. In fact, the court explained, for two of those counts, the superseding indictment included specific reference to the number of firearms

---

[11] Tita, but not Nji or Fonguh, objected to application of subsection (b)(5) on other grounds as well. J.A.2490. These other objections have been abandoned on appeal.

involved in the offenses. J.A.2630-2631 (Fonguh sentencing); *see* J.A.68-69 (Count IV); J.A.701-71 (Count V). And because defendants were convicted of the counts as charged, the court found no reason to "intercede" in the jury's verdict to "require some kind of specific finding as to each one" of the firearms identified in the counts of conviction. J.A.2419 (Nji sentencing). That reasoning, which the court applied in all of defendants' sentencings, was not error.

**1.** To begin with, the six-level enhancement under subsection (b)(1)(C) applies in all cases where "the offense involved" between 25 and 99 firearms. U.S.S.G. § 2K2.1(b)(1). In turn, an "offense" under the Guidelines "means the offense of conviction and all relevant conduct under § 1B1.3." U.S.S.G. § 1B1.1, cmt. 1(I). So in determining how many firearms were "involved" in an "offense," a district court "shall" consider a defendant's convictions, as well as the entire course of his relevant conduct. *See United States v. Bullard*, 301 Fed. App. 224, 228 (4th Cir. 2008) (per curiam); *United States v. Clapp*, 54 F.3d 774, at *1 (4th Cir. 1995) (table). "Doing so allows the court to ensure that the defendant's sentence reflects a more complete picture of his illegal behavior, rather than a narrower and incomplete snapshot of a criminal act." *United States v. Burnett*, 37 F.4th 1235, 1238 (7th Cir. 2022).

Here, of course, the district court needed not—and did not—go so far.

Defendants' convictions were plenty from which to determine that more than 25 firearms were "involved," regardless of whether any other relevant conduct could have led to a higher firearms count. The superseding indictment specifically enumerated the number of firearms charged in Counts IV and V, and the record confirms that the same number of firearms was, in fact, involved in those counts and likewise tied to the conspiracy, of which defendants were also convicted. No more was required to prove that over 25 firearms were "involved" in the "offenses" committed by defendants. *See United States v. Bostic*, 168 F.3d 718, 724 (4th Cir. 1999); *United States v. Pizzuto*, 2022 WL 16646653, at *2 (4th Cir. Nov. 3, 2022) (per curiam).

Even so, defendants fault the district court for failing to make "particularized findings" as to which guns, precisely, were attributable to defendants based on "the scope of the criminal activity [each] particular defendant agreed to jointly undertake." Br. 86. For this argument, they rely entirely on *United States v. Evans*, 90 F.4th 257 (4th Cir. 2024), in which this Court held that such findings were required under U.S.S.G. § 1B1.3(a)(1)(B) before a sentencing court could attribute to one defendant (Evans) a quantity of drugs seized from another defendant (Douglas) when Evans was not linked to those drugs in any way except as Douglas's *Pinkerton* coconspirator. *See Evans*, 90 F.4th at 260, 262-263.

But defendants' case is factually and legally distinct. For one thing, none of the four counts in Evans's indictment, charging him with conspiracy and three substantive offenses, included a reference to a quantity of drugs. As factually charged (and convicted) on the substantive offenses, Evans was involved only in "distributing" and "possessing with intent to distribute" a "substance containing a detectable amount of methamphetamine." Superseding Indictment, *United States v. Evans*, No. 5:18-cr-14 (N.D.W.V. Dec. 4, 2018). Evans's convictions, in other words, had no specific tie to the quantity of drugs he was later sentenced for, which in turn were unmoored from the factual predicates on which he was charged. Not so here.

For another, defendants' reliance on *Evans* is essentially a reprise of the same tune they have been whistling all along: that their convictions on Counts IV and V were only because the jury applied *Pinkerton* liability, and not because it found sufficient evidence to hold them directly liable. That remains an assumption untethered from the record. The evidence at trial squarely connected defendants to the same, specific firearms they were charged with transporting and smuggling. And unlike in *Evans*, where the sentencing court attributed Douglas's drugs to Evans based *solely* on the *Pinkerton* doctrine, defendants offer no reason to believe the jury took the same approach upon convicting them. Certainly the district court did not think the jury did so, having earlier expressed its belief that "there was more than

78

sufficient evidence" for a jury to find defendants directly liable at least on Count IV. J.A.2256 (Rule 29 hearing); *see* J.A.2240-2270.

Finally, despite defendants' focus on whether they "knew" that the serial numbers of 28 firearms were obliterated, or that any of the 39 firearms seized would be unlawfully exported (they did, *supra* at 21-37), application of subsection (b)(1)(C)— unlike a conviction under Sections 922(k) and 554(a)—does not require a finding of knowledge. It requires only that the criminal acts of which defendants were convicted, or any of their other relevant conduct, "involved" those firearms. *See United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001) ("The word 'involved' occurs frequently throughout the Guidelines … and is typically employed to mean 'included.'"); *accord United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005). Clearly they did. Meanwhile, in *Evans*, nothing in his indictment or evidence at trial suggested that Evans's substantive convictions "involved" the drugs seized from Douglas. On the contrary, all three of Evans's substantive convictions arose from "controlled buys and seizures from dealers in West Virginia who were connected to Evans," *Evans*, 90 F.4th at 260—*not* from Douglas's traffic-stop seizure.

*Evans*, then, is inapplicable on multiple fronts. No particularized findings are required when defendants' substantive "offenses of conviction" straightforwardly "involved" the requisite number of firearms. But even if it were otherwise,

defendants can hardly complain that the district court shied away from discussing "the scope of the defendant[s'] agreement to jointly undertake criminal activity as well as … foreseeability."  *Evans*, 90 F.4th at 263.   At the Rule 29 motions hearing and in its later opinion, if not also at defendants' sentencings, the court repeatedly expressed its view that the evidence showed that the firearms were both known to defendants and clearly a part of their agreement to join the Peanut Project, J.A.2256-2257, J.A.2259-2261, J.A.2268-2270—which is plenty on which to affirm the enhancement here.[12]   There is thus no error (Nji and Fonguh), much less plain error (Tita), in the court's application of subsection (b)(1)(C).

**2.**   As for the four-level enhancement under subsection (b)(5), that, too, was properly applied.   There is no question that defendants "transported, transferred, or otherwise disposed of two or more firearms."   U.S.S.G. § 2K2.1, cmt. 13(A)(i). And that is the only requirement (as challenged by defendants, *supra* at 75 n.11) for

---

[12]   Defendants assert that the Court cannot go outside of defendants' sentencing hearings to "'search[ ]… for statements that might explain a sentence.'"   Br. 92 (quoting *United States v. Bright*, 125 F.4th 97, 103 (4th Cir. 2025)).   But in a situation like this one, that rule does not hold.   By contesting application of subsection (b)(1)(C)—in other words, by contesting whether defendants' "offense[s] involved" more than 25 firearms—defendants are fundamentally challenging the factual basis of their Counts IV and V convictions.   And that challenge was already considered, and rejected, at the Rule 29 hearing and in the court's subsequent opinion, which is exactly where the kind of findings that defendants complain are missing can be found.

application of subsection (b)(5). Like subsection (b)(1)(C), it does not require a finding that defendants transported such firearms while "knowing" that it was unlawful to do so, or that they "knew" the firearms had their serial numbers obliterated. It requires only that the transportation occurred and was attributable "to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 2K2.1, cmt. 13(B). No doubt it was. In the end, not even defendants really dispute this fact, given that their only sufficiency challenge is whether defendants *knew* of the obliteration on the firearms they transported, not whether they *transported* them. Br. 22-33.

Instead, defendants respond by amplifying the alleged mismatch between defendants' Count IV and V convictions—which could have been based on a single firearm, they say—and the number of firearms that subsection (b)(5) requires, which is "two or more." Br. 91-92. Given how many firearms were involved in defendants' offenses—28 for Count IV and 39 for Count V—that view of the jury's verdict is uncharitable, to say the least. It is also irrelevant. If subsection (b)(1)(C) applies, because defendants' offenses of conviction involved more than 25 firearms, subsection (b)(5) must also apply, since those same offenses plainly entailed "transporting" firearms.

81

## V.  THE DISTRICT COURT DID NOT COMMIT *ROGERS* ERROR

### A.  Standard of Review

Claims of *Rogers* error are reviewed de novo.  *United States v. Smith*, 117

F.4th 584, 605 (4th Cir. 2024).

### B.  The District Court Properly Announced the Standard Conditions Clarified by the Later-Issued Written Judgments

The district court did not commit *Rogers* error when it orally pronounced at

defendants' sentencings that it would impose the "standard conditions" of supervised

release, summarized what those conditions entailed, and issued written judgments

containing the same conditions in full.[13]   The two challenged conditions read as

follows in defendants' written judgments:

> 6)  You must allow the probation officer to visit you at any time
> at your home or elsewhere, and you must permit the probation
> officer to take any items prohibited by the conditions of your su-
> pervision that he or she observes in plain view.
>
> 7)  You must work full time (at least 30 hours per week) at a
> lawful type of employment, unless the probation officer excuses
> you from doing so.  If you do not have full-time employment
> you must try to find full-time employment, unless the probation
> officer excuses you from doing so.  If you plan to change where
> you work or anything about your work (such as your position or
> your job responsibilities), you must notify the probation officer

---

[13]   The Government preserves for further review the argument that the Court "should overrule its aberrant *Rogers-Singletary* jurisprudence" for the reasons stated in its Petition for Rehearing En Banc, *United States v. Mathis*, No. 21-4578 (4th Cir. July 12, 2024).   Because panels of the Court are bound to follow that jurisprudence, the Government does so as well in this filing.

> at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer with 72 hours of becoming aware of a change or expected change.

J.A.2481 (Nji); J.A.2558 (Tita); J.A.2684 (Fonguh). The written judgments contained 11 other standard conditions of supervised release, in addition to the two above. All 13 conditions matched verbatim the 13 standard supervision conditions required by the District of Maryland's standing order, which themselves are functionally identical to the 13 standard conditions set out in U.S.S.G. § 5D1.3(c). *See* Standing Order 2020-13, *In re Conditions of Supervised Release*, No. 1:00-mc-00308 (D. Md. June 10, 2020).

At each of defendants' sentencings, the court explained that it was imposing "the mandatory and standard conditions, as well as certain additional conditions." J.A.2675 (Fonguh); *see* J.A.2471 (requiring Nji to comply "[w]ith the mandatory conditions … and standard conditions"); J.A.3580 (requiring Tita to "comply with all of the mandatory and standard conditions"). It then offered a rundown of those conditions, telling Nji, as relevant here, that he "must allow the probation officer to visit you at any time at your residence" and "must work full-time at a lawful type of employment," J.A.2472; telling Fonguh that he "must allow the probation officer to visit you at any time" and "must make every effort to work full-time, at least 30 hours per week," J.A.2676; and telling Tita that he "must allow the probation officer

to visit you at any time at your home or elsewhere" and "must work full-time at a lawful type of employment," J.A.3579.   The written judgments followed.

These oral disclosures amply comply with the obligation "that district courts announce all discretionary conditions of supervised release at a defendant's sentencing hearing." *United States v. Cisson*, 33 F.4th 185, 191 (4th Cir. 2022).   That obligation does not require the court to announce in every case "each discretionary condition in open court," much less announce them word-for-word as they appear in the written judgment. *United States v. Rogers*, 961 F.3d 291, 299 (4th Cir. 2020) (cleaned up).   Instead, a court "may satisfy its [*Rogers*] obligation … through incorporation—by incorporating, for instance, all Guidelines 'standard' conditions," *id.*, "or those established by a court-wide standing order," *Smith*, 117 F.4th at 604. "And an oral reference to 'standard conditions'—without more—[is] sufficiently clear to accomplish that incorporation." *United States v. Limbaugh*, 2023 WL 119577, at *2 (4th Cir. Jan 6, 2023); *see also Cisson*, 33 F.4th at 194.   This is true even if, as in defendants' case, that reference could be to either the standing order or the Guidelines, so long as the conditions are the same in both.   After all, the goal of *Rogers* is to "inform[] [the defendant] orally that a certain set of conditions will be imposed," which "a later-issued written judgment that details those conditions" can clarify. *Rogers*, 361 F.3d at 299.   When there are no "*different* set[s] of 'standard'

84

conditions that might cause confusion," there is no *Rogers* error.   *Limbaugh*, 2023

WL 119577, at *2.[14]

So it is here.   The court's oral reference at each of defendants' sentencings to

the "standard conditions" it was imposing on their supervised release—whether that

reference was to the District of Maryland's standing order or the Guidelines' "Stand-

ard Conditions" of supervision, U.S.S.G. § 5D1.3(c)—sufficiently incorporated the

set of 13 standard conditions that both of those written lists contain.   That alone was

enough to satisfy the court's *Rogers* obligation.   But it went further in defendants'

case, summarizing each of the 13 standard conditions in a sentence or two, and using

language that provided fair notice of what they entailed.   The written judgments

then clarified these pronouncements on top of the court's already faithful oral

---

[14]     *United States v. Bullis*, 122 F.4th 107 (4th Cir. 2024), is not to the contrary.
In *Bullis*, this Court found "ambiguous" the sentencing court's general reference to
"standard conditions in this district," *id.* at 119, because the Eastern District of North
Carolina's standing order specifically mandates that "any reference in the pro-
nouncement of a sentence to the 'Standard Conditions of Supervision as adopted in
the Eastern District of North Carolina' shall be deemed to refer to and incorporate":
(1) ten "Mandatory Conditions of Probation," (2) seven "Mandatory Conditions of
Supervised Release," and (3) thirteen "Standard Conditions of Supervision."
Standing Order, *In re Mandatory & Standard Conditions of Probation & Supervised
Release*, No. 21-SO-5 (E.D.N.C. May 6, 2021).   Accordingly, a reference to "stand-
ard conditions" was inadequate in that case, since in the Eastern District of North
Carolina, that reference could have meant either the Guidelines' thirteen standard
conditions, or the standing order's thirty different mandatory and standard condi-
tions of probation and supervision.   *Bullis*, 122 F.4th at 119.

accountings.   None of this amounts to a *Rogers* error.   *See Cisson*, 33 F.4th at 194; *Limbaugh*, 2023 WL 119577, at *2; *United States v. Carr*, 2022 WL 5434313, at *1 (4th Cir. Oct. 7, 2022) (per curiam).   And indeed, this Court already so concluded in affirming a case out of this District, involving a similar *Rogers* claim, the same standing order, and a far less fulsome oral pronouncement than the district court's here.   *Compare* Response Brief, *United States v. Ragan-Armstrong*, 2023 WL 1817470, at *19, *47-56 (4th Cir. Feb. 2, 2023), *with Ragan-Armstrong*, 2023 WL 3018422, at *1-2 (4th Cir. Apr. 20, 2023) (per curiam).

Defendants do not grapple with any of this, nor do their cited cases.   Br. 99-100.   Instead, they focus only on trying to prove that the two written conditions at issue "differed materially" from those announced at sentencing.   Br. 97.   That argument misses the point, but even on its own terms, it fails.   The additional written language is not inconsistent with the court's oral pronouncements.   It instead merely spells out the standard conditions orally incorporated at sentencing.   *See United States v. Mathis*, 103 F.4th 193, 199 (4th Cir. 2024).   Defendants, in short, have not identified reversible error, and their sentences must be upheld.

## CONCLUSION

For the reasons stated, this Court should affirm defendants' convictions and sentences.

> Kelly O. Hayes
> United States Attorney
>
> David C. Bornstein
> Assistant United States Attorney
> Chief, Appellate Division
>
> /s/ M.J. Kirsch Muñoz
> Assistant United States Attorney
> United States Attorney's Office
> 6406 Ivy Lane, 8th Floor
> Greenbelt, Maryland 20770
> (410) 736-8276

May 21, 2025

## STATEMENT REGARDING ORAL ARGUMENT

The Government respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 19,990 words, excluding the parts of the document exempted by Fed. R. App. 32(f).

This brief also complies with the typeface and type-style requirements in Fed. R. P. 23(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 21, 2025, I electronically filed the forego-
ing with the Clerk of Court using the CM/ECF System, which will send notice of the
filing to defendants' counsel of record, who are all ECF filers.


/s/ M.J. Kirsch Muñoz
Assistant United States Attorney